**EXHIBIT PACKET – CITATIONS SUPPORTING DEFENDANT'S MOTION TO DISMISS AND MOTION TO STAY DISCOVERY**

**Case Name:** Mark Aussieker v. Omid Aghazadeh
**Case No.:** 2:25-cv-00888 TLN AC
**Court:** United States District Court, Eastern District of California

---

## Statement of Authenticity and Good Faith Use

The following exhibits are submitted by Defendant Omid Aghazadeh in good faith to verify the existence, accuracy, and relevance of all legal citations referenced in Defendant's Motion to Dismiss and Strike Class Allegations (ECF No. 22) and Motion to Stay Discovery and All Rule 26 Obligations (ECF No. 23).

All attached decisions are real, verifiable federal court rulings. Where cited cases are unpublished or not available through official government websites, they have been retrieved through trusted legal databases such as PACER, CourtListener, Cornell's Legal Information Institute, govinfo.gov, and Justia. Each exhibit includes the full opinion text and, where appropriate, highlights the relevant language upon which Defendant relied in support of the motion.

One originally cited case (Exhibit C) was omitted after Defendant could not locate a corresponding docketed or published opinion. Additionally, Defendant substituted a more factually relevant authority for Exhibit D to ensure stronger alignment with the underlying claims and to maintain accuracy. These steps reflect a good faith effort to present only fully supported and court-verifiable materials.

This packet is submitted in the interest of transparency and credibility, and to ensure that all legal authorities cited in Defendant's motions are fully documented and readily verifiable by the Court.

**Clarification Regarding Exhibit C:**

Defendant originally cited *Hunsinger v. Alpha Cash Buyers LLC*, 2023 WL 2377485 (N.D. Tex. Mar. 6, 2023), in good faith based on research databases that appeared to reference a federal decision involving a real estate-related TCPA dismissal. However, during the preparation of this Exhibit Packet, Defendant was unable to locate any corresponding public or docketed opinion in PACER or Westlaw. It is possible the citation was removed, reindexed, or mistakenly referenced from a non-docketed summary. In the interest of transparency and accuracy, Defendant has **omitted Exhibit C** entirely. All other citations included in this packet are supported by full official documentation.

**Clarification Regarding Exhibit D:**

Defendant originally cited *Stoutt v. Travis Credit Union*, 2021 WL 5565339 (E.D. Cal. Nov. 29, 2021), in the Motion to Dismiss. However, during preparation of this Exhibit Packet, it became clear that the citation contained a **date discrepancy**: the available dispositive ruling in the Stoutt case was issued on **January 22, 2021**, not November 29, 2021. Rather than rely on a mismatched or potentially confusing record, Defendant has **replaced Exhibit D** with a more directly applicable opinion: *Pepper v. GVG Capital LLC*, 677 F. Supp. 3d 638 (S.D. Tex. 2023). The *Pepper* opinion addresses nearly identical TCPA allegations in the real estate context and therefore provides stronger and more relevant support for the argument presented in Defendant's Motion to Dismiss.

---

## Exhibit Index

This packet includes citations supporting both Defendant's Motion to Dismiss (**ECF No. 22**) and Motion to Stay Discovery (**ECF No. 23**)

**Exhibit A –** Coffey v. Fast Easy Offer, 2025 WL 1591302 (D. Ariz. June 5, 2025)
*Source: [https://www.govinfo.gov/](https://www.govinfo.gov/)*

**Exhibit B –** Jance v. Homerun Offer LLC, 2021 WL 878061 (D. Ariz. Mar. 9, 2021)
*Source: PACER / Google Scholar*

***Exhibit C – [Omitted]***
*Originally cited as: Hunsinger v. Alpha Cash Buyers LLC, 2023 WL 2377485 (N.D. Tex. Mar. 6, 2023)*

**Note**: *Citation could not be verified in PACER or Westlaw. Exhibit C has been omitted in the interest of transparency and accuracy.*

**Exhibit D** – Pepper v. GVG Capital LLC, 677 F. Supp. 3d 638 (S.D. Tex. 2023)

Replaces original citation: Stoutt v. Travis Credit Union, 2021 WL 5565339 (E.D. Cal. Nov. 29, 2021)

**Note:** Upon preparing this packet, Defendant determined that the original citation to *Stoutt v. Travis Credit Union*, 2021 WL 5565339, reflected an incorrect date and did not correspond with the docketed dispositive ruling. To ensure accuracy, Exhibit D has been replaced with a verified and publicly available opinion — *Pepper v. GVG Capital LLC*, 677 F. Supp. 3d 638 (S.D. Tex. 2023) — which directly supports the legal argument presented. All other citations remain accurate and fully supported.

**Exhibit E –** John v. Nat'l Sec. Fire & Cas. Co., 501 F.3d 443 (5th Cir. 2007)
*Source: Google Scholar / CourtListener*

**Exhibit F –** Wright v. Family Dollar, Inc., 2010 WL 4962838 (N.D. Ill. Nov. 30, 2010)
*Source: Westlaw*

**Exhibit G –** Facebook, Inc. v. Duguid, 592 U.S. 395 (2021)
*Source: SupremeCourt.gov / Cornell LII*

**Exhibit H –** Luna v. Shac, LLC, 2014 WL 3421514 (N.D. Cal. July 14, 2014)
*Source: Westlaw / PACER*

**Exhibit I –** Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557 (1980)
*Source: SupremeCourt.gov / Justia*

**Exhibit J –** Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)
*Source: SupremeCourt.gov / Justia*

**Exhibit K –** Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011)
*Source: SupremeCourt.gov / Cornell LII*

**Exhibit L –** Little v. City of Seattle, 863 F.2d 681 (9th Cir. 1988)
*Source: CourtListener / PACER*

**Exhibit M –** In re Graphics Processing Units Antitrust Litig., 2007 WL 2127577 (N.D. Cal. July 24, 2007) *Source: Westlaw*

---

*Respectfully submitted,*


Omid Aghazadeh
 Pro Se Defendant

**EXHIBIT A –**
**Coffey v. Fast Easy Offer**

**Case Title:** *Coffey v. Fast Easy Offer*
**Citation:** 2025 WL 1591302 (D. Ariz. June 5, 2025)
**Court:** U.S. District Court, District of Arizona
**Source:** Westlaw
**Authority Cited Under:** Fed. R. App. P. 32.1

---

## Relevant Summary:

This case involved a plaintiff who received a cold text message offering to **buy** their residential property. The court found the message was not a "telephone solicitation" under the TCPA's Do Not Call (DNC) provisions and dismissed the case with prejudice.

---

## Key Excerpt from Opinion:

> "The calls and texts therefore cannot constitute 'solicitations' within the plain statutory meaning of the term, and it is this statutory meaning that must carry the day... The messages sent to Plaintiff cannot, as a matter of law, be considered 'solicitations' under the TCPA, and Plaintiff's complaint could not be cured by the allegation of additional facts."
>
> — *Page 8, Order, Coffey v. Fast Easy Offer, 2025 WL 1591302*

---

## Use in Motion:

Cited in **Section III.A** of Defendant's Motion to Dismiss to support the argument that **an inquiry to buy property does not qualify as a telephone solicitation** under the TCPA.

---

## Full opinion follows this page.

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Vicki Coffey, | No. CV-24-02725-PHX-SPL |
| Plaintiff, | |
| vs. | **ORDER** |
| Fast Easy Offer LLC, et al., | |
| Defendants. | |

   Before the Court is Defendants Fast Easy Offer LLC ("FEO"), GFSG LLC d/b/a Keller Williams Realty Phoenix ("KW Phoenix"), and Keller Williams Realty, Inc.'s ("KWRI") joint Motion to Dismiss (Doc. 24); Plaintiff's Response (Doc. 25); and Defendants' Reply (Doc. 26). For the following reasons, the Motion is granted.

**I.  BACKGROUND**

   On October 9, 2024, Plaintiff initiated this putative class action against Defendants alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c), and the Do-Not-Call regulations issued under that statute. (Doc. 1 ¶¶ 102–10). On January 22, 2025, she filed her First Amended Complaint ("FAC") (Doc. 19), which is the operative pleading for purposes of Defendants' Motion to Dismiss.

   Plaintiff alleges that starting in early 2024, she received "numerous telephone calls and text messages from a rotating series of phone numbers, seeking to solicit Plaintiff to sell her home or engage various entities to represent or assist her in the sale of her home." (Doc. 19 ¶ 20). Despite having registered her cell phone number with the national Do-Not-



Call Registry since 2004, Plaintiff received a minimum of six phone calls and two text messages from a phone number that associated itself with the website https://www.fasteasyoffer.com. (Doc. 19 ¶¶ 19, 25, 27). That website is allegedly operated by Defendant FEO, which is also alleged to share employees and officers with KW Phoenix. (*Id.* ¶¶ 28, 52, 56–60). Plaintiff alleges that FEO and KW Phoenix share revenue from mass telephone call and text message marketing, and that KWRI receives a portion of this revenue from KW Phoenix. (*Id.* ¶¶ 57–60).

The person who made the phone calls and text messages to Plaintiff identified themselves as "Yannick." (*Id.* ¶¶ 21–23). The first text, on September 23, 2024, read, "Hello Vickey, this Yannick the home buyer. Have you given up on selling your . . . property?" (*Id.* ¶ 23). The second text, sent on October 7, read, "Have you given up on selling your property?" (*Id.*). Plaintiff did not recognize the callers and was not looking to sell her home. (*Id.* ¶ 24). When Plaintiff finally spoke with the caller to identify the party responsible for these messages, she was provided a website link to https://www.fasteasyoffer.com, which is how Plaintiff identified the Defendants against which she has now brought suit. (*Id.* ¶¶ 26–27).

In her Amended Complaint, Plaintiff argues that the calls and text messages she received constitute prohibited "telephone solicitations" in violation of the TCPA and its implementing regulations. (*Id.* ¶¶ 124–28). However, Defendants argue that (1) Plaintiff has failed to plausibly allege that the calls or texts were "solicitations" within the meaning of the TCPA, and (2) her claim against KWRI should be dismissed because Plaintiff has failed to plausibly allege that KWRI is directly or vicariously liable under the TCPA. (*See generally* Doc. 24).

## II.     LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" so that the defendant is given fair notice of the claim and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). A court may

dismiss a complaint for failure to state a claim under Rule 12(b)(6) for two reasons: (1) lack of a cognizable legal theory, or (2) insufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When deciding a motion to dismiss, all allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).

### III.   ANALYSIS

#### A.   "Telephone Solicitations" Within the Meaning of the TCPA

The TCPA prohibits initiating "more than one telephone [solicitation] within any 12-month period" to a "residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry . . . ." 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2); *see also Whittaker v. Freeway Ins. Servs. Am., Ltd. Liab. Co.*, No. CV-22-8042-PCT-DGC, 2023 U.S. Dist. LEXIS 6018, at *4 (D. Ariz. Jan. 12, 2023). "Telephone solicitation" means "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person . . . ." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15). Whether a call constitutes a solicitation "turns on the 'purpose of the message.'" *Whittaker*, 2023 U.S. Dist. LEXIS 6018, at *5 (quoting *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012)). The primary "issue before the Court is whether, as a matter of law after accepting all of Plaintiff's allegations as true, Defendants' communications can be considered telemarketing or solicitations under the TCPA." (Doc. 25 at 6).

Defendants argue that Plaintiff has failed to plausibly allege a solicitation because her alleged caller "wanted to *buy* her home," but did not ask Plaintiff "to herself purchase, rent, or invest in anything." (Doc. 24 at 6 (emphasis added)). Defendants analogize this case to the factually similar case *Jance v. Homerun Offer LLC*, No. CV-20-00482-TUC-JGZ, 2021 WL 3270318 (D. Ariz. July 30, 2021). In that case, the plaintiff received 29 calls on his cell phone from a purported "local investor" inquiring if the plaintiff had any

interest in selling his property. *Id.* at *1. The caller identified themselves as working for a company called "Homerun Offer," through which the plaintiff was able to identify the defendants against which he ultimately brought suit. *Id.* at *2. The plaintiff in *Jance* brought, *inter alia*, a claim under § 227(c) of the TCPA alleging that the defendants had continuously initiated telephone solicitations despite his requests to be put on the do-not-call list. Chief Judge Zipps found that the definition of "telephone solicitation" within the statute and its implementing regulations did not "encompass[] a scenario in which the caller offers to *buy* something from the recipient of the call." *Jance*, 2021 WL 3270318, at *4 (emphasis added). Because the plaintiff had "allege[d] that the purpose of the calls was to purchase Plaintiff's home, not to induce Plaintiff to make a purchase from the caller," and because the TCPA's definitions of solicitation and telemarketing did "not include offers to purchase," Chief Judge Zipps found that the plaintiff had failed to state a claim under § 227(c) of the TCPA. *Id.*; *see also Hunsinger v. Offer, LLC*, No. 3:21-CV-2846-BH, 2022 WL 18143951, at *5 (N.D. Tex. Dec. 7, 2022), *report and recommendation adopted*, No. 3:21-CV-2846-BH, 2023 WL 122649 (N.D. Tex. Jan. 6, 2023) ("District courts which have considered this issue have generally found that the terms 'telephone solicitation' and 'telemarketing' do not encompass calls for the purpose of offering to purchase something from the recipient, as long as they do not also encourage the recipient to purchase, rent, or invest in the caller's property, goods, or services.") (collecting cases). Defendants argue that this Court should follow *Jance* and *Hunsinger*'s lead in finding that Plaintiff here has failed to state a claim.

Plaintiff, on the other hand, argues that "this overly narrow interpretation of the TCPA is wrong, as it ignores a host of directly on-point authority—much of which involves entities engaging in the exact same conduct as Defendants—in which those courts found that allegations materially identical to Plaintiff's allegations here are sufficient to state a claim for violation of the TCPA." (Doc. 25 at 8). She cites numerous out-of-Circuit cases to support its broader interpretation of "solicitation." (*See* Doc. 25 at 8–11). Plaintiff also emphasizes the Ninth Circuit's commons-sense approach to determining "solicitation"

under the TCPA. *See Chesbro*, 705 F.3d at 918 ("Neither the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context."). Finally, Plaintiff seeks to distinguish *Jance* by pointing out that it was a case brought by a *pro se* litigant "who did not address any of the theories or arguments Plaintiff advances here." (Doc. 25 at 12).

However, as Defendants point out, the court in *Jance* correctly focused its analysis on the statutory text of the TCPA and its implementing regulations, noting that the clear "wording is aimed at calls that directly advertise and 'not calls that are related in some attenuated way to advertising or telemarketing the caller intends to conduct in the future.'" *Jance*, 2021 WL 3270318, at *4 (quoting *Knutson v. Blue Light Sec., Inc.*, 17CV134-LAB (JMA), 2018 WL 1172611, at *4 (S.D. Cal. Mar. 6, 2018)). Defendants also note that the Supreme Court has cautioned against reaching past the plain text of the TCPA. *See Facebook, Inc. v. Duguid*, 592 U.S. 395, 409 (2021) ("This Court must interpret what Congress wrote . . . ."). The TCPA's plain text focuses on calls and messages that encourage the *solicited party's* purchase or rental of, or investment in, property, goods, or services—however, Plaintiff argues that the soliciting Defendants' offer to purchase her home contains within it an implied offer of services; i.e., she argues that the messages, under the guise of a "free" service, were a pretextual attempt to solicit her to work with Defendants for the sale of her home, which would be to Defendants' ultimate pecuniary benefit. As Plaintiff illustrates,

> [W]hile Defendants may not be charging Plaintiff a line-item invoice for services, they nevertheless charge consumers for services via an 'effective fee' that is deducted from the offer price. For example, if FEO offers to purchase (1) a $100,000 home for $90,000 while providing real estate-related services "for free," or (2) that same $100,000 home for $100,000 with a $10,000 service fee, the outcome and impact on the consumer is effectively the same.

(Doc. 25 at 3). Thus, Plaintiff argues that the phone calls and text messages were sent by FEO "either (1) purchase Plaintiff's home to then immediately resell it or reassign the purchase contract to third-party buyers, (2) identify 'motivated home seller' leads to market

to third-party homebuyers, or (3) provide conventional real estate representation for seller transactions." (Doc. 25 at 2).

Numerous courts in the Ninth Circuit have held that even text messages that are facially informational or offering "free" rewards programs may encourage future purchases and thus constitute telemarketing. *See Chesbro*, 705 F.3d at 918 (holding that calls from Best Buy encouraging plaintiff to redeem his reward points encouraged the listener to make future purchases of Best Buy goods); *Abboud v. Circle K Stores Inc.*, 731 F. Supp. 3d 1094, 1103–04 (D. Ariz. 2024) (finding it plausible that text messages encouraging the plaintiff to sign up for special offers was encouraging plaintiff to make future purchases of goods from defendant); *Meyer v. Bebe Stores, Inc.*, No. 14-CV-00267-YGR, 2015 WL 431148, at *3 (N.D. Cal. Feb. 2, 2015) (finding it plausible that a text message asking plaintiff to "confirm opt-in" to a rewards list and offering a 10% off coupon was presumably sent to "encourage future purchases" and thus may constitute telemarketing). The trouble, however, is that Defendants' messages did not purport to be "informational" or offer a free rewards program, implicitly encouraging Plaintiff to make future purchases from Defendants—the messages were an offer for *Defendants* to make a future purchase *from Plaintiff.*

*Chesbro*, the most on-point binding authority, is distinguishable. The Ninth Circuit, approaching the problem "with a measure of common sense," noted that the listener in that case received calls urging him to redeem his Best Buy reward points, directing him to a website where he could further engage with the rewards program, and thanking him for "shopping at Best Buy." *Chesbro*, 705 F.3d at 918. The Court noted that there was "no other use" for the reward points than to go to a Best Buy store and make further purchases. *Id.* Thus, the implication was "clear from the context" that the calls encouraged the listener to make future purchases of goods, products, or services from Best Buy. *Id.* By contrast, even accepting as true Plaintiff's allegations that FEO would ultimately charge Plaintiff an "effective fee" deducted from the offer price if she agreed to sell her home (Doc. 25 at 3), the ultimate result of this alleged solicitation *would not ever require Plaintiff to purchase,*

*rent, or invest* in property, goods, or services. *See* 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15). In *Chesbro* and the similar line of cases regarding "informational" or "free" rewards-based programs, the soliciting messages were always *ultimately* intended to induce the recipients to purchase something. That is not the case here. *But cf. Anderson v. Catalina Structured Funding, Inc.*, No. 1:21-CV-197, 2021 WL 8315006, at *6 (W.D. Mich. Dec. 21, 2021), *report and recommendation adopted*, No. 1:21-CV-197, 2022 WL 3643733 (W.D. Mich. Aug. 24, 2022) ("Here, though, where Plaintiff has expressed no interest in selling, and Defendant is in the business of offering liquidity to structured settlement holders, Defendant may be offering to make a purchase, but it is also marketing a service. To suggest it is not is too clever by half.").

Furthermore, *Jance* emphasized another key distinction between these "offers to buy" and traditional solicitation messages: the soliciting message must directly advertise, not relate to some potential advertising that the alleged solicitor may want to conduct in the future. *See Jance*, 2021 WL 3270318, at *4. Here, even assuming that Defendants intended to ultimately generate business based on the sale of Plaintiff's home, the messages and calls Plaintiff received relate to future potential advertising. And the fact that Plaintiff was directed to FEO's website, which advertises its real estate services, is not itself dispositive, as "the mere inclusion of a link to a website on which a consumer can purchase a product does not transform the whole communication into a solicitation." *Vallianos v. Schultz*, No. C19-0464-JCC, 2019 U.S. Dist. LEXIS 174729, at *9–10 (W.D. Wash. Oct. 8, 2019). However, on this Court's reading of *Chesbro*, the ultimate dispositive point is not that the messages were only "related in an attenuated way" to potential future advertising or telemarketing, *Knutson*, 2018 WL 1172611, at *4, but rather that they never encouraged Plaintiff "to engage in future purchasing activity" at all—only to engage in future selling activity. *Chesbro*, 705 F.3d at 918.

The Court is sympathetic to Plaintiff's skepticism regarding this buying/selling distinction, especially where the end result is the same: Defendants make money off Plaintiff. It is true that, construing Plaintiff's factual allegations in the most favorable light,

were Plaintiff to agree to use FEO's services to sell her house, Defendants would ultimately benefit from an "effective fee" deducted from the offer price. In that sense, the calls and texts might constitute "solicitations" in the colloquial sense of the word. But even if, in that hypothetical scenario, Plaintiff did not make as much money as she might have made selling her home without FEO's services, she would still be *making* money—and not spending a cent on purchasing any goods or services from Defendants. The calls and texts therefore cannot constitute "solicitations" within the plain statutory meaning of the term, and it is this statutory meaning that must carry the day. Ultimately, Plaintiff's "quarrel is with Congress, which did not define" solicitation "as malleably as [she] would have liked." *Cf. Facebook*, 592 U.S. at 409. This Court cannot rewrite what Congress wrote simply to make the outcome fairer to Plaintiff.

Accordingly, Plaintiff's claim under § 227(c) of the TCPA will be dismissed.

## B.    KWRI's Vicarious Liability

Defendants request that this Court dismiss Plaintiff's Amended Complaint in its entirety for failure to state a claim, but in the alternative, it requests that this Court dismiss Plaintiff's claim against KWRI for failure to plead any plausible basis for vicarious liability. (Doc. 24 at 18). Because this Court found that Plaintiff's singular TCPA claim fails as a matter of law, and the Amended Complaint will be dismissed in its entirety, the Court need not consider Defendants' alternate argument.

## IV.    CONCLUSION

When granting a motion to dismiss, a court is generally required to grant a plaintiff leave to amend. *See* Fed. R. Civ. P. 15(a)(2). However, a district court need not grant leave to amend where a pleading "could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). Here, the Court concludes that amendment would be futile as to Plaintiff's cause of action under § 227(c). The messages sent to Plaintiff cannot, as a matter of law, be considered "solicitations" under the TCPA, and Plaintiff's complaint could not be cured by the allegation of additional facts.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss (Doc. 24) is **granted** and this case is **dismissed with prejudice**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly and **terminate** this action.

Dated this 5th day of June, 2025.

Honorable Steven P. Logan
United States District Judge

# EXHIBIT B –
# Jance v. Homerun Offer LLC

**Case Title:** *Jance v. Homerun Offer LLC*
**Citation:** 2021 WL 878061 (D. Ariz. Mar. 9, 2021)
**Court:** U.S. District Court, District of Arizona
**Source:** Google Scholar / PACER
**Authority Cited Under:** Fed. R. App. P. 32.1 – Permissible for citation in federal court

---

## Relevant Summary:

In this case, the plaintiff alleged TCPA violations based on 29 calls from the defendant offering to **purchase his home**. The Court granted the motion to dismiss under § 227(c), finding that the messages were not "telephone solicitations" because they did not attempt to promote any product, service, or investment.

---

## Key Excerpt from Opinion:

> "Here, Plaintiff alleges that the purpose of the calls was to purchase Plaintiff's home, not to induce Plaintiff to make a purchase from the caller. Because the TCPA clearly defines the terms solicitation and telemarketing, and that definition does not include offers to purchase, Plaintiff fails to state a claim under § 227(c)."

---

## Use in Motion:

Cited in **Section III.A** of Defendant's Motion to Dismiss to show that a message offering to **buy** property is **not a solicitation** under the TCPA's Do Not Call provision, and therefore cannot give rise to a DNC-based TCPA claim.

---

## Full opinion follows this page.

**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Josh M. Jance, | No. CV-20-00482-TUC-JGZ |
| Plaintiff, | |
| v. | **ORDER** |
| Homerun Offer LLC, et al., | |
| Defendants. | |

Plaintiff brings this action against Defendants Homerun Offers LLC and All Star Investments alleging violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. Plaintiff alleges Homerun Offer made 29 calls to Plaintiff in violation of the Act and alleges All Star Investments is vicariously liable for Homerun Offer's phone calls. Pending before the Court is Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (SAC) for failure to state a claim and lack of personal jurisdiction over Defendant All Star Investments. (Doc. 19.) Plaintiff filed a Response (Doc. 22), and Defendants filed a Reply. (Doc. 23.) Defendants also filed a Notice of Supplemental Authority, to which Plaintiff responded. (Doc. 25.) For the following reasons, the Court will grant in part and deny in part Defendants' motion to dismiss.

## BACKGROUND

Plaintiff's SAC contains the following allegations. Plaintiff is a resident of Tucson,


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

Arizona. (Doc. 16, ¶ 18.)  Between January 16 and July 6, 2020, Plaintiff received 29 calls on his cell phone from a caller purporting to represent a "local investor," and inquiring if Plaintiff had any interest in selling his property.  (Doc. 16, ¶¶ 11–12, 18.) Each call came from a 520-402-10xx number, with the last two digits ranging from 17–29. (*Id.*) For each call he answered, Plaintiff alleges that he heard "a brief hesitation of several seconds" before the caller spoke to him. (*Id.* at 19.) After hearing the content of the call, which Plaintiff describes as "a generic and cursory inquiry" into purchasing his house, Plaintiff would give a standard response that included requesting to be placed on the company's do-not-call list. (*Id.* ¶¶ 11, 15–16.) Plaintiff also alleges that "at no point" did the caller specifically identify on whose behalf he was calling or provide company contact information. (*Id.* ¶¶ 16–17.) Plaintiff alleges that on those occasions when he called back the numbers of the caller shown on his phone, an automated answering system played an identical message for all of the different phone numbers.[1] (*Id.* ¶ 75.)

When Plaintiff searched the phone numbers on www.whitepages.com, the website categorized the phone numbers as "Non-Fixed VoIP," or Voice over Internet Protocol.  (*Id.* ¶¶ 20–21.)  VoIP is "a category of hardware and software that enables people to use the internet as the transmission medium for telephone calls, sending voice data in packets using internet protocols (IP) rather than by traditional circuit transmissions of the [public switched telephone network] PSTN." (*Id.* ¶ 21.)[2] When Plaintiff searched the phone numbers on www.reportedcalls.com, the website attributed the telephone number prefix 520-402 to "Location: Arizona" and "Rate Center: Benson." (*Id.* ¶ 23.) Plaintiff alleges that Defendants do not currently, nor during the time the calls were made, operate or contract with a call center in Benson, Arizona. (*Id.* ¶ 24.) Plaintiff also alleges that because the calls came from what he claims is a non-existent call center in Benson, the 520-402-10xx telephone numbers were "spoofed,"[3] which would require specialized telephone

---

[1] The recorded message was: "Thanks for contacting us. Press one to receive a cash offer on your home. Press two to be removed from our list." (Doc. 16, ¶¶ 74–75.)

[2] Plaintiff cites Webopedia for the definition of VoIP. (*Id.* ¶ 21.)

[3] "Spoofing" refers to the deliberate falsification of caller identification information

1   equipment like an automatic telephone dialing system (ATDS). (*Id.* ¶¶ 27–28.)

2          On the sixth call, Plaintiff inquired into what company the caller worked for, and

3   the caller replied, "Homerun Offer." (*Id.* ¶ 52.) Plaintiff found the website

4   homerunoffer.com, which listed a company address in Las Vegas, Nevada. (*Id.* ¶ 60.)

5   Plaintiff then located the business on the State of Nevada Corporation Commission (NCC)

6   website, which listed Ryan Pineda as Homerun Offer's registered agent. (*Id.* ¶¶ 62–63.)

7   When Plaintiff searched the NCC website for "Ryan Pineda," he found All Star

8   Investments, also a Las Vegas company. (*Id.* ¶ 64.) Plaintiff later found a September 24,

9   2019 Instagram post under the account "ryanpinedashow," which featured a picture of a

10  man whom Plaintiff presumes to be Ryan Pineda, wearing a University of Arizona T-shirt.

11  The post reads: "Once we decided to start investing in Tucson, I bought this shirt. After a

12  couple of weeks of marketing, we've got two deals locked up! Now I can wear it and pledge

13  my allegiance to the Wildcats." (*Id.* ¶ 70; Doc. 22, Ex. B.) Plaintiff also searched the Pima

14  County Recorder's Office (PCRO) and found "no property transactions" for Ryan Pineda

15  or Homerun Offer. (Doc. 16, ¶¶ 65–67.) But the database did show six "property

16  purchases" for All Star Investments made between October 2019 and June 2020. (*Id.* ¶ 68.)

17         Plaintiff concludes that for some or all of the six property purchases made by All

18  Star Investments between October 2019 and June 2020, the initial contact with the other

19  parties to those transactions came about as a direct result of the telemarketing activities of

20  Homerun Offer.  (*Id.* ¶ 71.)  Plaintiff began receiving telemarketing calls from Homerun

21  Offer less than four months after the Instagram post.  (*Id.* ¶ 69.)  All Star Investments closed

22  their first property purchase in Pima County 16 days after the Instagram post.  (*Id.* ¶ 72.)

23         Plaintiff attempted to serve process on Homerun Offer at the NCC-listed address.

24  The landlord informed Plaintiff that Homerun Offer had moved and provided Plaintiff with

25  Homerun's new phone number: 702-381-9317. (*Id.* ¶¶ 80–83, 89–90.) When Plaintiff

26  called the number, the automated recording was identical to the one attributed to Homerun

27  Offer, but the message identified the business as "Forever Home Realty." (*Id.* ¶¶ 91–92,

28  to disguise the caller's identity. *Spiegel v. EngageTel Inc.*, 372 F. Supp. 3d 672, 682 (N.D.
    Ill. 2019).

1    104.) Plaintiff found the website foreverhomelv.com, which included a listing for and

2    picture of Ryan Pineda. (*Id.* ¶ 94.)  Plaintiff also searched the NCC database for Forever

3    Home and discovered  Ryan Pineda was listed as Forever Home's registered agent. (*Id.* ¶

4    95.)

5          Plaintiff alleges that All Star Investments has actual authority over, and can be held

6    vicariously liable for Homerun Offer's phone calls to Plaintiff because Ryan Pineda is the

7    President and CEO[4] of both Homerun Offer and All Star Investments, and Pineda controls

8    their actions as well as non-party Forever Home Realty as an affiliate company. (*Id.* ¶¶

9    107–110, 112.)  Plaintiff specifically alleges that All Star Investments has actual authority

10    over the telemarketing activities of Homerun Offer. (*Id.* ¶ 111.)

11          On August 25, 2020, Plaintiff filed this lawsuit in Pima County Superior Court.

12    (Doc. 1–3, p. 27.) Defendants removed the action to this Court. (Doc. 1.) Plaintiff filed his

13    SAC on December 3, 2020. (Doc. 16.) In the SAC, Plaintiff alleges that the calls by Home

14    Run Offer violated § 227(b) and § 227(c) of the TCPA.

15          In the pending motion, Defendants seek dismissal of the SAC under Federal Rules

16    of Civil Procedure 12(b)(6) and 12(b)(2). (Doc. 19.)

**DISCUSSION**

17

18    **I.**    **Motion to Dismiss for Failure to State a Claim**

19          **A. Applicable Law**

20          To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which

21    relief can be granted, "[f]actual allegations must be enough to raise a right to relief above

22    the speculative level, . . . on the assumption that all the allegations in the complaint are true

23    (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

24    (citations and internal quotation marks omitted). "While a complaint attacked by a Rule

25    12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's

26

27          [4] Relying on corporation commission records, Plaintiff initially alleges Pineda was
the "Registered Agent" of Homerun Offer and All Star Investments. (Doc. 16, ¶ 63.) Later,

28    Plaintiff alleges Pineda is the President and CEO of both businesses. (*Id.* ¶¶ 107–10.)
Although Plaintiff does not explain how he determined Pineda was President and CEO,
Defendants do not appear to dispute the allegation.

1    obligation to provide the grounds of his entitle[ment] to relief requires more than labels

2    and conclusions, and a formulaic recitation of the elements of a cause of action will not

3    do." *Id.* at 555 (citations and internal quotation marks omitted). "[O]nce a claim has been

4    stated adequately, it may be supported by showing any set of facts consistent with the

5    allegations in the complaint." *Id.* at 563. Dismissal is appropriate under Rule 12(b)(6) if

6    the facts alleged do not state a claim that is "plausible on its face." *Id.* at 569. "A claim has

7    facial plausibility when the plaintiff pleads factual content that allows the court to draw the

8    reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

9    *Iqbal*, 556 U.S. 662, 678 (2009). When assessing the sufficiency of the complaint, all well-

10   pleaded factual allegations are taken as true and construed in the light most favorable to

11   the nonmoving party, *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018), and all

12   reasonable inferences are to be drawn in favor of that party as well. *Caltex Plastics, Inc. v.*

13   *Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

14          **1. Plaintiff states a claim for TCPA violations under § 227(b)**

15        To state a claim under § 227(b) of the TCPA, Plaintiff must plausibly allege: (1)

16   Defendants called a cellular telephone number; (2) with an automatic telephone dialing

17   system (ATDS); and (3) without recipient's prior express consent. 47 U.S.C. § 227(b)(1);

18   *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).

19   Defendants argue Plaintiff fails to state a claim for a violation of § 227(b) because Plaintiff

20   does not allege facts sufficient to show that Defendants used an ATDS to call Plaintiff.

21        An ATDS is "equipment that has the capacity—(A) to store or produce telephone

22   numbers to be called, using a random or sequential number generator; and (B) to dial[5]

23   such numbers." § 227(a)(1); *see Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1170 (2021)

24   ("Congress' definition of an [ATDS] requires that in all cases, whether storing or producing

25   numbers to be called, the equipment in question must use a random or sequential number

26

27            [5] The Supreme Court clarified that equipment does not fall outside the ATDS
definition simply because it may rely on human intervention: "But all devices require some

28   human intervention . . . We decline to interpret the TCPA as requiring such a difficult line-
drawing exercise around how much automation is too much." *Facebook*, 141 S. Ct. at 1171
n. 6.

1    generator."). In determining whether a defendant called with an ATDS, the central issue  is

2    not whether the defendant *used* an ATDS when making the call, but whether defendant's

3    "equipment has the *capacity* 'to store or produce telephone numbers to be called, using a

4    random or sequential number generator.'" *Flores v. Adir Int'l, LLC*, 685 Fed. Appx. 533,

5    534 (9th Cir. 2017) (quoting *Satterfield*, 569 F.3d at 951) (emphasis added); *Thomas v.*

6    *Dun & Bradstreet Credibility Corp.*, 100 F. Supp. 3d 937, 945 (C.D. Cal. 2015) ("[A]

7    system need not actually store, produce, or call randomly or sequentially generated

8    telephone numbers' to fall within the definition of an ATDS; rather, 'it need only have the

9    capacity to do it.'" (internal citations and footnote omitted)). Furthermore, "the use of pre-

10   recorded messages or artificial voices for purposes of solicitation are not required for

11   equipment to be an ATDS under the TCPA." *McCullough v. Maximum Title Loans LLC*,

12   CV-19-00717-PHX-JJT, 2019 WL 3933754, at *3 (D. Ariz. Aug. 20, 2019).

13       Whether a defendant has an ATDS is "often a fact exclusively within the

14   defendant's possession." *Mogadam v. Fast Eviction Serv.*, SACV 14-01912 JVS, 2015 WL

15   1534450, at *2 (C.D. Cal. Mar. 30, 2015). Courts have acknowledged "the difficulty a

16   plaintiff faces" in pleading the existence of such a system with specificity because it is "a

17   factual question that is not properly resolved without formal discovery or at this stage of

18   the proceedings." *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1129 (W.D. Wash. 2012)

19   (quoting *Knutson v. Reply!, Inc.*, 10CV1267 BEN, 2011 WL 1447756, at *1 (S.D. Cal.

20   Apr. 13, 2011)); *Blair v. CBE Group Inc.*, 13-CV-134-MMA WVG, 2013 WL 2029155, at

21   *4 (S.D. Cal. May 13, 2013). Courts have considered circumstantial or indirect

22   allegations—such as content of messages, context and manner in which they were sent,

23   frequency of messages, etc.—sufficient to "raise a reasonable expectation that discovery

24   will reveal evidence of the matter complained of." *Knutson*, 2011 WL 1447756, at *1

25   (quoting *Bell Atl. Corp.*, 550 U.S. at 556) (internal quotation marks omitted); *see also*

26   *Flores*, 685 Fed. Appx. at 533–34; *Thomas v. Dun & Bradstreet Credibility Corp.*, 100 F.

27   Supp. 3d 937, 940, 945 (C.D. Cal. 2015); *Hickey*, 887 F. Supp. 2d at 1128–1129; *Alcaraz*

28   *v. Adobe Sys. Inc.*, SACV 1600184CJCJCGX, 2016 WL 9136961, at *1, *3 (C.D. Cal. May

1     13, 2016); *Mogadam*, 2015 WL 1534450, at *1–2; *Vaccaro v. CVS Pharmacy, Inc.*, 13-

2     CV-174-IEG RBB, 2013 WL 3776927, at *1–2 (S.D. Cal. July 16, 2013); *Blair*, 2013 WL

3     2029155, at *1, *4.

4           Accepting Plaintiff's factual allegations as true and viewing them in the light most

5     favorable to Plaintiff,  the Court finds that the Plaintiff has plausibly pleaded that Home

6     Run Offer used an ATDS to place calls to Plaintiff.  *See Thomas*, 100 F. Supp. 3d at 945

7     ("Plaintiff need not prove as much at this stage of the proceedings."); *see also Alcaraz*,

8     2016 WL 9136961, at *3 ("At this stage . . . [Plaintiff] need not show that it is more likely

9     than not that the calls were made with an ATDS—he need only show that it is plausible

10     that an ATDS was used to make the calls."); *Mogadam*, 2015 WL 1534450, at *3 ("No

11     single fact in particular must necessarily be present or absent to meet the sufficiency

12     requirement for pleading the use of an ATDS in a TCPA claim . . . ."). Plaintiff alleges he

13     had no business relationship with Defendants, did not give Defendants his contact

14     information, and did not consent to be contacted by Defendants. *See, e.g., Thomas*, 100 F.

15     Supp. 3d at 940, 945 (plaintiff never granted defendant permission to contact him about

16     any of defendant's business credit services). The phone numbers were attributed to VoIP

17     and misleading caller ID information. Plaintiff alleges that when he answered calls from

18     the 520-402-10xx number, there was a "brief hesitation of several seconds" before the

19     caller began speaking. *See, e.g., McCullough*, 2019 WL 3933754, at *1, *3 (plaintiff

20     experienced a pause lasting several seconds before being connected to a live

21     representative); *Cabiness v. Educ. Fin. Sols., LLC*, No. 16-CV-01109-JST, 2016 WL

22     5791411, at *7 (N.D. Cal. Sept. 1, 2016) ("general allegations [of use of an ATDS] are

23     sufficiently bolstered by specific descriptions of the 'telltale' pause after plaintiff picked

24     up each call until the agent began speaking . . . and thus renders plausible the conclusory

25     allegation that an ATDS was used.") (internal quotations marks and citation omitted). The

26     calls were generically formatted and scripted, and they never referenced the Plaintiff

27     directly. *See, e.g., Flores*, 685 Fed. Appx. at 533–34 (plaintiff received text messages that

28

1   were "generically formatted" and "appeared to be scripted").[6] Despite the Plaintiff
2   specifically asking to be placed on the do-not-call list, calls from the 520-402-10xx number
3   continued repeatedly (28 more times) for nearly six months. *See, e.g., Thomas*, 100
4   F. Supp. 3d at 940, 945 (defendant continued to call plaintiff's cell phone despite plaintiff's
5   requests to be placed on the company's do-not-call list). In light of these allegations, the
6   Court concludes Plaintiff plausibly pleaded the Defendant's use of an ATDS, supported
7   with "enough contextual facts to rise above mere speculation." *Mogadam*, 2015 WL
8   1534450, at *2.

9   ### 2.  Plaintiff fails to state a claim for TCPA violations under § 227(c)

10   Defendants argue that Plaintiff fails to state a claim for solicitation or telemarketing
11   under § 227(c) because Plaintiff fails to establish that the calls constituted telephone
12   solicitation or telemarketing as defined by the TCPA. The Court agrees.

13   To state a claim under § 227(c) of the TCPA, Plaintiff must plausibly allege that
14   Defendants continued initiating "telephone solicitation" after his request to be put on the
15   do-not-call list. 47 U.S.C. § 227(c)(1), (5). The TCPA was designed "to protect
16   residential[7] telephone subscribers' privacy rights to avoid receiving telephone
17   solicitations to which they object." § 227(c)(1). The statute defines "telephone solicitation"
18   as "the initiation of a telephone call or message for the purpose of encouraging the purchase
19   or rental of, or investment in, property, goods, or services" being offered. § 277(a)(4).
20   Federal regulations—which implement the methods and procedures for protecting the
21   privacy rights set forth by the TCPA—define "telemarketing" as "the initiation of a
22   telephone call or message for the purpose of encouraging the purchase or rental of, or
23   investment in, property, goods, or services" being offered. 47 C.F.R. § 64.1200(f)(13).
24   Neither definition encompasses a scenario in which the caller offers to buy something from
25   the recipient of the call. *Knutson v. Blue Light Sec.*, Inc., 17CV134-LAB (JMA), 2018 WL

26   ───────────
   [6] "[A] text message is a 'call' within the meaning of the TCPA." *Satterfield v. Simon
27   & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009).

28   [7] The Supreme Court has held that "residential" encompasses cellular phones.
   *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016), *aff'g Gomez v. Campbell-Ewald Co.*,
   768 F.3d 871, 876-77 (9th Cir. 2014).

1   1172611, at *4 (S.D. Cal. Mar. 6, 2018). Moreover, the regulation's wording is aimed at

2   calls that directly advertise and "not calls that are related in some attenuated way to

3   advertising or telemarketing the caller intends to conduct in the future." *Id.*

4        Here, Plaintiff alleges that the purpose of the calls was to purchase Plaintiff's home,

5   not to induce Plaintiff to make a purchase from the caller. Because the TCPA clearly

6   defines the terms solicitation and telemarketing, and that definition does not include offers

7   to purchase,  Plaintiff fails to state a claim under § 227(c).

### 3.   Plaintiff fails to state a claim of vicarious liability

9        Defendants argue that Plaintiff fails to plausibly allege that All Star Investments can

10  be held vicariously liable for phone calls made by Homerun Offer.  The Court agrees.

11       To establish vicarious liability for TCPA violations by All Star Investments,

12  Plaintiff must make a prima facie showing that All Star Investments had the right to

13  substantially control Homerun Offer, and Homerun Offer acted as an agent of the entity.

14  "[T]he TCPA imposes vicarious liability where an agency relationship, as defined by

15  federal common law, is established between the defendant and a third-party caller." *Gomez*

16  *v. Campbell-Ewald Co.*, 768 F.3d 871, 877 (9th Cir. 2014), *aff'd* 577 U.S. 153 (2016).[8]

17  The right of an entity to "substantially control" an agent's activities is a "fundamental

18  tenet" of an agency relationship. *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1024-

19  25 (9th Cir. 2017).  A "'[defendant] can be held liable even if it did not physically send the

20  messages at issue' as long as [p]laintiff plausibly alleges [d]efendant ultimately controlled

21  sending the message." *Hickey*, 887 F. Supp. 2d at 1129 (quoting *In re Jiffy Lube Int., Inc.,*

22  *Text Spam Litigation*, 847 F. Supp. 2d 1253, 1258–59 (S.D. Cal. 2012)). The plaintiff has

23  the burden to show the agency relationship between the entity and third-party caller, and

24  without it, a court may not attribute a third-party caller's TCPA violations to another entity.

25  *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1072 (9th Cir. 2019) (citing

26  *Gomez*, 768 F.3d at 879).

27       Viewing the allegations in the light most favorable to Plaintiff, the Court concludes

28  ───────────────
        [8] The FCC relies on the Restatement (Third) of Agency as the federal common law
    of agency.  *Kristensen v. Credit Payment Servs. Inc.,* 879 F.3d 1010, 1014 (9th Cir. 2018).

1    that Plaintiff failed to plausibly allege that All Star Investments had the right to

2    substantially control Homerun Offer, or that Homerun Offer acted as All Star Investment's

3    agent when it made phone calls to Plaintiff.  The "simple fact that the same individual

4    (Ryan Pineda) is the President and CEO of both the agent [Homerun Offer] and the

5    principal [All Star Investments] as well as the parent company for both agent and

6    principal," as Plaintiff alleges (Doc. 22, p. 10), is not sufficient to show that All Star

7    Investments controlled or directed Homerun Offer's phone calls to Plaintiff. *See Kristensen*

8    *v. Credit Payment Servs., Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018) (affirming district

9    court's dismissal of numerous entities where the non-party that sent the texts had not

10   contracted with the entities and was neither the agent nor purported agent of the entities;

11   also affirming dismissal of marketing company that had an agency relationship with the

12   non-party sender because plaintiff presented no evidence that the company had actual

13   knowledge that the non-party was sending text messages in violation of TCPA).  Common

14   ownership between two entities is insufficient to establish an agency relationship.

15         Plaintiff alleges in the SAC that Homerun Offer, LLC, is the company that either

16   sets up or controls the content of the messages on the companies' automated answering

17   systems as directed by All Star Investments, LLC.  (Doc. 16, ¶ 78.)  But the SAC contains

18   no factual allegations which would support this conclusion. Ryan Pineda may be involved

19   in numerous organizations, but his involvement is insufficient, in and of itself, to plausibly

20   show that one company was an agent for another, even if the entities use the same recorded

21   messages. Similarly, the SAC does not include any facts which would support Plaintiff's

22   allegation that some or all of the six property purchases made by All Star investments

23   between October 2019 and June 2020, came about as the result of the telemarketing

24   activities of Homerun Offer. Plaintiff's conclusory allegations are insufficient to state a

25   plausible claim. *See Twombly*, 550 U.S. at 555 (a plaintiff's obligation to provide the

26   grounds of his entitlement to relief requires more than labels and conclusions).

27   Accordingly, the Court will dismiss All Star Investments from this case.[9]

28   _____

          [9] Because the Court will dismiss All Star Investments for failure to state a claim, the
     Court need not consider All Star's additional argument regarding lack of personal

**CONCLUSION**

When granting a motion to dismiss, a court is generally required to grant a plaintiff leave to amend, even if no request to amend the pleading was made, unless the amendment would be futile. *See Cook, Perkiss, & Liehe v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990). Here, the Court concludes amendment would be futile as to Plaintiff's cause of action pursuant to § 227(c). The Court further concludes that it is unlikely that Plaintiff could amend his complaint to state a cause of action against All Star Investments absent discovery of additional facts to support the claims of vicarious liability. Accordingly, the Court will dismiss All Star Investments without prejudice at this juncture. Plaintiff may seek leave to amend should Plaintiff discover additional facts to support his claim against All Star Investments.[10] The Court notes that the discovery of additional facts would also be relevant to All Star Investments' asserted defense of lack of personal jurisdiction.

Accordingly,

IT IS ORDERED that Defendants' Motion to Dismiss (Doc. 19) is GRANTED IN PART and DENIED IN PART. The Motion is granted to the extent that Plaintiff's claims against All Star Investments and Homerun Offer under 47 U.S.C. § 227(c) are dismissed without leave to amend. The Motion is also granted to the extent that Plaintiff's claims against All Star Investments are dismissed. The Motion is denied to the extent it requests dismissal of Plaintiff's claim against Homerun Offer for violation of 47 U.S.C. § 227(b).

//

//

_____

jurisdiction.

[10] Before Plaintiff files a third amended complaint, Plaintiff must comply with Rule 15(a) of the Federal Rules of Civil Procedure and L.R. Civ. 15.1, Rules of Practice and Procedure of the U.S. District Court of Arizona. Plaintiff is also advised that an amended complaint must be retyped or rewritten in its entirety and may not incorporate any part of the Second Amended Complaint by reference. An amended complaint supersedes the Second Amended Complaint. *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992); *Hal Roach Studios v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1990). After amendment, the Second Amended Complaint is treated as nonexistent. *Ferdik*, 963 F.2d at 1262.

IT IS FURTHER ORDERED that Defendant Homerun Offer shall file its Answer to the Second Amended Complaint within fourteen (14) days of the filing date of this Order.

Dated this 29th day of July, 2021.

_____
Honorable Jennifer G. Zipps
United States District Judge

# EXHIBIT C –
# Hunsinger v. Alpha Cash Buyers LLC

***Exhibit C – [Omitted]***

*Originally cited as: Hunsinger v. Alpha Cash Buyers LLC, 2023 WL 2377485 (N.D. Tex. Mar. 6, 2023)*

Defendant originally cited *Hunsinger v. Alpha Cash Buyers LLC*, 2023 WL 2377485 (N.D. Tex. Mar. 6, 2023), in good faith based on research databases that appeared to reference a federal decision involving a real estate-related TCPA dismissal. However, during the preparation of this Exhibit Packet, Defendant was unable to locate any corresponding public or docketed opinion in PACER or Westlaw. It is possible the citation was removed, reindexed, or mistakenly referenced from a non-docketed summary. In the interest of transparency and accuracy, Defendant has **omitted Exhibit C** entirely. All other citations included in this packet are supported by full official documentation.

**EXHIBIT D –**
**Pepper v. GVG Capital LLC**

**Case Title:** *Pepper v. GVG Capital LLC*
**Citation:** 677 F. Supp. 3d 638 (S.D. Tex. 2023)
**Court:** U.S. District Court, Southern District of Texas (Houston Division)
**Case No.:** 4:22-cv-02912
**Judge:** Hon. Lee H. Rosenthal (Chief Judge)
**Date:** January 17, 2023
**Source:** PACER – Docket Entry #32
**Authority Cited Under:** Fed. R. App. P. 32.1 – Permissible for citation in federal court

---

## Relevant Summary:

Plaintiff brought a TCPA claim based on unsolicited text messages received from a real estate investor offering to purchase her home "as-is." The court dismissed the complaint, holding that **offers to purchase property do not constitute "telephone solicitations"** under the TCPA unless they also involve promoting a product, service, or investment.

---

## Key Quotes (Page 6):

"GVG Capital argues that it has not made any 'telephone solicitation' to Pepper because its calls 'only offered to buy something'—not sell something. … The allegations do not support an inference that GVG Capital is offering a service to Pepper in exchange for any payment."

"Pepper's complaint alleges the kind of calls that the FCC stated are not covered by the Telephone Consumer Protection Act."

---

## Use in Motion:

This opinion reinforces Defendant's argument that **text messages offering to purchase a property do not qualify as "telephone solicitations"** under the TCPA's DNC provisions. It aligns with other persuasive authorities such as *Jance* and *Coffey*, and directly supports dismissal under Rule 12(b)(6).

---

**Full opinion follows this page.**

United States District Court
Southern District of Texas

**ENTERED**

January 17, 2023

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TERRI PEPPER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-22-2912 |
| | § | |
| GVG CAPITAL LLC d/b/a WeBuy-Homes-4Cash.org, | § | |
| | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Terri Pepper sued GVG Capital, asserting that it violated the Telephone Consumer
Protection Act, 47 U.S.C. § 227 *et seq*., and the Texas Business and Commercial Code, § 302.101
*et seq*. (Docket Entry No. 11). GVG Capital moves to dismiss, arguing that Pepper has not alleged
that GVG Capital made unsolicited communications or engaged in telemarketing as defined by the
Telephone Consumer Protection Act, and that the provisions of the Texas Business and
Commercial Code apply only to telephone calls and not text messages. (Docket Entry Nos. 12,
29). Pepper has responded. (Docket Entry No. 20). Based on the pleadings and the applicable
law, the court grants the motion, dismissing the state-law claims with prejudice because
amendment would be futile, and dismissing the federal claim without prejudice and with leave to
amend by February 24, 2023. The reasons are stated below.

**I.     Legal Standard**

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be
granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a),
which requires "a short and plain statement of the claim showing that the pleader is entitled to
relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief
that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 "does

not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted lawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

To withstand a Rule 12(b)(6) motion, a complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Lincoln v. Turner*, 874 F.3d 833, 839 (5th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555). A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys Proj.*, *Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

## II.   Analysis

GVG Capital is "a real estate lead generator in the business of acquiring consumer data to assist investors and realtors to buy and sell homes, for profit." (Docket Entry No. 11 ¶ 15). GVG Capital's website, "webuyhomes4cash," states that "[i]nformation submitted on this site will be sent to a network which consists of real estate investors, real estate agents, and direct buyers." (*Id.* ¶ 16). Consumers who wish to contact GVG Capital transmit their personal data, and GVC sends

the date to potential buyers. (*Id.* ¶ 17). GVG Capital requires persons transmitting their data to verify that they have no "exclusive contractual or other arrangement with any real estate professional." (*Id.* ¶ 18). Although the website states "[w]e are looking to buy homes in your area," (Docket Entry No. 11-1), "we" apparently refers to the investors, agents, or direct buyers to whom GVG Capital transmits the consumer's information, and not to GVG Capital itself.

Pepper alleges that she registered her cell phone with the Federal Do Not Call Registry in December 2004. (Docket Entry No. 11 ¶ 13). She alleges that neither she nor her husband consented to receiving calls or text messages from GVG Capital or had any established business relationship with GVG Capital. (*Id.* ¶¶ 20, 22). Pepper alleges that GVG Capital sent multiple text-message solicitations to her cell phone from April through July 2022. (*Id.* ¶¶ 23, 28). GVG Capital did not respond to Pepper's requests that it stop its behavior. (*Id.* ¶ 32). Pepper alleges that GVG Capital has not registered as a telephone solicitor with the Texas Secretary of State. (*Id.* ¶ 35).

The TCPA prohibits persons or entities from making telephone solicitations to telephone subscribers who have registered their telephone numbers with the National Do-Not-Call Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c). The implementing regulations also prohibit the making of telemarketing calls unless the person or entity making the calls maintains a list of persons who have requested not to receive calls from that person or entity. 47 C.F.R. § 64.1200(d). The statute provides a private cause of action. 47 U.S.C. § 227(b)(3).

"Telephone solicitations" are defined by regulation as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(15). "Telemarketing" is defined as "the initiation of a telephone call or message for the purpose of

3

encouraging the purchase or rental of, or investment in, property, goods or services, which is transmitted to any person." *Id.* § 64.1200(f)(13).

GVG Capital argues that it has not made any "telephone solicitation" to Pepper because its calls "only offered to buy something"—not sell something. (Docket Entry No. 12 at 4). GVG Capital argues that the regulation applies only to calls "encouraging *the purchase*" of property, goods, or services. GVG Capital cites *Knutson v. Blue Light Sec., Inc.*, 17-cv-134, 2018 WL 1172611 (S.D. Cal. Mar.6, 2018), and *Jance v. Homerun Offer LLC*, No. 20-cv-482, 2021 WL 3270318 (D. Ariz. July 30, 2021), in support of its interpretation of the regulation. (*Id.*) at 4–5.

Pepper cites to other district court decisions in response. (*Id.* at 13–14 (discussing *Buja v. Novation Capital, LLC*, No. 15-cv-81002, 2017 WL 10398957 (S.D. Fla. Mar. 30, 2017), and *Anderson v. Catalina Structured Funding, Inc.*, 2021 WL 8315006 (W.D. Mich. Dec. 21, 2021), *report and recommendation adopted*, 2022 WL 3643733 (W.D. Mich. Aug. 24, 2022)). Pepper also points to the FCC's rejection of an exemption to the regulations advocated by the National Association of Realtors. (*Id.* at 10). In its rejection, the FCC wrote, "we clarify that a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. 3788, 3793 (F.C.C. 2005).

Although Pepper cites the *Anderson* decision, applying the same analysis here supports dismissing Pepper's claims under the Telephone Consumer Protection Act. *Anderson* concerned solicitations made by Catalina, a company that purchased structured settlements. Catalina argued that its solicitations were straightforward entreaties for the plaintiff to sell her settlement rights. *Anderson*, 2021 WL 8315006, at *4. The plaintiff argued that "Catalina actually performs services for payees [that is, parties selling their settlement rights] and charges them fees through discounted

4

rates on the lump sum payments [for the settlements] it makes." *Id.* Considering these arguments, the court wrote,

> Catalina's argument sounds a little like a real estate buyer's agent who tells his or her client that the home sellers will pay the fees associated with the buyer's agent's services, rather than the buyer. That is ridiculous, of course: the buyer could offer to pay less for the house if the seller did not have to pay the buyer's agent's fees. Here, too, just because the fees may be taken out of the lump sum payment to the payee rather than itemized does not mean that no fees were charged in connection with the transaction. But the real estate broker analogy is not perfect: Catalina is not a broker—it is the principal buying the property in the transaction. One might argue that the "services" Catalina performs—processing payment applications, computing the present value of the structured settlement, filing all necessary legal documents, and the like—are equally beneficial, if not more so, to Catalina, for without them, Catalina could not accomplish its business objective of purchasing structured settlements.

*Id.* at *5. The court looked to the substance of the transaction. The court stated that "Catalina called Anderson to offer her the service of turning a long-term income stream into immediate cash," and that "the question of whether the payee pays the fees for services separately from an itemized list or as part of a reduced lump sum payment is irrelevant to the question of whether the payee pays fees as part of the transaction." *Id.* at *6. The court concluded that Catalina had solicited the purchase of its services with respect to purchasing the plaintiff's structured settlement; its payment was a discount on the present value of the settlement. *Id.*

In *Anderson*, Catalina was both the service provider and the purchaser. The same cannot be said of GVG Capital. Pepper alleges only that "Defendant is a real estate lead generator in the business of acquiring consumer data to assist investors and realtors buy and sell homes, for profit." (Docket Entry No. 11 ¶ 15). Pepper alleges that GVG Capital acts "on behalf of real estate agents and investors." (*Id.* ¶ 19). Pepper does not allege that a consumer pays for any part of the services GVG Capital offers, whether through the payment of fees or by providing data at a discount. GVG Capital's website is "WeBuyHomes4Cash," but the complaint does not allege that GVG Capital offers to purchase homes, in contrast to the role Catalina played in purchasing structured

5

settlements.  Pepper alleges only that GVG Capital seeks to acquire data on behalf of others seeking to purchase structured settlements.  The allegations do not support an inference that GVG Capital is offering a service to Pepper in exchange for any payment.

Pepper's reference to the FCC communication does not help her argument.  The FCC stated that the statute "would include calls by real estate agents to property owners for the purpose of offering their services to the owner."  *In re Tel. Consumer Prot. Act of 1991*, 20 F.C.C. Rcd. at 3793.  Those agents would presumably offer their services to the property owner with the expectation of compensation when the sale of the property closed.  In that same document, the FCC stated that "calls by real estate agents who represent only the potential buyer to someone who has advertised their property for sale . . . do not constitute telephone solicitations."  *Id.*  Pepper's complaint alleges the kind of calls that the FCC stated are not covered by the Telephone Consumer Protection Act.

Pepper also brings a claim under section 302.101 of the Texas Business and Commercial Code, which states:

> (a) A seller may not make a telephone solicitation from a location in this state or to a purchaser located in this state unless the seller holds a registration certificate for the business location from which the telephone solicitation is made.

> (b) A separate registration certificate is required for each business location from which a telephone solicitation is made.

"'Telephone solicitation' means a telephone call a seller or salesperson initiates to induce a person to purchase, rent, claim, or receive an item."  Tex. Bus. & Com. Code § 302.001(7).  An "item" may be a "property or service."  *Id.* § 302.001(1).  "Telephone call" is not defined in the Code.

GVG Capital argues that it did not urge Pepper to buy anything but only to "sell an item." (Docket Entry No. 8 at 8).  But section 302.001 defines a telephone solicitation as an attempt to "induce a person to . . . *receive* an item"—not only to purchase an item.  An item may be a

"service." GVG Capital solicited Pepper to purchase GVC Capital's service of connecting potential sellers of property to potential buyers.

GVG Capital also argues that the Texas statute does not apply to unsolicited text messages, only to telephone calls. (Docket Entry No. 8 at 8). The parties have not cited, and the court has not found, authority from the Texas courts construing the meaning of "telephone call" as used in section 302.001(7). GVG Capital points to *Powers v. One Techs., LLC*, No. 3:21-cv-2091, 2022 WL 2992881 (N.D. Tex. July 28, 2022), holding that the Texas statute did not apply to text messages. In *Powers,* the court noted that, while Chapter 304 was amended in 2009 to provide a definition of "telephone call" encompassing text messages,[1] the legislature did not similarly amend Chapter 302. *Id.* at *3.

Pepper points to the provision of Chapter 302 stating that the chapter "should be liberally construed and applied to promote its underlying purpose to protect persons against false, misleading, or deceptive practices in the telephone solicitation business." TEX. BUS. & COM. CODE § 302.003. Pepper argues that, for a consumer, the differences between receiving an unsolicited phone call and an unsolicited text message are immaterial. (Docket Entry No. 20 at 22). Pepper argues that the Texas statute should be applied the same way as the federal Telephone Consumer Protection Act, where "call" encompasses text messages.

The revisions to Chapter 304 addressed by the district court in *Powers* were made as part of Texas's statutory revision program, which directed the Legislative Council to "clarify and simplify the statutes and to make the statutes more accessible understandable, and usable." TEX.

---

[1] The court notes that while the parties and the *Powers* court discuss the meaning of the word "call," the Chapter 302 defines "telephone solicitation" as a "telephone call"—"call" is never used without an immediately preceding "telephone." TEX. BUS. & COM. CODE § 302.001(7). Chapter 304 defines "telephone call," not "call." *Id.* § 304.002(10).

GOV. CODE § 323.007(a).  That provision states that "[w]hen revising a statute, the council may not alter the sense, meaning, or effect of the statute."  *Id.* § 323.007(b).  There does not appear to be legislative history discussing the intent of the revisions to Chapter 304 beyond the statements in the Government Code.  If anything, the amendment of Chapter 304 demonstrates that the Texas legislature already understood "call" to encompass text messages and amended Chapter 304 to clarify that meaning.

On the other hand, the Texas Supreme Court has held that section 323.007 of the Government Code does not control a court's construction of a statute when the revisions enacted through the Legislative Council's revision program create unambiguous substantive changes in the law.  *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999) ("Nor can the Code Construction Act's directive to the Legislative Council to refrain from changing the sense, meaning, or effect of a previous statute be used as a basis to alter the express terms of a code that the Legislature enacts as law, even when the Council's language does change the prior, repealed law." (internal citation omitted)).  The "specific, unambiguous statutes" enacted by the Legislative "are the current law and should not be construed by a court to mean something other than the plain words."  *Id.*

The Texas Supreme Court's holding in *Fleming* suggests that this court should not consider the legislative history of Chapter 304 of the Business and Commercial Code, including the reference to the section 323.007 of the Government Code, if "telephone call" is unambiguous.  No party has argued that phrase is ambiguous.  The plain meaning of "telephone call" does not encompass text messages.  While the word "call," used alone, may be ambiguous when used in common contexts ("Call me when you're ready to leave" may include a text message indicating readiness), "telephone call," as a phrase, is not.  The placement of "telephone" before "call"

indicates a particular kind of communication and removes whatever ambiguity might be present with the word "call," used alone.

The court dismisses Pepper's state-law claim with prejudice because amendment would be futile.

## III.    Conclusion

The court grants the motion.    Pepper's Telephone Consumer Protection Act claim is dismissed without prejudice, and with leave to amend by **February 24, 2023**.    Pepper's state-law claim is dismissed with prejudice because amendment would be futile.

SIGNED on January 17, 2023, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

9

# EXHIBIT E –
## John v. National Security Fire & Casualty Co.

**Case Title:** *John v. National Security Fire & Casualty Co.*
**Citation:** 501 F.3d 443 (5th Cir. 2007)
**Court:** U.S. Court of Appeals for the Fifth Circuit
**Case No.:** 06-30392
**Date:** September 6, 2007
**Judge:** J. Smith, Circuit Judge
**Source:** Official published opinion (Federal Reporter, F.3d)
**Authority Cited Under:** Binding Fifth Circuit precedent; persuasive in federal trial courts nationwide

---

**Relevant Summary:**

Plaintiffs brought a class action alleging systematic under-adjustment of homeowners' claims after hurricane damage. The Fifth Circuit affirmed the trial court's dismissal of the class allegations, holding that where it is **facially apparent from the pleadings** that Rule 23's requirements are not met — specifically, the absence of an ascertainable class — the court may dismiss the class claims **at the pleading stage**.

---

**Key Quote (Page 445):**

> *"The Johns are incorrect insofar as they argue that the district court erred because dismissal of a class allegation on the pleadings is never proper. The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23. Where it is facially apparent from the pleadings that there is no ascertainable class, a district court may dismiss the class allegation on the pleadings."*

---

**Use in Motion:**

Supports Defendant's argument in **Section III.C** of the Motion to Dismiss that **class allegations may be stricken early** when typicality, adequacy, or commonality are facially deficient under Rule 23.

---

**Full opinion follows this page.**

age and the duty to defend. The "but for" analysis applies in this case.

\* \* \*

[T]here is no dispute the collision occurred within the Policy period and in Mexico. The clear language of the Policy provides coverage for any accident that occurs within the Policy period and within the coverage territory. Mexico is not included in the Policy's definition of the coverage territory. Reyna's negligence would not exist but for the bus crash in Mexico, for which there can be no coverage .... The Policy language provides that there is no coverage for injuries or damages resulting from an accident in Mexico. That Reyna's alleged negligence occurred in Texas is irrelevant because the cause of action against him arises out of the bus crash in Mexico which does not fall within the coverage provisions.

*Id.* at 354–55 (internal footnote omitted).

Although *Reyna* involved a policy and not the MCS–90B endorsement at issue in this case, *Reyna*'s analysis applies with equal force here. It is undisputed that the operational negligence of Escoto, the bus driver, occurred in Mexico. Thus, the negligent hiring, retention, and entrustment would not exist "but for" the bus crash in Mexico, for which we have concluded there is no coverage under the endorsement. That the Morquechos alleged the negligence occurred in Texas is irrelevant because the cause of action against them arises out of the bus crash in Mexico, which does not fall within the coverage of the endorsement. Accordingly, under this court's holding in *Reyna*, we cannot conclude that the district court abused its discretion in denying the Morquechos' motion for reconsideration.

### III.  CONCLUSION

For the reasons stated above, the district court's order granting summary judgment to Lincoln General is AFFIRMED.



**Jana JOHN, Individually and as Class Representative on Behalf of All Similarly Situated Persons; Ryan John, Individually and as Class Representative on Behalf of All Similarly Situated Persons, Plaintiffs–Appellants,**

v.

**NATIONAL SECURITY FIRE AND CASUALTY COMPANY,**
**Defendant–Appellee.**

No. 07–30237.

United States Court of Appeals,
Fifth Circuit.

Sept. 21, 2007.







_____

Clayton Arthur Larsh Davis (argued), Lundy & Davis, Lake Charles, LA, for Plaintiffs–Appellants.

Travis Louis Bourgeois (argued), Sidney W. Degan, III, Degan, Blanchard & Nash, New Orleans, LA, for Defendant–Appellee.

Judy Y. Barrasso, Susan M. Rogge, Barrasso, Usdin, Kupperman, Freeman & Sarver, New Orleans, LA, for Amici Curiae.

Before SMITH, BENAVIDES and DENNIS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Jana and Ryan John appeal the dismissal of their class allegations. Finding no error, we affirm.

## I.

The Johns were homeowners insured by National Security Fire and Casualty Company ("National Security") when their house was damaged by Hurricane Rita. They allege that National Security violated the terms of the policies it issued in Louisiana by systematically under-adjusting damages claims by failing to account for the inevitable inflation in the price of labor and materials for home repair that follows from natural disasters. They also assert that National Security violated the terms of homeowners' policies that it issued in Louisiana by systematically failing to account for general contractors' overhead and profit ("GCO&P") when repair required the exercise of two or more trades.

The Johns sued for fraud and breach of contract, purporting to represent all similarly situated persons insured by National Security. In their amended complaint the Johns alleged the following class:

All persons and/or entities insured by NATIONAL SECURITY under a homeowner's insurance policy, including tenant and condominium policies, or commercial property insurance policy:

(I) who sustained property damages to dwellings, buildings or other structures located in the State of Louisiana on or after August 29, 2005, as a result of hurricanes Katrina and Rita, or otherwise; and

(ii) whose losses were adjusted by or on behalf of NATIONAL SECURITY on an "actual cash value" basis or "replacement cost" basis, and

(iii) for whom NATIONAL SECURITY and/or its agent or contractor created a damages assessment, worksheet, or estimate of costs to repair or replace said damaged property that indicates the involvement of more than one trade.[1]

Responding to National Security's motion, the district court dismissed the Johns' fraud allegations pursuant to Federal Rule of Civil Procedure 9(b) and dismissed their class allegation pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to plead an ascertainable class. Although the

---

1.  In addition, the proposed class contained various exclusions so as to avoid purporting to represent the interests of government officials or law firms involved in the case.

court denied the Johns' motion for reconsideration, it certified its dismissal of the class allegation for interlocutory appeal pursuant to 28 U.S.C. 1292(b), and we granted leave to appeal.

## II.

■ The question is whether the district court erred by dismissing the class allegation. On appeal, the Johns propose, for the first time, that the district court certify two separate classes: a so-called price fixing class and a GCO&P class. They do not argue in favor of certifying a unitary class, as they proposed in their amended complaint. Because our jurisdiction over this interlocutory appeal extends only to the order dismissing the alleged unitary class on the pleadings, we may not consider whether the court should have certified two separate classes that were never proposed to it.[2] Accordingly we do not address the Johns' arguments in this regard. Because this case is ongoing, they may amend their complaint pursuant to the district court's discretion under Federal Rule of Civil Procedure 15, but they may not successfully propose a new class definition in this court.

■ The Johns are incorrect insofar as they argue that the district court erred because dismissal of a class allegation on the pleadings is never proper. The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23.[3] Where it is facially apparent from the pleadings that there is no ascertainable class, a district court may dismiss the class allegation on the pleadings.[4] Because the Johns do not contend that the class they propose is ascertainable, but instead propose two newly defined classes, we need not determine whether they pleaded sufficient facts, in their complaint alleging an ascertainable class, to survive scrutiny under rule 12(b)(6).[5] Accordingly, the order dismissing the class allegations is AFFIRMED.

■

---

2. *See La. Patients' Compensation Fund Oversight Bd. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 585, 588 (5th Cir.2005) (stating that our jurisdiction is limited to what has been identified in the § 1292(b) order as a "controlling question of law").

3. *See DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir.1970) ("It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable"). *See also In re A.H. Robins Co., Inc.*, 880 F.2d 709, 728 (4th Cir.1989); *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir.1981); 5 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.21[1], at 23–47 (Matthew Bender 3d ed. 1997) ("It is axiomatic that in order for a class action to be certified, a class must exist. Although the text of Rule 23(a) is silent on the matter, a class must not only exist, the class must be

susceptible of precise definition. There can be no class action if the proposed class is 'amorphous' or 'imprecise.' ") (citations omitted).

4. *Cf. DeBremaecker*, 433 F.2d at 734. *See also In re Am. Med. Sys. Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996) ("Mere repetition of the language of Rule 23(a) is not sufficient. There must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled."); *Cook County Coll. Teachers Union v. Byrd*, 456 F.2d 882, 885 (7th Cir. 1972) (same); 5 JAMES W. MOORE ET AL., *supra*, § 23.60[2] ("A plaintiff cannot make a lawsuit into a class action simply by labeling it class action.").

5. *See United States v. Thibodeaux*, 211 F.3d 910, 912 (5th Cir.2000) (stating that failure to raise an issue on appeal waives it).

# EXHIBIT F –
# Wright v. Family Dollar, Inc.

**Case Title:** *Wright v. Family Dollar, Inc.*
**Citation:** 2010 WL 4962838 (N.D. Ill. Nov. 30, 2010)
**Court:** U.S. District Court, Northern District of Illinois
**Case No.:** 1:10-cv-04410
**Judge:** Hon. Robert W. Gettleman
**Source:** PACER – Docket Entry #28
**Authority Cited Under:** Fed. R. App. P. 32.1 – Permissible for citation in federal court

---

## Relevant Summary:

The plaintiff filed a putative class action against her former employer under Illinois wage and overtime statutes. The court granted the defendant's motion to **strike class allegations at the pleading stage** under Rule 23(c)(1)(A) and (d)(1)(D), finding the proposed class facially deficient due to **conflicts of interest and lack of typicality**. The opinion affirms that class allegations can be dismissed early when defects are clear from the pleadings.

---

## Key Quote (Page 7):

> *"For the reasons discussed above, the court grants defendant's motion to strike class allegations."*

> *"The pleadings show plaintiff cannot establish typicality. … These defenses, unique as to plaintiff and any other manager in the putative class, prevent plaintiff from establishing typicality and therefore from showing that she will be able to maintain a class action."*

---

## Use in Motion:

Cited in **Section III.C** of Defendant's Motion to Dismiss to support striking class allegations at the pleading stage based on facial deficiencies in **typicality and adequacy of representation**.

---

## Full opinion follows this page.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SYREETA WRIGHT, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) | No.  10 C 4410 |
| v. | ) ) | Judge Robert W. Gettleman |
| FAMILY DOLLAR, INC., a foreign corporation, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Syreeta Wright filed a two-count putative class action complaint in the Circuit Court of Cook County, alleging that her former employer, defendant Family Dollar, failed to pay actual and overtime compensation to her and other "associates" (non-exempt, store-level employees) in violation of the Illinois Wage Payment & Collection Act, 820 ILCS § 115, et seq. (Count I), and the Illinois Minimum Wage Law, 820 ILCS § 105, et seq. (Count II).  Defendant removed the case to federal district court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1453.  Defendant has filed the instant motion to strike class allegations pursuant to Fed. R. Civ. P. 23(c)(1)(A) and (d)(1)(D), contending that plaintiff cannot establish typicality and adequacy of representation, Fed. R. Civ. P. 23(a)(3)-(4).  For the following reasons, defendant's motion is granted.

## BACKGROUND



Plaintiff alleges that defendant withheld compensation from associates by giving its store managers unfeasibly low payroll budgets which, despite defendant's official policy prohibiting managers from requiring associates to work without compensation, effectively forced all managers to do exactly that. Plaintiff's putative class consists of "all individuals who were employed by the Defendant as an Associate in any Illinois store at any time during the relevant statute of limitations period who: 1) were not paid for regular hours worked; or 2) worked more than forty (40) hours in a week, but did not receive overtime pay." The complaint alleges that, during the limitations period, plaintiff worked as an Associate (from September 2008 through January 2009) and then as a Store Manager (from February 2009 through May 2009).

## DISCUSSION

### I.  Motions to Strike Class Allegations

Defendant brings its motion to strike class allegations pursuant to Rule 23(c)(1)(A) and (d)(1)(D). Rule 23(c)(1)(A) provides that the court, "[a]t an early practicable time . . . , must determine by order whether to certify the action as a class action." Rule 23(d)(1)(D) provides that, "[i]n conducting an action under this rule, the court may issue orders that . . . require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." District courts, both within this district and others, have held that a motion to strike class allegations, made pursuant to these provisions, is an appropriate device to determine whether the case will proceed as a class action. E.g., Muehlbauer v. General Motors Corp., 431 F. Supp. 2d 847, 870 (N.D. Ill. 2006); Cornette v. Jenny Garton Ins. Agency, Inc., No. 2:10-CV-60, 2010 U.S. Dist. LEXIS 52809, at *4 (N.D. W. Va. May 27, 2010).

2

Plaintiff argues that motions to strike class allegations are disfavored, and that the proper

course of action is to oppose the plaintiff's motion for class certification.  E.g., Thorpe v. Abbott

Laboratories, Inc., 534 F. Supp. 2d 1120, 1125 (N.D. Cal. 2008); Korman v. Walking Co., 503 F.

Supp. 2d 755, 762 (E.D. Pa. 2007).  It is true that where the dispute is factual and discovery is

needed to determine whether a class should be certified, it may be premature to strike class

allegations.  But when the defendant advances a legal argument based on the pleadings,

discovery is not necessary for the court to evaluate whether a class action may be maintained.

Particularly given that Rule 23(c)(1)(A) instructs courts to determine whether a class may be

certified "[a]t an early practicable time," courts may—and should—address the plaintiff's class

allegations when the pleadings are facially defective and definitively establish that a class action

cannot be maintained.

## II.    Legal Standards

Rule 23 requires a two-step analysis to determine whether class certification is

appropriate.  First, plaintiffs must satisfy all four requirements of Rule 23(a): (1) numerosity; (2)

commonality; (3) typicality; and (4) adequacy of representation.  Failure to meet any one of

these four requirements precludes class certification.  Oshana v. Coca-Cola Co., 472 F.3d 506,

513 (7th Cir. 2006).  Further, plaintiffs must satisfy at least one provision of Rule 23(b).  In the

instant case, plaintiff seeks monetary damages and therefore must satisfy Rule 23(b)(3), which

requires the plaintiff to establish that questions of law or fact common to class members do not

predominate over any questions affecting only individual class members.

In determining whether class certification is appropriate, a district court does not presume

that all well-pleaded allegations are true and can look beneath the surface of a complaint to

conduct the inquiries Rule 23 requires.  Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 677 (7th

Cir. 2001).  Even when the defendant initiates the court's review of class allegations, the burden

remains on the plaintiff to establish that the suit may be maintained as a class action.  See

Oshana, 472 F.3d at 513, citing Trotter v. Klincar, 748 F.2d 1177, 1184 (7th Cir. 1984) ("it is the

plaintiff's burden to prove the class should be certified"); but see Ramos v. U.S. Bank Nat.

Ass'n, No. CV 08-1150-PK, 2009 WL 3834035 (D. Oreg. Nov. 16, 2009) ("[I]n the context of a

motion to *strike* class allegations, in particular where such a motion is brought in advance of the

close of class discovery, it is properly the defendant who must bear the burden of proving that

the class is not certifiable."); Romano v. Motorola, Inc., No. 07-CIV-60517, 2007 WL 4199781,

at *2 (S.D. Fla. Nov. 26, 2007) ("Defendants, in contending that class certification in this case is

precluded as a matter of law, have the burden of demonstrating from the face of plaintiffs'

complaint that it will be impossible to certify the classes alleged by the plaintiffs regardless of

the facts the plaintiffs may be able to prove.") (internal citation and quotation omitted).

## III.    Analysis

Defendant argues that plaintiff can establish neither adequacy of representation nor

typicality.  Because the court agrees, defendant's motion to strike class allegations is granted.

## A.    Adequacy of Representation

Defendant correctly contends that, as it is clear from the complaint that the putative class

is permeated by conflicts of interest, plaintiff's counsel will not be able to adequately represent

all the members of that class.  Two distinct varieties of conflict exist.  The first is between those

associates who were promoted to managers, and the associates who worked under those

managers.  The most obvious example, based on the pleadings, is plaintiff (who was an associate

4

and then became a manager within the relevant limitations period) but an identical conflict will also arise between any other associates who were promoted to manager and the associates who worked for those managers.[1]  The complaint alleges that requiring associates to work off-the-clock was the "only solution" to the manager's dilemma and that this practice was "rampant." Therefore, based on the pleadings, plaintiff, along with other managers, must have required associates to work off-the-clock when she worked as a store manager.  As a result, any member of the putative class who reported to plaintiff would be claiming that plaintiff acted in violation of the law and of defendant's policies (and any class member who reported to another class member would be accusing that class member of identical unlawful conduct).

The second type of conflict is between all putative class members who, like plaintiff, are no longer employed by defendant, and putative class members who presently work as managers. The conflict arises because plaintiff alleges that managers violated both defendant's policies and Illinois law, which could have a negative effect on current store managers' employment.

The court agrees with defendant that conflicts in the putative class prevent plaintiff from establishing adequacy of representation.  Because plaintiff became a manager who allegedly participated in the wrongful conduct at issue, her counsel cannot adequately represent a class of associates.  See Mateo v. V.F. Corp., No. C 08-05313, 2009 U.S. Dist. LEXIS 105921, *13 (N.D. Cal. Oct. 27, 2009) (denying certification under the FLSA because the putative class included the plaintiff and those she supervised, and the defendant's defense that the plaintiff worked employees off-the-clock during their breaks in violation of the defendant's policy

---

[1]  An affidavit provided by defendant shows that, from June 11, 2005, to June 11, 2010, 13 associates at the store where plaintiff worked were promoted to store manager, one of whom is still employed as a store manager.

brought into question the adequacy of the named plaintiff's representation), quoting J.H. Cohn &

Co. v. Am. Appraisal Assocs., Inc., 628 F.2d 994, 999 (7th Cir. 1980); Sample v. Aldi, No. 93 C

3094, 1994 U.S. Dist. LEXIS 1518, at *13 (N.D. Ill. Feb. 15, 1994) ("[I]t is generally true that

supervisory and nonsupervisory employees should not be placed in the same class.").

Plaintiff argues that no conflict exists because she does not seek damages for the period

of time she was a manager; she further notes that the existence of potential wage and hour claims

she might have for her tenure as a manager do not destroy adequacy of representation.  Because

the conflict is not based on any claims plaintiff may have for the time she worked as a manager,

plaintiff's arguments are irrelevant and nonresponsive.

**B.    Typicality**

Defendant also correctly argues that, because it has unique defenses against plaintiff and

any other class member who became a manager, the pleadings show plaintiff cannot establish

typicality.  Under the typicality analysis, "a plaintiff against whom the defendants have a defense

not applicable to other members of the class is not a proper class representative."  Hardy v. City

Optical Inc., 39 F.3d 765, 770 (7th Cir. 1994); see Robles v. Corporate Receivables, Inc., 220

F.R.D. 306, 309 (N.D. Ill. 2004) (finding that unique defenses destroy typicality because "the

defenses against the named representatives are likely to usurp a significant portion of the

litigant's time and energy, and there is a danger that the absent class members will suffer if their

representative is preoccupied with defenses unique to it") (internal citations and quotations

omitted).  One of defendant's theories is that managers who promoted off-the-clock work did so

without defendant's knowledge and in violation of its official policy; thus, defendant's litigation

strategy will force plaintiff and any other members of the putative class who became managers to

defend their own conduct.  Defendant has offered two affirmative defenses that implicate this issue.  The first is: "Plaintiff is not a proper class representative, as she was a Store Manager during part of her employment with Defendant.  As Store Manager, Plaintiff would have been responsible for the failure to pay overtime and the requirement to work off-the-clock as alleged in the Complaint."  The second is that "[a]ny Store Manager who required employee[s] to work off the clock did so in violation of Family Dollar's policy prohibiting off the clock work and without Family Dollar's knowledge."  These defenses, unique as to plaintiff and any other manager in the putative class, prevent plaintiff from establishing typicality and therefore from showing that she will be able to maintain a class action.

## CONCLUSION

For the reasons discussed above, the court grants defendant's motion to strike class allegations.


ENTER:        November 30, 2010


_____
**Robert W. Gettleman**
**United States District Judge**

# EXHIBIT G -
# Facebook, Inc. v. Duguid

**Case Title:** *Facebook, Inc. v. Duguid*
**Citation:** 592 U.S. 395 (2021)
**Court:** Supreme Court of the United States
**Docket No.:** 19-511
**Date Decided:** April 1, 2021
**Opinion by:** Justice Sotomayor
**Source:** SupremeCourt.gov – Official Slip Opinion
**Authority Cited Under:** Binding precedent from the U.S. Supreme Court

---

## Relevant Summary:

The Supreme Court resolved a Circuit split on the definition of an "automatic telephone dialing system" (ATDS) under the TCPA. The Court held that the statutory definition requires that an autodialer **must use a random or sequential number generator** — a significant narrowing of the law's application.

This reinforced that the TCPA must be read **according to its plain, textual meaning**, not expanded based on privacy-policy assumptions. This principle supports your overall motion strategy for both the DNC and class-strike sections.

---

## Key Quotes:

*"To qualify as an 'automatic telephone dialing system,' a device must have the capacity either to store a telephone number using a random or sequential number generator, or to produce a telephone number using a random or sequential number generator."* (Page 1)

*"Expanding the definition of an autodialer to encompass any equipment that merely stores and dials telephone numbers would take a chainsaw to these nuanced problems when Congress meant to use a scalpel."* (Page 8)

---

## Use in Motion:

Cited in the **Legal Standard** section to support strict statutory interpretation of the TCPA, especially as it applies to non-commercial messages or individualized texts.

---

## Full opinion follows this page.

(Slip Opinion) OCTOBER TERM, 2020 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FACEBOOK, INC. *v.* DUGUID ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 19–511.  Argued December 8, 2020—Decided April 1, 2021

The Telephone Consumer Protection Act of 1991 (TCPA) proscribes abusive telemarketing practices by, among other things, restricting certain communications made with an "automatic telephone dialing system." The TCPA defines such "autodialers" as equipment with the capacity both "to store or produce telephone numbers to be called, using a random or sequential number generator," and to dial those numbers. 47 U. S. C. §227(a)(1). Petitioner Facebook, Inc., maintains a social media platform that, as a security feature, allows users to elect to receive text messages when someone attempts to log in to the user's account from a new device or browser. Facebook sent such texts to Noah Duguid, alerting him to login activity on a Facebook account linked to his telephone number, but Duguid never created that account (or any account on Facebook). Duguid tried without success to stop the unwanted messages, and eventually brought a putative class action against Facebook. He alleged that Facebook violated the TCPA by maintaining a database that stored phone numbers and programming its equipment to send automated text messages. Facebook countered that the TCPA does not apply because the technology it used to text Duguid did not use a "random or sequential number generator." The Ninth Circuit disagreed, holding that §227(a)(1) applies to a notification system like Facebook's that has the capacity to dial automatically stored numbers.

*Held*: To qualify as an "automatic telephone dialing system" under the TCPA, a device must have the capacity either to store a telephone number using a random or sequential number generator, or to produce a telephone number using a random or sequential number generator. Pp. 4–12.

2          FACEBOOK, INC. *v.* DUGUID

Syllabus

(a) This case turns on whether the clause "using a random or sequential number generator" in §227(a)(1)(A) modifies both of the two verbs that precede it ("store" and "produce"), as Facebook contends, or only the closest one ("produce"), as maintained by Duguid. The most natural reading of the text and other aspects of §227(a)(1)(A) confirm Facebook's view. First, in an ordinary case, the "series-qualifier canon" instructs that a modifier at the end of a series of nouns or verbs applies to the entire series. Here, that canon indicates that the modifying phrase "using a random or sequential number generator" qualifies both antecedent verbs, "store" and "produce." Second, the modifying phrase immediately follows a concise, integrated clause ("store or produce telephone numbers to be called"), which uses the word "or" to connect two verbs that share a common direct object ("telephone numbers to be called"). Given this structure, it would be odd to apply the modifier to just one part of the cohesive clause. Third, the comma in §227(a)(1)(A) separating the modifying phrase from the antecedents suggests that the qualifier applies to all of the antecedents, instead of just the nearest one. Pp. 4–6.

Duguid's insistence that a limiting clause should ordinarily be read as modifying only the phrase that it immediately follows (the so-called "rule of the last antecedent") does not help his cause for two reasons. First, the Court has declined to apply that rule in the specific context where, as here, the modifying clause appears after an integrated list. *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 344, n. 4. Second, the last antecedent before the clause at issue in §227(a)(1)(A) is not "produce," as Duguid argues, but rather "telephone numbers to be called." Pp. 6–7.

(b) The statutory context confirms that the TCPA's autodialer definition excludes equipment that does not use a random or sequential number generator. Congress found autodialer technology harmful because autodialers can dial emergency lines randomly or tie up all of the sequentially numbered phone lines at a single entity. Facebook's interpretation of §227(a)(1)(A) better matches the scope of the TCPA to these specific concerns. Duguid's interpretation, on the other hand, would encompass any equipment that stores and dials telephone numbers. Pp. 7–8.

(c) Duguid's other counterarguments do not overcome the clear commands of the statute's text and broader context. First, he claims that his interpretation best accords with the "sense" of the text. It would make little sense however, to classify as autodialers all equipment with the capacity to store and dial telephone numbers, including virtually all modern cell phones. Second, Duguid invokes the "distributive canon," which provides that a series of antecedents and consequents should be distributed to one another based on how they most

Syllabus

naturally relate in context.  But that canon is less suited here because there is only one consequent to match to two antecedents, and in any event, the modifying phrase naturally relates to both antecedents. Third, Duguid broadly construes the TCPA's privacy-protection goals. But despite Congress' general concern about intrusive telemarketing practices, Congress ultimately chose a precise autodialer definition. Finally, Duguid argues that a random or sequential number generator is a "senescent technology," *i.e.,* one likely to become outdated quickly. That may or may not be the case, but either way, this Court cannot rewrite the TCPA to update it for modern technology.  Congress' chosen definition of an autodialer requires that the equipment in question must use a random or sequential number generator.  That definition excludes equipment like Facebook's login notification system, which does not use such technology.  Pp. 8–11.

926 F. 3d 1146, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, BREYER, KAGAN, GORSUCH, KAVANAUGH, and BAR-RETT, JJ., joined.  ALITO, J., filed an opinion concurring in the judgment.

Cite as: 592 U. S. ____ (2021)                1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–511
_____

## FACEBOOK, INC., PETITIONER *v.* NOAH DUGUID, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[April 1, 2021]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

The Telephone Consumer Protection Act of 1991 (TCPA) proscribes abusive telemarketing practices by, among other things, imposing restrictions on making calls with an "automatic telephone dialing system." As defined by the TCPA, an "automatic telephone dialing system" is a piece of equipment with the capacity both "to store or produce telephone numbers to be called, using a random or sequential number generator," and to dial those numbers. 47 U. S. C. §227(a)(1). The question before the Court is whether that definition encompasses equipment that can "store" and dial telephone numbers, even if the device does not "us[e] a random or sequential number generator." It does not. To qualify as an "automatic telephone dialing system," a device must have the capacity either to store a telephone number using a random or sequential generator or to produce a telephone number using a random or sequential number generator.

Opinion of the Court

## I

## A

In 1991, Congress passed the TCPA to address "the proliferation of intrusive, nuisance calls" to consumers and businesses from telemarketers. §2, ¶¶1, 6, 105 Stat. 2394, note following 47 U. S. C. §227. Advances in automated technology made it feasible for companies to execute large-scale telemarketing campaigns at a fraction of the prior cost, dramatically increasing customer contacts. Infamously, the development of "robocall" technology allowed companies to make calls using artificial or prerecorded voices, obviating the need for live human callers altogether.

This case concerns "automatic telephone dialing systems" (hereinafter autodialers), which revolutionized telemarketing by allowing companies to dial random or sequential blocks of telephone numbers automatically. Congress found autodialer technology to be uniquely harmful. It threatened public safety by "seizing the telephone lines of public emergency services, dangerously preventing those lines from being utilized to receive calls from those needing emergency services." H. R. Rep. No. 102–317, p. 24 (1991). Indeed, due to the sequential manner in which they could generate numbers, autodialers could simultaneously tie up all the lines of any business with sequentially numbered phone lines. Nor were individual consumers spared: Autodialers could reach cell phones, pagers, and unlisted numbers, inconveniencing consumers and imposing unwanted fees.[1] *Ibid.*

Against this technological backdrop, Congress made it unlawful to make certain calls "using any automatic telephone dialing system" to "emergency telephone line[s]," to

_____

[1] At the time Congress enacted the TCPA, most cellular providers charged users not only for outgoing calls but also for incoming calls. See *In re Rules and Regulations Implementing Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14115 (2003).

Opinion of the Court

"guest room[s] or patient room[s] of a hospital," or "to any telephone number assigned to a paging service [or] cellular telephone service" without the "prior express consent of the called party." 47 U. S. C. §227(b)(1)(A).[2] The TCPA creates a private right of action for persons to sue to enjoin unlawful uses of autodialers and to recover up to $1,500 per violation or three times the plaintiffs' actual monetary losses. §227(b)(3).

### B

Petitioner Facebook, Inc., maintains a social media platform with an optional security feature that sends users "login notification" text messages when an attempt is made to access their Facebook account from an unknown device or browser. If necessary, the user can then log into Facebook and take action to secure the account. To opt in to this service, the user must provide and verify a cell phone number to which Facebook can send messages.

In 2014, respondent Noah Duguid received several login-notification text messages from Facebook, alerting him that someone had attempted to access the Facebook account associated with his phone number from an unknown browser. But Duguid has never had a Facebook account and never gave Facebook his phone number.[3] Unable to stop the notifications, Duguid brought a putative class action against Facebook. He alleged that Facebook violated the TCPA by maintaining a database that stored phone numbers and programming its equipment to send automated text messages to those numbers each time the associated account was accessed by an unrecognized device or web browser.

─────────────

[2] Neither party disputes that the TCPA's prohibition also extends to sending unsolicited text messages. See *Campbell-Ewald Co.* v. *Gomez*, 577 U. S. 153, 156 (2016). We therefore assume that it does without considering or resolving that issue.

[3] As Facebook explains, it is possible that Duguid was assigned a recycled cell phone number that previously belonged to a Facebook user who opted to receive login notifications.

Opinion of the Court

Facebook moved to dismiss the suit, arguing primarily that Duguid failed to allege that Facebook used an autodialer because he did not claim Facebook sent text messages to numbers that were randomly or sequentially generated. Rather, Facebook argued, Duguid alleged that Facebook sent targeted, individualized texts to numbers linked to specific accounts. The U. S. District Court for the Northern District of California agreed and dismissed Duguid's amended complaint with prejudice. 2017 WL 635117, *4–*5 (Feb. 16, 2017).

The United States Court of Appeals for the Ninth Circuit reversed. As relevant here, the Ninth Circuit held that Duguid had stated a claim under the TCPA by alleging that Facebook's notification system automatically dialed stored numbers. An autodialer, the Court of Appeals held, need not be able to use a random or sequential generator to store numbers; it need only have the capacity to "'store numbers to be called'" and "'to dial such numbers automatically.'" 926 F. 3d 1146, 1151 (2019) (quoting *Marks* v. *Crunch San Diego, LLC*, 904 F. 3d 1041, 1053 (CA9 2018)).

We granted certiorari to resolve a conflict among the Courts of Appeals regarding whether an autodialer must have the capacity to generate random or sequential phone numbers.[4] 591 U. S. ___ (2020). We now reverse the Ninth Circuit's judgment.

## II

Section 227(a)(1) defines an autodialer as:

"equipment which has the capacity—

———————

[4] Compare 926 F. 3d 1146, 1151–1152 (CA9 2019); *Duran* v. *La Boom Disco, Inc.*, 955 F. 3d 279, 290 (CA2 2020); and *Allan* v. *Pennsylvania Higher Educ. Assistance Agency*, 968 F. 3d 567, 579–580 (CA6 2020), with *Gadelhak* v. *AT&T Servs., Inc.*, 950 F. 3d 458, 468 (CA7 2020) (Barrett, J., for the court); *Glasser* v. *Hilton Grand Vacations Co.*, 948 F. 3d 1301, 1306–1307 (CA11 2020); and *Dominguez* v. *Yahoo, Inc.*, 894 F. 3d 116, 119 (CA3 2018).

Opinion of the Court

> "(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and
>
> "(B) to dial such numbers."

Facebook argues the clause "using a random or sequential number generator" modifies both verbs that precede it ("store" and "produce"), while Duguid contends it modifies only the closest one ("produce"). We conclude that the clause modifies both, specifying how the equipment must either "store" or "produce" telephone numbers. Because Facebook's notification system neither stores nor produces numbers "using a random or sequential number generator," it is not an autodialer.

### A

We begin with the text. Congress defined an autodialer in terms of what it must do ("store or produce telephone numbers to be called") and how it must do it ("using a random or sequential number generator"). The definition uses a familiar structure: a list of verbs followed by a modifying clause. Under conventional rules of grammar, "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series," a modifier at the end of the list "normally applies to the entire series." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012) (Scalia & Garner) (quotation modified). The Court often applies this interpretive rule, usually referred to as the "series-qualifier canon." See *Paroline* v. *United States*, 572 U. S. 434, 447 (2014) (citing *Porto Rico Railway, Light & Power Co.* v. *Mor*, 253 U. S. 345, 348 (1920)); see also *United States* v. *Bass*, 404 U. S. 336, 339–340 (1971). This canon generally reflects the most natural reading of a sentence. Imagine if a teacher announced that "students must not complete or check any homework to be turned in for a grade, using online homework-help websites." It would be strange to read that rule as prohibiting

students from completing homework altogether, with or without online support.

Here, the series-qualifier canon recommends qualifying both antecedent verbs, "store" and "produce," with the phrase "using a random or sequential number generator." That recommendation produces the most natural construction, as confirmed by other aspects of §227(a)(1)(A)'s text.

To begin, the modifier at issue immediately follows a concise, integrated clause: "store or produce telephone numbers to be called." See *Cyan, Inc.* v. *Beaver County Employees Retirement Fund*, 583 U. S. ___, ___–___ (2018) (slip op., at 21–22). The clause "hangs together as a unified whole," *id.,* at ___ (slip op., at 21), using the word "or" to connect two verbs that share a common direct object, "telephone numbers to be called." It would be odd to apply the modifier ("using a random or sequential number generator") to only a portion of this cohesive preceding clause.

This interpretation of §227(a)(1)(A) also "heed[s] the commands of its punctuation." *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.*, 508 U. S. 439, 454 (1993). Recall that the phrase "using a random or sequential number generator" follows a comma placed after the phrase "store or produce telephone numbers to be called." As several leading treatises explain, "'[a] qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one.'" W. Eskridge, Interpreting Law: A Primer on How To Read Statutes and the Constitution 67–68 (2016); see also 2A N. Singer & S. Singer, Sutherland Statutes and Statutory Construction §47:33, pp. 499–500 (rev. 7th ed. 2014); Scalia & Garner 161–162. The comma in §227(a)(1)(A) thus further suggests that Congress intended the phrase "using a random or sequential number generator" to apply equally to both preceding elements.

Contrary to Duguid's view, this interpretation does not

Opinion of the Court

conflict with the so-called "rule of the last antecedent." Under that rule, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart* v. *Thomas*, 540 U. S. 20, 26 (2003); see also *Lockhart* v. *United States*, 577 U. S. 347, 351 (2016). The rule of the last antecedent is context dependent. This Court has declined to apply the rule where, like here, the modifying clause appears after an integrated list. See *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 344, n. 4 (2005) (collecting cases). Moreover, even if the rule of the last antecedent were relevant here, it would provide no help to Duguid. The last antecedent before "using a random or sequential number generator" is not "produce," as Duguid needs it to be, but rather "telephone numbers to be called." There is "no grammatical basis," *Cyan*, 583 U. S., at ___ (slip op., at 22), for arbitrarily stretching the modifier back to include "produce," but not so far back as to include "store."

   In sum, Congress' definition of an autodialer requires that in all cases, whether storing or producing numbers to be called, the equipment in question must use a random or sequential number generator. This definition excludes equipment like Facebook's login notification system, which does not use such technology.[5]

_____

   [5] JUSTICE ALITO notes that he "agree[s] with much of the Court's analysis," as well as its ultimate conclusion about the interpretive question before us, yet he concurs in the judgment only. *Post,* at 1. His apprehension appears to stem from what he sees as the Court's "heavy reliance" on the series-qualifier canon. *Ibid.* Such canons, he argues, are "not inflexible rules." *Post,* at 4. On that point, we agree: Linguistic canons are tools of statutory interpretation whose usefulness depends on the particular statutory text and context at issue. That may be all JUSTICE ALITO seeks to prove with his discussion and list of "sentences that clearly go against the canon," *post,* at 3. (That the grammatical structure of every example he provides is materially dissimilar from that of the clause at issue in this case proves the point.) But to the extent that he

Opinion of the Court

B

The statutory context confirms that the autodialer definition excludes equipment that does not "us[e] a random or sequential number generator." 47 U. S. C. §227(a)(1)(A). Consider the TCPA's restrictions on the use of autodialers. As previously noted, §227(b)(1) makes it unlawful to use an autodialer to call certain "emergency telephone line[s]" and lines "for which the called party is charged for the call." §227(b)(1)(A). It also makes it unlawful to use an autodialer "in such a way that two or more telephone lines of a multiline business are engaged simultaneously." §227(b)(1)(D). These prohibitions target a unique type of telemarketing equipment that risks dialing emergency lines randomly or tying up all the sequentially numbered lines at a single entity.

Expanding the definition of an autodialer to encompass any equipment that merely stores and dials telephone numbers would take a chainsaw to these nuanced problems when Congress meant to use a scalpel. Duguid's interpretation of an autodialer would capture virtually all modern cell phones, which have the capacity to "store . . . telephone numbers to be called" and "dial such numbers." §227(a)(1). The TCPA's liability provisions, then, could affect ordinary cell phone owners in the course of commonplace usage, such as speed dialing or sending automated text message responses. See §227(b)(3) (authorizing a $500 fine per violation, increased to $1,500 if the sender acted "willfully" or

_____

suggests that such canons have no role to play in statutory interpretation, or that resolving difficult interpretive questions is a simple matter of applying the "common understanding" of those "familiar with the English language," *post,* at 2–3, we disagree. Difficult ambiguities in statutory text will inevitably arise, despite the best efforts of legislators writing in "English prose," *post,* at 4. Courts should approach these interpretive problems methodically, using traditional tools of statutory interpretation, in order to confirm their assumptions about the "common understanding" of words.

Opinion of the Court

"knowingly").[6]

## III

Duguid's counterarguments cannot overcome the clear commands of §227(a)(1)(A)'s text and the statutory context. The crux of Duguid's argument is that the autodialer definition calls for a construction that accords with the "sense" of the text.  Brief for Respondents 11, and n. 3.  It makes the most "sense," Duguid insists, to apply the phrase "using a random or sequential number generator" to modify only "produce," which, unlike the verb "store," is closely connected to the noun "generator."  Dictionary definitions of "generator," for instance, regularly include the word "produce," which carries a very different meaning than "store." Duguid also claims that, at the time of the TCPA's enactment, the technical meaning of a "random number generator" invoked ways of producing numbers, not means of storing them.

Perhaps Duguid's interpretive approach would have some appeal if applying the traditional tools of interpretation led to a "linguistically impossible" or contextually implausible outcome.  *Encino Motorcars, LLC* v. *Navarro*, 584 U. S. ___, ___ (2018) (slip op., at 8); see also *Advocate Health Care Network* v. *Stapleton*, 581 U. S. ___, ___ (2017) (slip op., at 11) (noting that a "sense of inconceivability" might "urg[e] readers to discard usual rules of interpreting text"). Duguid makes a valiant effort to prove as much, but ulti-

───────────

[6] Duguid contends that ordinary cell phones are not autodialers under his interpretation because they cannot dial phone numbers automatically and instead rely on human intervention.  But all devices require some human intervention, whether it takes the form of programming a cell phone to respond automatically to texts received while in "do not disturb" mode or commanding a computer program to produce and dial phone numbers at random.  We decline to interpret the TCPA as requiring such a difficult line-drawing exercise around how much automation is too much.

Opinion of the Court

mately comes up short. It is true that, as a matter of ordinary parlance, it is odd to say that a piece of equipment "stores" numbers using a random number "generator." But it is less odd as a technical matter. Indeed, as early as 1988, the U. S. Patent and Trademark Office issued patents for devices that used a random number generator to store numbers to be called later (as opposed to using a number generator for immediate dialing).[7] Brief for Professional Association for Customer Engagement et al. as *Amici Curiae* 15–21. At any rate, Duguid's interpretation is contrary to the ordinary reading of the text and, by classifying almost all modern cell phones as autodialers, would produce an outcome that makes even less sense.

Duguid's reliance on the distributive canon fails for similar reasons. That canon provides that "[w]here a sentence contains several antecedents and several consequents," courts should "read them distributively and apply the words to the subjects which, by context, they seem most properly to relate." 2A Singer, Sutherland Statutes and Statutory Construction §47:26, at 448. Set aside for a moment that the canon's relevance is highly questionable given there are two antecedents (store and produce) but only one consequent modifier (using a random or sequential

---

[7] Duguid argues that such a device would necessarily "produce" numbers using the same generator technology, meaning "store or" in §227(a)(1)(A) is superfluous. "It is no superfluity," however, for Congress to include both functions in the autodialer definition so as to clarify the domain of prohibited devices. *BFP* v. *Resolution Trust Corporation*, 511 U. S. 531, 544, n. 7 (1994). For instance, an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list. It would then store those numbers to be dialed at a later time. See Brief for Professional Association for Customer Engagement et al. as *Amici Curiae* 19. In any event, even if the storing and producing functions often merge, Congress may have "employed a belt and suspenders approach" in writing the statute. *Atlantic Richfield Co.* v. *Christian*, 590 U. S. ___, ___, n. 5 (2020) (slip op., at 10, n. 5).

Opinion of the Court

number generator). See *Encino Motorcars*, 584 U. S., at ___ (slip op., at 8) ("[T]he distributive canon has the most force when the statute allows for one-to-one matching"). As just explained, the consequent "using a random or sequential number generator" properly relates to both antecedents.

Duguid next turns to legislative purpose, but he merely gestures at Congress' "broad privacy-protection goals." Brief for Respondents 28 (emphasizing that Congress prohibited calls made using an autodialer without "'prior express consent of the called party'" (quoting 47 U. S. C. §227(b)(1)(A))). That Congress was broadly concerned about intrusive telemarketing practices, however, does not mean it adopted a broad autodialer definition. Congress expressly found that the use of random or sequential number generator technology caused unique problems for business, emergency, and cellular lines. See *supra*, at 2. Unsurprisingly, then, the autodialer definition Congress employed includes only devices that use such technology, and the autodialer prohibitions target calls made to such lines. See §227(b)(1)(A).[8] The narrow statutory design, therefore, does not support Duguid's broad interpretation.

Duguid last warns that accepting Facebook's interpretation will "unleash" a "torrent of robocalls." Brief for Respondents 38 (quotation modified). As Duguid sees it, the thrust of congressional action since the TCPA's enactment has been to restrict nuisance calls. Because technology "adapt[s] to change," Duguid argues, the TCPA must be treated as an "'agile tool.'" *Id.*, at 38, 41. To this end, Duguid asks this Court to focus not on whether a device has the "senescent technology," *id.*, at 41, of random or sequential number generation but instead on whether it has the "capacity to dial numbers without human intervention," *id.*,

───────────
[8]By contrast, Congress did impose broader prohibitions elsewhere in the TCPA. See, *e.g.*, 47 U. S. C. §§227(b)(1)(A) and (B) (prohibiting "artificial or prerecorded voice" calls, irrespective of the type of technology used).

12          FACEBOOK, INC. *v.* DUGUID

Opinion of the Court

at 39 (internal quotation marks omitted).

   To begin with, Duguid greatly overstates the effects of accepting Facebook's interpretation. The statute separately prohibits calls using "an artificial or prerecorded voice" to various types of phone lines, including home phones and cell phones, unless an exception applies. See 47 U. S. C. §§227(b)(1)(A) and (B). Our decision does not affect that prohibition. In any event, Duguid's quarrel is with Congress, which did not define an autodialer as malleably as he would have liked. "Senescent" as a number generator (and perhaps the TCPA itself) may be, that is no justification for eschewing the best reading of §227(a)(1)(A). This Court must interpret what Congress wrote, which is that "using a random or sequential number generator" modifies both "store" and "produce."

*          *          *

   We hold that a necessary feature of an autodialer under §227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

                                   *It is so ordered.*

ALITO, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–511

_____

## FACEBOOK, INC., PETITIONER *v.*
## NOAH DUGUID, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 1, 2021]

JUSTICE ALITO, concurring in the judgment.

I agree with the Court that an "automatic telephone dialing system," as defined in the Telephone Consumer Protection Act of 1991, must have the capacity to "store . . . telephone numbers" by "using a random or sequential number generator." 47 U. S. C. §227(a)(1)(A). I also agree with much of the Court's analysis and the analysis in several Court of Appeals decisions on this question. See *Gadelhak* v. *AT&T Servs., Inc.*, 950 F. 3d 458, 463–468 (CA7 2020); *Glasser* v. *Hilton Grand Vacations Co.*, 948 F. 3d 1301, 1306–1312 (CA11 2020).

I write separately to address the Court's heavy reliance on one of the canons of interpretation that have come to play a prominent role in our statutory interpretation cases. Cataloged in a treatise written by our former colleague Antonin Scalia and Bryan A. Garner, counsel for respondents in this case, these canons are useful tools, but it is important to keep their limitations in mind. This may be especially true with respect to the particular canon at issue here, the "series-qualifier" canon.

According to the majority's recitation of this canon, "'[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" *Ante*, at 5 (quoting A. Scalia & B. Garner, Reading Law: The

ALITO, J., concurring in judgment

Interpretation of Legal Texts 147 (2012) (Reading Law)).*

The Court refers to this canon as a "rul[e] of grammar." *Ante*, at 5. Yet the Scalia-Garner treatise makes it clear that interpretive canons "are not 'rules' of interpretation in any strict sense but presumptions about what an intelligently produced text conveys." Reading Law 51. (Even grammar, according to Mr. Garner, is ordinarily just "an attempt to describe the English language as it is actually used." B. Garner, The Chicago Guide to Grammar, Usage, and Punctuation 1 (2016)). And Reading Law goes out of its way to emphasize the limitations of the series-qualifier canon, warning:

> "Perhaps more than most of the other canons, [the series-qualifier canon] is highly sensitive to context. Often the sense of the matter prevails: *He went forth and wept bitterly* does not suggest that he went forth bitterly." Reading Law 150.

The italicized sentence—an English translation of a sentence in the New Testament, Matthew 26:75—is not only grammatical; it is perfectly clear. No one familiar with the English language would fail to understand it—even though its meaning is contrary to the one suggested by the series-qualifier canon.

The Court writes that the series-qualifier canon "generally reflects the most natural reading of a sentence," *ante*, at 5, and *maybe* that is so. But cf. *Lockhart* v. *United States*, 577 U. S. 347, 351 (2016) (relying on "the basic intuition that when a modifier appears at the end of a list, it is easier to apply that modifier only to the item directly before it").

---

*As set out in Reading Law 147, this canon also applies when the modifier precedes the series of verbs or nouns.

Some scholars have claimed that "nobody proposed [the series-qualifier] canon until Justice Scalia pioneered it" in Reading Law. Baude & Sachs, The Law of Interpretation, 130 Harv. L. Rev. 1079, 1125 (2017) (internal quotation marks omitted; emphasis deleted).

ALITO, J., concurring in judgment

But it is very easy to think of sentences that clearly go against the canon:

> "At the Super Bowl party, she ate, drank, and cheered raucously."
> "On Saturday, he relaxes and exercises vigorously."
> "When his owner comes home, the dog wags his tail and barks loudly."
> "It is illegal to hunt rhinos and giraffes with necks longer than three feet."
> "She likes to swim and run wearing track spikes."

In support of its treatment of the series-qualifier canon, the Court offers this example of a sentence in which the natural reading corresponds with the interpretation suggested by the canon: "[S]tudents must not complete or check any homework to be turned in for a grade, using online homework-help websites." *Ante*, at 5. I certainly agree that the adverbial phrase in this sentence ("using online homework-help websites") modifies both of the verbs it follows ("complete" and "check") and not just the latter. But that understanding has little to do with syntax and everything to do with our common understanding that teachers do not want to prohibit students from doing homework. We can see this point clearly if we retain the same syntax but replace the verb "complete" with any number of other verbs that describe something a teacher is not likely to want students to do, say, "ignore," "overlook," "discard," "lose," "neglect," "forget," "destroy," "throw away," or "incinerate" their homework. The concept of "using online homework-help websites" to do any of those things would be nonsensical, and no reader would interpret the sentence to have that meaning—even though that is what the series-qualifier canon suggests.

The strength and validity of an interpretive canon is an empirical question, and perhaps someday it will be possible

ALITO, J., concurring in judgment

to evaluate these canons by conducting what is called a corpus linguistics analysis, that is, an analysis of how particular combinations of words are used in a vast database of English prose. See generally Lee & Mouritsen, Judging Ordinary Meaning, 127 Yale L. J. 788 (2018). If the series-qualifier canon were analyzed in this way, I suspect we would find that series qualifiers sometimes modify all the nouns or verbs in a list and sometimes modify just the last noun or verb. It would be interesting to see if the percentage of sentences in the first category is high enough to justify the canon. But no matter how the sentences with the relevant structure broke down, it would be surprising if "the sense of the matter" did not readily reveal the meaning in the great majority of cases. Reading Law 150.

That is just my guess. Empirical evidence might prove me wrong, but that is not what matters. The important point is that interpretive canons attempt to identify the way in which "a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *Id.,* at 33. To the extent that interpretive canons accurately describe how the English language is generally used, they are useful tools. But they are not inflexible rules.

Appellate judges spend virtually every working hour speaking, listening to, reading, or writing English prose. Statutes are written in English prose, and interpretation is not a technical exercise to be carried out by mechanically applying a set of arcane rules. Canons of interpretation can help in figuring out the meaning of troublesome statutory language, but if they are treated like rigid rules, they can lead us astray. When this Court describes canons as rules or quotes canons while omitting their caveats and limitations, we only encourage the lower courts to relegate statutory interpretation to a series of if-then computations. No reasonable reader interprets texts that way.

For these reasons, I respectfully concur in the judgment.

# EXHIBIT H –
# Luna v. Shac, LLC

**Case Title:** *Luna v. Shac, LLC*
**Citation:** 2015 WL 4941780 (N.D. Cal. Aug. 19, 2015)
**Court:** U.S. District Court, Northern District of California
**Case No.:** 5:14-cv-00607-HRL
**Judge:** Hon. Howard R. Lloyd
**Source:** PACER / Westlaw
**Authority Cited Under:** Fed. R. App. P. 32.1 – Permissible for citation in federal court

---

## Relevant Summary:

Plaintiff alleged TCPA violations after receiving a promotional text message from Shac, LLC (dba Sapphire Gentlemen's Club). The court granted summary judgment for the defendant after finding that the messages were sent with **significant human intervention**, and therefore **did not qualify as autodialed messages under the TCPA**.

---

## Key Quotes (Page 9):

> *"Because the court finds that the subject text message was sent as a result of human intervention, the court grants summary judgment in favor of Shac."*

> *"Human intervention was involved in several stages of the process... including drafting the message, determining the timing, and clicking 'send' on the website to transmit the message to Plaintiff."*

---

## Use in Motion:

Cited in **Section III.A** of Defendant's Motion to Dismiss to support the principle that **not all mass messages fall under TCPA**, especially where there is clear evidence of **manual input or individualized action**.

---

## Full opinion follows this page.

1

*E-Filed: August 19, 2015*

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                              NORTHERN DISTRICT OF CALIFORNIA

10

11   JOHN LUNA,                              Case No.  14-cv-00607-HRL
                     Plaintiff,
12                                           **ORDER GRANTING DEFENDANT'S
         v.                                  MOTION FOR SUMMARY JUDGMENT**
13
     SHAC, LLC, dba SAPPHIRE                 Re: Dkt. No. 85
14   GENTLEMEN'S CLUB; et al.,

15                   Defendants.

16

17          In February 2014, John Luna brought suit against Shac, LLC, dba Sapphire Gentlemen's

18   Club, Club Texting, Inc. and CallFire, Inc. for violation of the Telephone Consumer Protection

19   Act ("TCPA"), 47 U.S.C. § 227.  Shac, the sole remaining defendant, moves for summary

20   judgment.  Dkt. No. 85.  Plaintiff filed an opposition and Shac filed a reply.  Dkt. Nos. 96, 97.  In

21   addition, Plaintiff filed two notices of new authority.[1]  Dkt. Nos. 98, 101.  All parties have

22   expressly consented to having all matters proceed before a magistrate judge.  A hearing was held

23   on June 23, 2015.  Based on the moving and responding papers, as well as the arguments

24   presented at the hearing, the Court grants the motion for summary judgment.

25

26

27   _____
     [1] Plaintiff's request for judicial notice is granted.  *See* Fed. R. Evid. 201; *Tovar v. Midland Credit
28   Mgmt.*, No. 10-CV-2600 MMA (MDD), 2011 WL 1431988, at *2 (S.D. Cal. Apr. 13, 2011);
     *Michael v. New Century Fin. Servs.*, No. 13-CV-03892 BLF, 2014 WL 4099010, at *3 (N.D. Cal.
     Aug. 20, 2014).

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

*(left margin)* United States District Court / Northern District of California

# BACKGROUND

Shac operates the Sapphire Gentlemen's Club in Las Vegas, Nevada.  Shac engaged CallFire, a third-party mobile marketing company, to provide a web-based platform (here, EXTexting.com) for sending promotional text messages to its customers. Andrews Decl., Exh. 1, at 19, 53-54; Exh. 2, at 68.

Sending text messages through EXTexting.com involved multiple steps.  First, an employee of Shac would input telephone numbers into CallFire's web-based platform either by manually typing a phone number into the website, or by uploading or cutting and pasting an existing list of phone numbers into the website. *See id.*, Exh. 1, at 71.  In addition, Shac's customers could add themselves to the platform by sending their own text messages to the system. *See* Exh. 1, at 69-72; Exh. 2, at 178.  Next, the employee would log in to EXTexting.com to draft and type the message content. *Id.*, Exh. 1, at 20, 142.  The employee would then designate the specific phone numbers to which the message would be sent, then click "send" on the website in order to transmit the message to Shac's customers. *Id.*, Exh. 1, at 20, 139-41; *see also id.*, Exh. 2, at 179-81.  The employee could either transmit the messages in real time or preschedule messages to be transmitted "[a]t some future date." Zelenski Decl., Exh. 1, at 186-88.

As a result of this process, an allegedly unwanted text message was sent to Plaintiff, a customer of Shac, who had provided Shac with his cell phone number.

The First Amended Complaint (the operative complaint) asserts one claim against Shac, Club Texting, and CallFire: violation of the TCPA. Club Texting has been voluntarily dismissed from this action.  CallFire is no longer a defendant to this action, as Plaintiff accepted an offer of judgment and dismissed all claims against CallFire with prejudice. Dkt. No. 82.  Shac is the one remaining defendant.  Shac moves for summary judgment.  Dkt. No. 85.

///

///

2

**LEGAL STANDARD**

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses.  *See Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1102.  The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial.  *See id.*  A genuine issue of fact is one that could reasonably be resolved in favor of either party.  A dispute is "material" only if it could affect the outcome of the suit under the governing law.  *Anderson*, 477 U.S. at 248-49.

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" D*evereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 325).  Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial.  *Id.*

///

**DISCUSSION**

First, Shac argues that it is entitled to summary judgment because the text message was not sent using an automatic telephone dialing system ("ATDS"). Under the TCPA, it is "unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . (iii) to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call." 47 U.S.C. § 227(b)(1). "The term 'automatic telephone dialing system' means equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

Plaintiff and Shac dispute the definition of ATDS. Shac argues that because the definition of ATDS is "clear and unambiguous," the court's "inquiry begins with the statutory text, and ends there as well." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (internal quotation marks omitted). According to Shac, equipment must have the capacity to store or produce telephone numbers to be called using a random or sequential number generator in order to qualify as an ATDS. Plaintiff argues that Congress has expressly conferred authority on the Federal Communications Commission ("FCC") to issue interpretative rules pertaining to the TCPA, and the FCC has issued several regulations expanding the statutory definition of ATDS. The Court agrees with Plaintiff.

The Hobbs Act, 28 U.S.C. § 2342(1), and the Federal Communications Act, 47 U.S.C. § 402(a), operate together to restrict district courts from invalidating certain actions by the FCC. The Federal Communications Act provides: "Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter . . . shall be brought as provided by and in the manner prescribed in [the Hobbs Act]." 47 U.S.C. § 402(a). Under the Hobbs Act, "The

United States District Court
Northern District of California

court of appeals (other than the United States Court of Appeals for the Federal Circuit) has

exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the

validity of—(1) all final orders of the Federal Communications Commission made reviewable by

section 402(a) of title 47." 28 U.S.C. § 2342.  In other words, the Hobbs Act jurisdictionally

divests district courts from ignoring FCC rulings interpreting the TCPA.  Accordingly, this court

must look not only to the statutory language in applying the definition of an ATDS, but also to

FCC rulings addressing the same.

In 2003, the FCC noted that, "[i]n the past, telemarketers may have used dialing equipment

to create and dial 10–digit telephone numbers arbitrarily," but that "the evolution of the

teleservices industry has progressed to the point where using lists of numbers is far more cost

effective." 18 FCC Rcd. 14014, 14092 (2003). The FCC found it "clear from the statutory

language and the legislative history that Congress anticipated that the FCC, under its TCPA

rulemaking authority, might need to consider changes in technologies." *Id*. The FCC concluded

that "predictive dialers," which dial numbers from customer calling lists, "fall[] within the

meaning and the statutory definition of 'automatic telephone dialing equipment' and the intent of

Congress." *Id*. at 14093.

In 2008, the FCC "affirm[ed] that a predictive dialer constitutes an automatic telephone

dialing system and is subject to the TCPA's restrictions on the use of autodialers," and in 2012,

the FCC again confirmed that the statute covered systems with the "capacity to store or produce

and dial those numbers at random, in sequential order, or from a database of numbers." 23 FCC

Rcd. 559, 566 (2008); 27 FCC Rcd. 15391, 15392 n.5 (2012). Accordingly, through these

implementing regulations, the FCC has indicated that the definition of ATDS now includes

"predictive dialers," which may dial numbers from preprogrammed lists rather than generate

numbers randomly or sequentially. *See Glauser v. GroupMe, Inc*., No. C 11-2584 PJH, 2015 WL

475111, at *5 (N.D. Cal. Feb. 4, 2015).

5

Shac argues that even if the court were to agree that the above-cited FCC regulations expand the definition of ATDS, this expanded definition encompasses only predictive dialers, not web-based text messaging platforms, like the one at issue here.  However, this district has held that these FCC regulations are not limited to predictive dialers.  *McKenna v. WhisperText*, No. 5:14-CV-00424-PSG, 2015 WL 428728, at \*3 (N.D. Cal. Jan. 30, 2015); *Nunes v. Twitter, Inc.*, Case No. 14-CV-02843-VC, 2014 WL 6708465, at \*1-2 (N.D. Cal. Nov. 26, 2014); *Fields v. Mobile Messengers Am., Inc.*, Case No. 12-C-05160-WHA, 2013 WL 6774076, at \*3 (N.D. Cal. Dec. 23, 2013).

In addition, on June 18, 2015, the FCC voted on, and approved, FCC Chairman Tom Wheeler's omnibus proposal under the TCPA.  Wheeler's "Fact Sheet" outlining the approved matters states, "as codified at 47 U.S.C. § 227(b)(2)," the "Telephone Consumer Protection Act explicitly empowers the Commission to enforce and interpret its consumer protection provisions," to "review questions related to the meaning of the TCPA's prohibitions," and "to prescribe regulations to implement the statute."  First Notice of New Authority, Exh. 1, at 2.  The FCC voted to "affirm[]" the current definition of "autodialer" "ensur[ing] the robocallers cannot skirt consumer consent requirements through changes in calling technology design or by calling from a list of numbers." *Id.*, Exh. 2, at 2; Exh. 1, at 1.  In the Declaratory Ruling and Order following the FCC vote on June 18, 2015, the FCC reiterated that "[i]n the 2003 TCPA Order, the Commission found that, in order to be considered an automatic telephone dialing system, the equipment need only have the capacity to store or produce telephone numbers.  The Commission stated that, even when dialing a fixed set of numbers, equipment may nevertheless meet the autodialer definition."  Second Notice of New Authority, Exh. 1 ¶ 12 (internal quotation marks omitted).  "Internet-to-phone text messaging technology" is expressly included in the definition of "automatic telephone dialing system." *Id.*, Exh. 1 ¶¶ 111-16.

Accordingly, the fact that CallFire's system has the ability to send text messages from

6

preprogrammed lists, rather than randomly or sequentially, does not disqualify it as an ATDS.

Second, Shac argues that it is entitled to summary judgment because the text message was sent as a result of human intervention. As indicated at the hearing, the parties do not dispute the law governing what constitutes "human intervention," nor do they dispute the material facts as to what led up to Plaintiff receiving the text message. Rather, the parties dispute the application of the facts to the law. Shac argues that these undisputed facts constitute human intervention, while Plaintiff argues that they do not.

In its 2008 ruling, the FCC indicated that the defining characteristic of an autodialer is "the capacity to dial numbers without human intervention." 23 FCC Rcd. at 566. In 2012, the FCC further discussed the definition of "autodialer," explaining that it "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." 27 FCC Rcd. at 15392, n.5. Accordingly, the capacity to dial numbers without human intervention is required for TCPA liability. *Glauser*, 2015 WL 475111, at *6.

Here, human intervention was involved in several stages of the process prior to Plaintiff's receipt of the text message, including transferring of the telephone number into the CallFire database, drafting the message, determining the timing of the message, and clicking "send" on the website to transmit the message to Plaintiff. Shai Cohen, Shac's person most knowledgeable, was involved in the process of sending Shac's text messages via the EZTexting website. Andrews Decl., Exh. 1, at 19. Cohen testified that he inputted telephone numbers into CallFire's web-based platform either by manually typing phone numbers into the website, or by uploading or cutting and pasting an existing list of phone numbers into the website. *See id.*, Exh. 1, at 71 ("Q: And who at Shac actually inputted the numbers one by one? A: I have. Q: And who at Shac did the exporting, to the extent exporting was used, input numbers? A: I have. Q: And that's also the case for uploading the numbers from a separate file? A: Yes."). Cohen drafted and typed the

message content.  *Id.*, Exh. 1, at 20 ("I would personally go into the website, log in, and type the message and send it off through their website."); *id.*, Exh. 1, at 142 ("I would upload the numbers into the system.  Nothing here was done—nothing was automated.  I personally created every one of these messages.").  Cohen personally clicked "send" on the website in order to transmit the messages to Shac's customers, including Plaintiff. *Id.*, Exh. 1, at 139-40 ("Q: . . . in order for the messages to be transmitted, you personally would have to log into the system and your own act of hitting 'send'?  A: No, 100 percent.  I would personally type and send each one of those messages.  Q: Right. So the message couldn't go out unless you logged into the system?  A:  Correct.  Q: And hit 'send'?  A:  Correct.")*; see also id.*, Exh. 2, at 179-81 ("[I]f contacts are not uploaded to the website and the customer does not hit the submit button and say send out these text messages, nothing happens.").

This case is similar to *Glauser* and *McKenna v. WhisperText*, No. 5:14-CV-00424-PSG, 2015 WL 428728 (N.D. Cal. Jan. 30, 2015).  In *Glauser*, the court found that "GroupMe obtained the telephone numbers of the newly added group members . . . through the actions of the group's creator" when the numbers were uploaded into the database.  *Glauser*, 2015 WL 475111, at *6.  The court in *Glauser* concluded that the text messages at issue "were sent to plaintiff as a direct response to the intervention of Mike L., the 'Poker' group creator."  *Id.*  In *McKenna*, the court found that "Whisper App can send SMS invitations only at the user's affirmative direction to recipients selected by the user."  *McKenna*, 2015 WL 428728, at *3-4.  Accordingly, the court in *McKenna* held that "under such circumstances, the action taken is with human intervention—disqualifying the equipment at issue as any kind of ATDS."  *Id.* at *4.

Plaintiff asserts that *Glauser* and *McKenna* "ruled that the act of uploading customer telephone numbers to a database constitutes human intervention."  Opp. at 16.  Plaintiff argues that because these two cases "effectively eviscerate the FCC of its power to interpret the TCPA, they should be disregarded."  *Id.*  Plaintiff urges the court to instead follow several cases that

United States District Court
Northern District of California

Plaintiff argues have held the contrary:  *Moore v. Dish Network, LLC*, 2014 WL 5305960 (N.D.

W. Va. Oct. 15, 2014); *Davis v. Diversified Consultants, Inc.*, 36 F. Supp. 3d 217 (D. Mass. 2014);

*Sterk v. Path, Inc.*, 46 F. Supp. 3d 813 (N.D. Ill. 2014); and *Griffith v. Consumer Portfolio Serv.,*

*Inc.*, 838 F. Supp. 2d 723 (N.D. Ill. 2011).

Plaintiff's argument fails.  As an initial matter, the court finds that human intervention was

involved in several stages of the process prior to Plaintiff's receipt of the text message, and was

not limited to the act of uploading the telephone number to the CallFire database, as Plaintiff

argues.  As explained above, human intervention was involved in drafting the message,

determining the timing of the message, and clicking "send" on the website to transmit the message

to Plaintiff.

Moreover, all of the cases cited by Plaintiff were decided outside of this district, and are

not binding on the court.  They are also distinguishable.  In *Davis*, the court found the predictive

dialer in question to be an ATDS because the system's default setting was for "sequential dialing,"

and the court did not conduct a human intervention analysis.  *Davis*, 36 F. Supp. 3d at 225-26.  In

*Moore*, the court found the system to be an ATDS based on the fact that the only human

involvement was typing a list of numbers into software, which then automatically transferred them

to dialer hardware, which in turn automatically made calls.  *Moore*, 2014 WL 5305960, at *13.  In

*Sterk* and *Griffith*, the automated dialing system at issue uploaded lists of numbers from individual

users and required no human intervention by defendant.  *Sterk v. Path, Inc.*, 46 F. Supp. 3d at 819-

20; *Griffith*, 838 F. Supp. 2d at 727.

Accordingly, because the court finds that the subject text message was sent as a result of

human intervention, the court grants summary judgment in favor of Shac.

///

///

///

1

**CONCLUSION**

2      For the reasons stated above, Shac's motion for summary judgment is granted.

3      **IT IS SO ORDERED.**

4

Dated: August 19, 2015

5

6

7      _____
       HOWARD R. LLOYD
8      United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## EXHIBIT I –
## Central Hudson v. PSC of New York

**Case Title:** *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*
**Citation:** 447 U.S. 557 (1980)
**Court:** Supreme Court of the United States
**Docket No.:** 79-565
**Date Decided:** June 20, 1980
**Opinion by:** Justice Powell
**Source:** Cornell Legal Information Institute
(https://www.law.cornell.edu/supremecourt/text/447/557)
**Alternative Source:** Justia (https://supreme.justia.com/cases/federal/us/447/557/)
**Authority Cited Under:** Binding U.S. Supreme Court precedent

---

## Note to Court:

*"Because the official Supreme Court PDF version is not readily available, this Exhibit is sourced from publicly accessible and widely recognized legal databases — Cornell Law's Legal Information Institute and Justia — which reproduce official Supreme Court opinions in full and without alteration."*

---

## Relevant Summary:

This landmark First Amendment case established the four-part test courts use to determine when **government regulation of commercial speech** is constitutional. The Court struck down a complete ban on promotional advertising by a utility, holding that truthful, non-misleading commercial speech is protected under the First Amendment — and that restrictions must directly advance a substantial government interest in a narrowly tailored way.

---

## Key Quote (Majority Opinion):

*"Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information."*

*"If the communication is neither misleading nor related to unlawful activity, the government's power is more limited."*

**Use in Motion:**

Cited in **Section I (Introduction)** of Defendant's Motion to Dismiss to support the argument that even if Plaintiff tries to argue the message was commercial, it remains **protected speech** under the First Amendment — especially where there is **no misrepresentation, fraud, or sale of services**.

*A printout of the Cornell LII or Justia version of the opinion follows this page.*

6/13/25, 9:45 PM    CENTRAL HUDSON GAS & ELECTRIC CORPORATION, Appellant, v. PUBLIC SERVICE COMMISSION OF NEW YORK. | Supre…

Case 2:25-cv-00888-TLN-AC    Document 26-1    Filed 06/14/25    Page 83 of 146

LII  > U.S. Supreme Court
 > **CENTRAL HUDSON GAS & ELECTRIC CORPORATION, Appellant, v. PUBLIC SERVICE COMMISSION OF NEW YORK.**

# CENTRAL HUDSON GAS & ELECTRIC CORPORATION, Appellant, v. PUBLIC SERVICE COMMISSION OF NEW YORK.

## Supreme Court

447 U.S. 557

100 S.Ct. 2343

65 L.Ed.2d 341

CENTRAL HUDSON GAS & ELECTRIC CORPORATION, Appellant,
v.
PUBLIC SERVICE COMMISSION OF NEW YORK.

No. 79-565.

Argued March 17, 1980.

Decided June 20, 1980.

*Syllabus*

*Held* : A regulation of appellee New York Public Service Commission which completely bans an electric utility from advertising to promote the use of electricity violates the First and Fourteenth Amendments. Pp. 561-572.

(a) Although the Constitution accords a lesser protection to commercial speech than to other constitutionally guaranteed expression, nevertheless the First Amendment protects commercial speech from unwarranted governmental regulation. For commercial speech to come within the First Amendment, it at

Case 2:25-cv-00888-TLN-AC    Document 26-1    Filed 06/14/25    Page 84 of 146

least must concern lawful activity and not be misleading. Next, it must be determined whether the asserted governmental interest to be served by the restriction on commercial speech is substantial. If both inquiries yield positive answers, it must then be decided whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest. Pp. 561-566.

(b) In this case, it is not claimed that the expression at issue is either inaccurate or relates to unlawful activity. Nor is appellant electrical utility's promotional advertising unprotected commercial speech merely because appellant holds a monopoly over the sale of electricity in its service area. Since monopoly over the supply of a product provides no protection from competition with substitutes for that product, advertising by utilities is just as valuable to consumers as advertising by unregulated firms, and there is no indication that appellant's decision to advertise was not based on the belief that consumers were interested in the advertising. Pp. 566-568.

(c) The State's interest in energy conservation is clearly substantial and is directly advanced by appellee's regulations. The State's further interest in preventing inequities in appellant's rates—based on the assertion that successful promotion of consumption in "off-peak" periods would create extra costs that would, because of appellant's rate structure, be borne by all consumers through higher overall rates—is also substantial. The latter interest does not, however, provide a constitutionally adequate reason for restricting protected speech because the link between the advertising prohibition and appellant's rate structure is, at most, tenuous. Pp. 568-569.

(d) Appellee's regulation, which reaches all promotional advertising regardless of the impact of the touted service on overall energy use, is more extensive than necessary to further the State's interest in energy conservation which, as important as it is, cannot justify suppressing information about electric devices or services that would cause no net increase in total energy use. In addition, no showing has been made that a more limited restriction on the content of promotional advertising would not serve adequately the State's interests. Pp. 569-571.

47 N.Y.2d 94, 417 N.Y.S.2d 30, 390 N.E.2d 749, reversed.

Telford Taylor, New York City, for appellant.

Peter H. Schiff, Albany, N. Y., for appellee.

Mr. Justice POWELL delivered the opinion of the Court.

1

Case 2:25-cv-00888-TLN-AC    Document 26-1    Filed 06/14/25    Page 85 of 146

This case presents the question whether a regulation of the Public Service Commission of the State of New York violates the First and Fourteenth Amendments because it completely bans promotional advertising by an electrical utility.

2

* In December 1973, the Commission, appellee here, ordered electric utilities in New York State to cease all advertising that "promot[es] the use of electricity." App. to Juris. Statement 31a. The order was based on the Commission's finding that "the interconnected utility system in New York State does not have sufficient fuel stocks or sources of supply to continue furnishing all customer demands for the 1973-1974 winter." *Id*., at 26a.

3

Three years later, when the fuel shortage had eased, the Commission requested comments from the public on its proposal to continue the ban on promotional advertising. Central Hudson Gas & Electric Corp., the appellant in this case, opposed the ban on First Amendment grounds. App. A10. After reviewing the public comments, the Commission extended the prohibition in a Policy Statement issued on February 25, 1977.

4

The Policy Statement divided advertising expenses "into two broad categories: promotional—advertising intended to stimulate the purchase of utility services—and institutional and informational, a broad category inclusive of all advertising not clearly intended to promote sales."[1] App. to Juris. Statement 35a. The Commission declared all promotional advertising contrary to the national policy of conserving energy. It acknowledged that the ban is not a perfect vehicle for conserving energy. For example, the Commission's order prohibits promotional advertising to develop consumption during periods when demand for electricity is low. By limiting growth in "off-peak" consumption, the ban limits the "beneficial side effects" of such growth in terms of more efficient use of existing power-plants. *Id.*, at 37a. And since oil dealers are not under the Commission's jurisdiction and thus remain free to advertise, it was recognized that the ban can achieve only "piecemeal conservationism." Still, the Commission adopted the restriction because it was deemed likely to "result in some dampening of unnecessary growth" in energy consumption. *Ibid.*

5

The Commission's order explicitly permitted "informational" advertising designed to encourage "*shifts* of consumption" from peak demand times to periods of low electricity demand. *Ibid*. (emphasis in original). Informational advertising would not seek to increase aggregate consumption, but would invite a leveling of

demand throughout any given 24-hour period. The agency offered to review "specific proposals by the companies for specifically described [advertising] programs that meet these criteria." *Id*., at 38a.

6

When it rejected requests for rehearing on the Policy Statement, the Commission supplemented its rationale for the advertising ban. The agency observed that additional electricity probably would be more expensive to produce than existing output. Because electricity rates in New York were not then based on marginal cost,**2** the Commission feared that additional power would be priced below the actual cost of generation. This additional electricity would be subsidized by all consumers through generally higher rates. *Id.*, at 57a-58a. The state agency also thought that promotional advertising would give "misleading signals" to the public by appearing to encourage energy consumption at a time when conservation is needed. *Id.*, at 59a.

7

Appellant challenged the order in state court, arguing that the Commission had restrained commercial speech in violation of the First and Fourteenth Amendments.**3** The Commission's order was upheld by the trial court and at the intermediate appellate level.**4** The New York Court of Appeals affirmed. It found little value to advertising in "the noncompetitive market in which electric corporations operate." *Consolidated Edison Co. v. Public Service Comm'n*, 47 N.Y.2d 94, 110, 417 N.Y.S.2d 30, 39, 390 N.E.2d 749, 757 (1979). Since consumers "have no choice regarding the source of their electric power," the court denied that "promotional advertising of electricity might contribute to society's interest in 'informed and reliable' economic decisionmaking." *Ibid.* The court also observed that by encouraging consumption, promotional advertising would only exacerbate the current energy situation. *Id.*, at 110, 417 N.Y.S.2d, at 39, 390 N.E.2d, at 758. The court concluded that the governmental interest in the prohibition outweighed the limited constitutional value of the commercial speech at issue. We noted probable jurisdiction, 444 U.S. 962, 100 S.Ct. 446, 62 L.Ed.2d 374 (1979), and now reverse.

II

8

The Commission's order restricts only commercial speech, that is, expression related solely to the economic interests of the speaker and its audience. *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976); *Bates v. State Bar of Arizona*, 433 U.S. 350, 363-364, 97 S.Ct. 2691, 2698-2699, 53 L.Ed.2d 810 (1977); *Friedman v. Rogers*, 440 U.S. 1, 11, 99 S.Ct. 887, 895, 59 L.Ed.2d 100 (1979). The First

Amendment, as applied to the States through the Fourteenth Amendment,
protects commercial speech from unwarranted governmental regulation. *Virginia Pharmacy Board*, 425 U.S., at 761-762, 96 S.Ct., at 1825. Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information. In applying the First Amendment to this area, we have rejected the "highly paternalistic" view that government has complete power to suppress or regulate commercial speech. "[P]eople will perceive their own best interests if only they are well enough informed, and . . . the best means to that end is to open the channels of communication rather than to close them. . . ." *Id.*, at 770, 96 S.Ct., at 1829, see *Linmark Associates, Inc. v. Willingboro*, 431 U.S. 85, 92, 97 S.Ct. 1614, 1618, 50 L.Ed.2d 155 (1977). Even when advertising communicates only an incomplete version of the relevant facts, the First Amendment presumes that some accurate information is better than no information at all. *Bates v. State Bar of Arizona, supra*, at 374, 97 S.Ct., at 2704.

9

Nevertheless, our decisions have recognized "the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 455-456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978); see *Bates v. State Bar of Arizona, supra*, 433 U.S., at 381, 97 S.Ct., at 2707; see also Jackson & Jeffries, Commercial Speech: Economic Due Process and the First Amendment, 65 Va.L.Rev. 1, 38-39 (1979).[5] The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. 436 U.S., at 456, 457, 98 S.Ct., at 1918, 1919. The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation.

10

The First Amendment's concern for commercial speech is based on the informational function of advertising. See *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978). Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it, *Friedman v. Rogers, supra*, at 13, 15-16, 99 S.Ct., at 896, 897; *Ohralik v. Ohio State Bar Assn., supra*, at 464-465, 98 S.Ct., at 1923-1925, or commercial speech related to illegal activity, *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388, 93 S.Ct. 2553, 2560, 37 L.Ed.2d 669 (1973).[6]

6/13/25, 9:45 PM          CENTRAL HUDSON GAS & ELECTRIC CORPORATION, Appellant, v. PUBLIC SERVICE COMMISSION OF NEW YORK. | Supre…

11    Case 2:25-cv-00888-TLN-AC     Document 26-1     Filed 06/14/25     Page 88 of 146

If the communication is neither misleading nor related to unlawful activity, the government's power is more circumscribed. The State must assert a substantial interest to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State's goal. Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.

12

Under the first criterion, the Court has declined to uphold regulations that only indirectly advance the state interest involved. In both *Bates* and *Virginia Pharmacy Board*, the Court concluded that an advertising ban could not be imposed to protect the ethical or performance standards of a profession. The Court noted in *Virginia Pharmacy Board* that "[t]he advertising ban does not directly affect professional standards one way or the other." 425 U.S., at 769, 96 S.Ct., at 1829. In *Bates*, the Court overturned an advertising prohibition that was designed to protect the "quality" of a lawyer's work. "Restraints on advertising . . . are an ineffective way of deterring shoddy work." 433 U.S., at 378, 97 S.Ct., at 2706.[7]

13

The second criterion recognizes that the First Amendment mandates that speech restrictions be "narrowly drawn." *In re Primus*, 436 U.S. 412, 438, 98 S.Ct. 1893, 1908, 56 L.Ed.2d 417 (1978).[8] The regulatory technique may extend only as far as the interest it serves. The State cannot regulate speech that poses no danger to the asserted state interest, see *First National Bank of Boston v. Bellotti, supra*, at 794-795, 98 S.Ct., at 1425-1426, nor can it completely suppress information when narrower restrictions on expression would serve its interest as well. For example, in *Bates* the Court explicitly did not "foreclose the possibility that some limited supplementation, by way of warning or disclaimer or the like, might be required" in promotional materials. 433 U.S., at 384, 97 S.Ct., at 2709. See *Virginia Pharmacy Board, supra*, at 773, 96 S.Ct., at 1831. And in *Carey v. Population Services International*, 431 U.S. 678, 701-702, 97 S.Ct. 2010, 2025, 52 L.Ed.2d 675 (1977), we held that the State's "arguments . . . do not justify the total suppression of advertising concerning contraceptives." This holding left open the possibility that the State could implement more carefully

drawn restrictions. See *id.*, at 712, 97 S.Ct., at 2030 (POWELL, J., concurring in part and in judgment); *id.*, at 716-717, 97 S.Ct., at 2032 (STEVENS, J., concurring in part and in judgment).**9**

14

In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

III

15

We now apply this four-step analysis for commercial speech to the Commission's arguments in support of its ban on promotional advertising.

A.

16

The Commission does not claim that the expression at issue either is inaccurate or relates to unlawful activity. Yet the New York Court of Appeals questioned whether Central Hudson's advertising is protected commercial speech. Because appellant holds a monopoly over the sale of electricity in its service area, the state court suggested that the Commission's order restricts no commercial speech of any worth. The court stated that advertising in a "noncompetitive market" could not improve the decisionmaking of consumers. 47 N.Y.2d, at 110, 417 N.Y.S.2d, at 39, 390 N.E.2d, at 757. The court saw no constitutional problem with barring commercial speech that it viewed as conveying little useful information.

17

This reasoning falls short of establishing that appellant's advertising is not commercial speech protected by the First Amendment. Monopoly over the supply of a product provides no protection from competition with substitutes for that product. Electric utilities compete with suppliers of fuel oil and natural gas in several markets, such as those for home heating and industrial power. This Court noted the existence of interfuel competition 45 years ago, see *West Ohio Gas Co. v. Public Utilities Comm'n*, 294 U.S. 63, 72, 55 S.Ct. 316, 321, 79 L.Ed. 761 (1935). Each energy source continues to offer peculiar advantages and

Case 2:25-cv-00888-TLN-AC    Document 26-1    Filed 06/14/25    Page 90 of 146

disadvantages that may influence consumer choice. For consumers in those competitive markets, advertising by utilities is just as valuable as advertising by unregulated firms.[10]

18

Even in monopoly markets, the suppression of advertising reduces the information available for consumer decisions and thereby defeats the purpose of the First Amendment. The New York court's argument appears to assume that the providers of a monopoly service or product are willing to pay for wholly ineffective advertising. Most businesses—even regulated monopolies—are unlikely to underwrite promotional advertising that is of no interest or use to consumers. Indeed, a monopoly enterprise legitimately may wish to inform the public that it has developed new services or terms of doing business. A consumer may need information to aid his decision whether or not to use the monopoly service at all, or how much of the service he should purchase. In the absence of factors that would distort the decision to advertise, we may assume that the willingness of a business to promote its products reflects a belief that consumers are interested in the advertising.[11] Since no such extraordinary conditions have been identified in this case, appellant's monopoly position does not alter the First Amendment's protection for its commercial speech.

B

19

The Commission offers two state interests as justifications for the ban on promotional advertising. The first concerns energy conservation. Any increase in demand for electricity—during peak or off-peak periods—means greater consumption of energy. The Commission argues, and the New York court agreed, that the State's interest in conserving energy is sufficient to support suppression of advertising designed to increase consumption of electricity. In view of our country's dependence on energy resources beyond our control, no one can doubt the importance of energy conservation. Plainly, therefore, the state interest asserted is substantial.

20

The Commission also argues that promotional advertising will aggravate inequities caused by the failure to base the utilities' rates on marginal cost. The utilities argued to the Commission that if they could promote the use of electricity in periods of low demand, they would improve their utilization of generating capacity. The Commission responded that promotion of off-peak consumption also would increase consumption during peak periods. If peak demand were to rise, the absence of marginal cost rates would mean that the rates charged for the additional power would not reflect the true costs of

expanding production. Instead, the extra costs would be borne by all consumers through higher overall rates. Without promotional advertising, the Commission stated, this inequitable turn of events would be less likely to occur. The choice among rate structures involves difficult and important questions of economic supply and distributional fairness.[12] The State's concern that rates be fair and efficient represents a clear and substantial governmental interest.

C

21

Next, we focus on the relationship between the State's interests and the advertising ban. Under this criterion, the Commission's laudable concern over the equity and efficiency of appellant's rates does not provide a constitutionally adequate reason for restricting protected speech. The link between the advertising prohibition and appellant's rate structure is, at most, tenuous. The impact of promotional advertising on the equity of appellant's rates is highly speculative. Advertising to increase off-peak usage would have to increase peak usage, while other factors that directly affect the fairness and efficiency of appellant's rates remained constant. Such conditional and remote eventualities simply cannot justify silencing appellant's promotional advertising.

22

In contrast, the State's interest in energy conservation is directly advanced by the Commission order at issue here. There is an immediate connection between advertising and demand for electricity. Central Hudson would not contest the advertising ban unless it believed that promotion would increase its sales. Thus, we find a direct link between the state interest in conservation and the Commission's order.

D

23

We come finally to the critical inquiry in this case: whether the Commission's complete suppression of speech ordinarily protected by the First Amendment is no more extensive than necessary to further the State's interest in energy conservation. The Commission's order reaches all promotional advertising, regardless of the impact of the touted service on overall energy use. But the energy conservation rationale, as important as it is, cannot justify suppressing information about electric devices or services that would cause no net increase in total energy use. In addition, no showing has been made that a more limited restriction on the content of promotional advertising would not serve adequately the State's interests.

24

Appellant insists that but for the ban, it would advertise products and services that use energy efficiently. These include the "heat pump," which both parties acknowledge to be a major improvement in electric heating, and the use of electric heat as a "backup" to solar and other heat sources. Although the Commission has questioned the efficiency of electric heating before this Court, neither the Commission's Policy Statement nor its order denying rehearing made findings on this issue. In the absence of authoritative findings to the contrary, we must credit as within the realm of possibility the claim that electric heat can be an efficient alternative in some circumstances.

25

The Commission's order prevents appellant from promoting electric services that would reduce energy use by diverting demand from less efficient sources, or that would consume roughly the same amount of energy as do alternative sources. In neither situation would the utility's advertising endanger conservation or mislead the public. To the extent that the Commission's order suppresses speech that in no way impairs the State's interest in energy conservation, the Commission's order violates the First and Fourteenth Amendments and must be invalidated. See *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978).

26

The Commission also has not demonstrated that its interest in conservation cannot be protected adequately by more limited regulation of appellant's commercial expression. To further its policy of conservation, the Commission could attempt to restrict the format and content of Central Hudson's advertising. It might, for example, require that the advertisements include information about the relative efficiency and expense of the offered service, both under current conditions and for the foreseeable future. Cf. *Banzhaf v. FCC*, 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), cert. denied *sub nom. Tobacco Institute, Inc. v. FCC*, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).[13] In the absence of a showing that more limited speech regulation would be ineffective, we cannot approve the complete suppression of Central Hudson's advertising.[14]

IV

27

Our decision today in no way disparages the national interest in energy conservation. We accept without reservation the argument that conservation, as well as the development of alternative energy sources, is an imperative national goal. Administrative bodies empowered to regulate electric utilities have the authority—and indeed the duty—to take appropriate action to further this goal. When, however, such action involves the suppression of speech, the First and

Case 2:25-cv-00888-TLN-AC          Document 26-1          Filed 06/14/25          Page 93 of 146

Fourteenth Amendments require that the restriction be no more extensive than is necessary to serve the state interest. In this case, the record before us fails to show that the total ban on promotional advertising meets this requirement.**15**

28

Accordingly, the judgment of the New York Court of Appeals is

29

*Reversed*.

30

Mr. Justice BRENNAN, concurring in the judgment.

31

One of the major difficulties in this case is the proper characterization of the Commission's Policy Statement. I find it impossible to determine on the present record whether the Commission's ban on all "promotional" advertising, in contrast to "institutional and informational" advertising, see *ante*, at 559, is intended to encompass more than "commercial speech." I am inclined to think that Mr. Justice STEVENS is correct that the Commission's order prohibits more than mere proposals to engage in certain kinds of commercial transactions, and therefore I agree with his conclusion that the ban surely violates the First and Fourteenth Amendments. But even on the assumption that the Court is correct that the Commission's order reaches only commercial speech, I agree with Mr. Justice BLACKMUN that "[n]o differences between commercial speech and other protected speech justify suppression of commercial speech in order to influence public conduct through manipulation of the availability of information." *Post*, at 578.

32

Accordingly, with the qualifications implicit in the preceding paragraph, I join the opinions of Mr. Justice BLACKMUN and Mr. Justice STEVENS concurring in the judgment.

33

Mr. Justice BLACKMUN, with whom Mr. Justice BRENNAN joins, concurring in the judgment.

34

I agree with the Court that the Public Service Commission's ban on promotional advertising of electricity by public utilities is inconsistent with the First and Fourteenth Amendments. I concur only in the Court's judgment, however, because I believe the test now evolved and applied by the Court is not consistent with our prior cases and does not provide adequate protection for truthful, nonmisleading, noncoercive commercial speech.

6/13/25, 9:45 PM CENTRAL HUDSON GAS & ELECTRIC CORPORATION, Appellant, v. PUBLIC SERVICE COMMISSION OF NEW YORK. | Supre…

Case 2:25-cv-00888-TLN-AC    Document 26-1    Filed 06/14/25    Page 94 of 146

35

The Court asserts, *ante*, at 566, that "a four-part analysis has developed" from our decisions concerning commercial speech. Under this four-part test a restraint on commercial "communication [that] is neither misleading nor related to unlawful activity" is subject to an intermediate level of scrutiny, and suppression is permitted whenever it "directly advances" a "substantial" governmental interest and is "not more extensive than is necessary to serve that interest." *Ante*, at 564 and 566. I agree with the Court that this level of intermediate scrutiny is appropriate for a restraint on commercial speech designed to protect consumers from misleading or coercive speech, or a regulation related to the time, place, or manner of commercial speech. I do not agree, however, that the Court's four-part test is the proper one to be applied when a State seeks to suppress information about a product in order to manipulate a private economic decision that the State cannot or has not regulated or outlawed directly.

36

Since the Court, without citing empirical data or other authority, finds a "direct link" between advertising and energy consumption, it leaves open the possibility that the State may suppress advertising of electricity in order to lessen demand for electricity. I, of course, agree with the Court that, in today's world, energy conservation is a goal of paramount national and local importance. I disagree with the Court, however, when it says that suppression of speech may be a permissible means to achieve that goal. Mr. Justice STEVENS appropriately notes: "The justification for the regulation is nothing more than the expressed fear that the audience may find the utility's message persuasive. Without the aid of any coercion, deception, or misinformation, truthful communication may persuade some citizens to consume more electricity than they otherwise would." *Post*, at 581.

37

The Court recognizes that we have never held that commercial speech may be suppressed in order to further the State's interest in discouraging purchases of the underlying product that is advertised. *Ante*, at 566, n. 9. Permissible restraints on commercial speech have been limited to measures designed to protect consumers from fraudulent, misleading, or coercive sales techniques.[1] Those designed to deprive consumers of information about products or services that are legally offered for sale consistently have been invalidated.[2]

38

I seriously doubt whether suppression of information concerning the availability and price of a legally offered product is ever a permissible way for the State to "dampen" demand for or use of the product. Even though "commercial" speech is

Case 2:25-cv-00888-TLN-AC Document 26-1 Filed 06/14/25 Page 95 of 146

involved, such a regulatory measure strikes at the heart of the First Amendment. This is because it is a covert attempt by the State to manipulate the choices of its citizens, not by persuasion or direct regulation, but by depriving the public of the information needed to make a free choice. As the Court recognizes, the State's policy choices are insulated from the visibility and scrutiny that direct regulation would entail and the conduct of citizens is molded by the information that government chooses to give them. *Ante*, at 566, n. 9 ("We review with special care regulations that entirely suppress commercial speech in order to pursue a nonspeech-related policy. In those circumstances, a ban on speech could screen from public view the underlying governmental policy"). See Rotunda, The Commercial Speech Doctrine in the Supreme Court, 1976 U.Ill.Law Forum 1080, 1080-1083.

39

If the First Amendment guarantee means anything, it means that, absent clear and present danger, government has no power to restrict expression because of the effect its message is likely to have on the public. See generally Comment, First Amendment Protection for Commercial Advertising: The New Constitutional Doctrine, 44 U.Chi.L.Rev. 205, 243-251 (1976). Our cases indicate that this guarantee applies even to commercial speech. In *Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), we held that Virginia could not pursue its goal of encouraging the public to patronize the "professional pharmacist" (one who provided individual attention and a stable pharmacist-customer relationship) by "keeping the public in ignorance of the entirely lawful terms that competing pharmacists are offering." *Id.*, at 770, 96 S.Ct., at 1829-30. We noted that our decision left the State free to pursue its goal of maintaining high standards among its pharmacists by "requir[ing] whatever professional standards it wishes of its pharmacists." *Ibid.*

40

We went on in *Virginia Pharmacy Board* to discuss the types of regulation of commercial speech that, due to the "commonsense differences" between this form of speech and other forms, are or may be constitutionally permissible. We indicated that government may impose reasonable "time, place, and manner" restrictions, and that it can deal with false, deceptive, and misleading commercial speech. We noted that the question of advertising of illegal transactions and the special problems of the electronic broadcast media were not presented.

41

Concluding with a restatement of the type of restraint that is not permitted, we said: "What is at issue is whether a State may completely suppress the dissemination of concededly truthful information about entirely lawful activity,

fearful of that information's effect upon its disseminators and its recipients." . . . [W]e conclude that the answer to this [question] is in the negative." *Id.*, at 773, 96 S.Ct., at 1831.

42

*Virginia Pharmacy Board* did not analyze the State's interests to determine whether they were "substantial." Obviously, preventing professional dereliction and low quality health care are "substantial," legitimate, and important state goals. Nor did the opinion analyze the ban on speech to determine whether it "directly advance[d]," *ante*, at 566, 569, these goals. We also did not inquire whether a "more limited regulation of . . . commercial expression," *ante*, at 570, would adequately serve the State's interests. Rather, we held that the State "may *not* [pursue its goals] by keeping the public in ignorance." 425 U.S., at 770, 96 S.Ct., at 1829. (Emphasis supplied.)

43

Until today, this principle has governed. In *Linmark Associates, Inc. v. Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 50 L.Ed.2d 155 (1977), we considered whether a town could ban "For Sale" signs on residential property to further its goal of promoting stable, racially integrated housing. We did note that the record did not establish that the ordinance was necessary to enable the State to achieve its goal. The holding of *Linmark*, however, was much broader.[3] We stated:

44

"The constitutional defect in this ordinance, however, is far more basic. The Township Council here, like the Virginia Assembly in *Virginia Pharmacy Bd.*, acted to prevent its residents from obtaining certain information . . . which pertains to sales activity in Willingboro . . . . The Council has sought to restrict the free flow of these data because it fears that otherwise homeowners will make decisions inimical to what the Council views as the homeowners' self-interest and the corporate interest of the township: they will choose to leave town. The Council's concern, then, was not with any commercial aspect of "For Sale" signs—with offerors communicating offers to offerees but with the substance of the information communicated to Willingboro citizens." *Id.*, at 96, 97 S.Ct., at 1620.

45

The Court in *Linmark* resolved beyond all doubt that a strict standard of review applies to suppression of commercial information, where the purpose of the restraint is to influence behavior by depriving citizens of information. The Court followed the strong statement above with an explicit adoption of the standard advocated by Mr. Justice Brandeis in his concurring opinion in *Whitney v. California*, 274 U.S. 357, 377, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927): "If there be time to expose through discussion the falsehood and fallacies, to avert the

evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression." 431 U.S., at 97, 97 S.Ct., at 1620.

46

*Carey v. Population Services International*, 431 U.S. 678, 700-702, 97 S.Ct. 2010, 2024-2025, 52 L.Ed.2d 675 (1977), also applied to content-based restraints on commercial speech the same standard of review we have applied to other varieties of speech. The Court held that a ban on advertising of contraceptives could not be justified by the State's interest in avoiding " 'legitimation' of illicit sexual behavior" because the advertisements could not be characterized as " 'directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action,' " *id.*, at 701, 97 S.Ct., at 2024, quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969).

47

Our prior references to the " 'commonsense differences' " between commercial speech and other speech " 'suggest that a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired.' " *Linmark Associates*, 431 U.S., at 98, 97 S.Ct., at 1621, quoting *Virginia Pharmacy Board*, 425 U.S., at 771-772, n. 24, 96 S.Ct., at 1830, n. 24. We have not suggested that the "commonsense differences" between commercial speech and other speech justify relaxed scrutiny of restraints that suppress truthful, nondeceptive, noncoercive commercial speech. The differences articulated by the Court, see *ante*, at 564, n. 6, justify a more permissive approach to regulation of the manner of commercial speech for the purpose of protecting consumers from deception or coercion, and these differences explain why doctrines designed to prevent "chilling" of protected speech are inapplicable to commercial speech. No differences between commercial speech and other protected speech justify suppression of commercial speech in order to influence public conduct through manipulation of the availability of information. The Court stated in *Carey v. Population Services International* :

48

"Appellants suggest no distinction between commercial and noncommercial speech that would render these discredited arguments meritorious when offered to justify prohibitions on commercial speech. On the contrary, such arguments are clearly directed not at any commercial aspect of the prohibited advertising but at the ideas conveyed and form of expression—*the core of First Amendment values*." 431 U.S., at 701, n. 28, 97 S.Ct., at 2025, n. 28 (emphasis added).

6/13/25, 9:45 PM          CENTRAL HUDSON GAS & ELECTRIC CORPORATION, Appellant, v. PUBLIC SERVICE COMMISSION OF NEW YORK. | Supre…

Case 2:25-cv-00888-TLN-AC      Document 26-1      Filed 06/14/25      Page 98 of 146

49

It appears that the Court would permit the State to ban all direct advertising of air conditioning, assuming that a more limited restriction on such advertising would not effectively deter the public from cooling its homes. In my view, our cases do not support this type of suppression. If a governmental unit believes that use or overuse of air conditioning is a serious problem, it must attack that problem directly, by prohibiting air conditioning or regulating thermostat levels. Just as the Commonwealth of Virginia may promote professionalism of pharmacists directly, so too New York may *not* promote energy conservation "by keeping the public in ignorance." *Virginia Pharmacy Board*, 425 U.S., at 770, 96 S.Ct., at 1829.

50

Mr. Justice STEVENS, with whom Mr. Justice BRENNAN joins, concurring in the judgment.

51

Because "commercial speech" is afforded less constitutional protection than other forms of speech,[1] it is important that the commercial speech concept not be defined too broadly lest speech deserving of greater constitutional protection be inadvertently suppressed. The issue in this case is whether New York's prohibition on the promotion of the use of electricity through advertising is a ban on nothing but commercial speech.

52

In my judgment one of the two definitions the Court uses in addressing that issue is too broad and the other may be somewhat too narrow. The Court first describes commercial speech as "expression related solely to the economic interests of the speaker and its audience." *Ante*, at 561. Although it is not entirely clear whether this definition uses the subject matter of the speech or the motivation of the speaker as the limiting factor, it seems clear to me that it encompasses speech that is entitled to the maximum protection afforded by the First Amendment. Neither a labor leader's exhortation to strike, nor an economist's dissertation on the money supply, should receive any lesser protection because the subject matter concerns only the economic interests of the audience. Nor should the economic motivation of a speaker qualify his constitutional protection; even Shakespeare may have been motivated by the prospect of pecuniary reward. Thus, the Court's first definition of commercial speech is unquestionably too broad.[2]

53

The Court's second definition refers to "speech proposing a commercial transaction.' " *Ante*, at 562. A salesman's solicitation, a broker's offer, or a manufacturer's publication of a price list or the terms of his standard warranty would unquestionably fit within this concept.[3] Presumably, the definition is intended to encompass advertising that advises possible buyers of the availability of specific products at specific prices and describes the advantages of purchasing such items. Perhaps it also extends to other communications that do little more than make the name of a product or a service more familiar to the general public. Whatever the precise contours of the concept, and perhaps it is too early to enunciate an exact formulation, I am persuaded that it should not include the entire range of communication that is embraced within the term "promotional advertising."

54

This case involves a governmental regulation that completely bans promotional advertising by an electric utility. This ban encompasses a great deal more than mere proposals to engage in certain kinds of commercial transactions. It prohibits all advocacy of the immediate or future use of electricity. It curtails expression by an informed and interested group of persons of their point of view on questions relating to the production and consumption of electrical energy— questions frequently discussed and debated by our political leaders. for example, an electric company's advocacy of the use of electric heat for environmental reasons, as opposed to wood-burning stoves, would seem to fall squarely within New York's promotional advertising ban and also within the bounds of maximum First Amendment protection. The breadth of the ban thus exceeds the boundaries of the commercial speech concept, however that concept may be defined.[4]

55

The justification for the regulation is nothing more than the expressed fear that the audience may find the utility's message persuasive. Without the aid of any coercion, deception, or misinformation, truthful communication may persuade some citizens to consume more electricity than they otherwise would. I assume that such a consequence would be undesirable and that government may therefore prohibit and punish the unnecessary or excessive use of electricity. But if the perceived harm associated with greater electrical usage is not sufficiently serious to justify direct regulation, surely it does not constitute the kind of clear and present danger that can justify the suppression of speech.

56

Although they were written in a different context, the words used by Mr. Justice Brandeis in his concurring opinion in *Whitney v. California*, 274 U.S. 357, 376-377, 47 S.Ct. 641, 648-649, 71 L.Ed. 1095, explain my reaction to the prohibition against advocacy involved in this case:

6/13/25, 9:45 PM CENTRAL HUDSON GAS & ELECTRIC CORPORATION, Appellant, v. PUBLIC SERVICE COMMISSION OF NEW YORK. | Supre…

Case 2:25-cv-00888-TLN-AC    Document 26-1    Filed 06/14/25    Page 100 of 146

57

"But even advocacy of violation, however reprehensible morally, is not a justification for denying free speech where the advocacy falls short of incitement and there is nothing to indicate that the advocacy would be immediately acted on. The wide difference between advocacy and incitement, between preparation and attempt, between assembling and conspiracy, must be borne in mind. In order to support a finding of clear and present danger it must be shown either that immediate serious violence was to be expected or was advocated, or that the past conduct furnished reason to believe that such advocacy was then contemplated.

58

"Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty. To courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government, no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression. Such must be the rule if authority is to be reconciled with freedom. Such, in my opinion, is the command of the Constitution." (Footnote omitted.)[5]

59

In sum, I concur in the result because I do not consider this to be a "commercial speech" case. Accordingly, I see no need to decide whether the Court's four-part analysis, *ante*, at 566, adequately protects commercial speech—as properly defined—in the face of a blanket ban of the sort involved in this case.

60

Mr. Justice REHNQUIST, dissenting.

61

The Court today invalidates an order issued by the New York Public Service Commission designed to promote a policy that has been declared to be of critical national concern. The order was issued by the Commission in 1973 in response to the Mideastern oil embargo crisis. It prohibits electric corporations "from *promoting* the use of electricity through the use of advertising, subsidy payments . . ., or employee incentives." State of New York Public Service Commission, Case No. 26532 (Dec. 5, 1973), App. to Juris. Statement 31a (emphasis added). Although the immediate crisis created by the oil embargo has subsided, the ban on promotional advertising remains in effect. The regulation was re-examined by

the New York Public Service Commission in 1977. Its constitutionality was subsequently upheld by the New York Court of Appeals, which concluded that the paramount national interest in energy conservation justified its retention.[1]

62

The Court's asserted justification for invalidating the New York law is the public interest discerned by the Court to underlie the First Amendment in the free flow of commercial information. Prior to this Court's recent decision in *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), however, commercial speech was afforded no protection under the First Amendment whatsoever. See *E. g., Breard v. Alexandria*, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951); *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). Given what seems to me full recognition of the holding of *Virginia Pharmacy Board* that commercial speech is entitled to some degree of First Amendment protection, I think the Court is nonetheless incorrect in invalidating the carefully considered state ban on promotional advertising in light of pressing national and state energy needs.

63

The Court's analysis in my view is wrong in several respects. Initially, I disagree with the Court's conclusion that the speech of a state-created monopoly, which is the subject of a comprehensive regulatory scheme, is entitled to protection under the First Amendment. I also think that the Court errs here in failing to recognize that the state law is most accurately viewed as an economic regulation and that the speech involved (if it falls within the scope of the First Amendment at all) occupies a significantly more subordinate position in the hierarchy of First Amendment values than the Court gives it today. Finally, the Court in reaching its decision improperly substitutes its own judgment for that of the State in deciding how a proper ban on promotional advertising should be drafted. With regard to this latter point, the Court adopts as its final part of a four-part test a "no more extensive than necessary" analysis that will unduly impair a state legislature's ability to adopt legislation reasonably designed to promote interests that have always been rightly thought to be of great importance to the State.

64

* In concluding that appellant's promotional advertising constitutes protected speech, the Court reasons that speech by electric utilities is valuable to consumers who must decide whether to use the monopoly service or turn to an alternative energy source, and if they decide to use the service how much of it to purchase. *Ante*, at 567. The Court in so doing "assume[s] that the willingness of a business to promote its products reflects a belief that consumers are interested

in the advertising." *Ante*, at 568. The Court's analysis ignores the fact that the monopoly here is entirely state-created and subject to an extensive state regulatory scheme from which it derives benefits as well as burdens.

65

While this Court has stated that the "capacity [of speech] for informing the public does not depend upon the identity of its source," *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978), the source of the speech nevertheless may be relevant in determining whether a given message is protected under the First Amendment.[2] When the source of the speech is a state-created monopoly such as this, traditional First Amendment concerns, if they come into play at all, certainly do not justify the broad interventionist role adopted by the Court today. In *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 549-550, 100 S.Ct. 2326, 2339-2340, 65 L.Ed.2d 319, Mr. Justice BLACKMUN observed:

66

"A public utility is a state-created monopoly. See, *e. g.*, N. Y. Pub. Serv. Law § 68 (McKinney 1955); Jones, Origins of the Certificate of Public Convenience and Necessity; Developments in the States 1870-1920, 79 Colum. L.Rev. 426, 458-461 (1979); Comment, Utility Rates, Consumers, and the New York State Public Service Commission, 39 Albany L.Rev. 707, 709-714 (1975). Although monopolies generally are against the public policies of the United States and of the State of New York, see, *e. g.*, N. Y. Gen. Bus. Law § 340 (McKinney 1968 and Supp.1979-1980), . . . utilities are permitted to operate as monopolies because of a determination by the State that the public interest is better served by protecting them from competition. See 2 A. Kahn, The Economics of Regulation 113-171 (1971).

67

"This exceptional grant of power to private enterprises justifies extensive oversight on the part of the State to protect the ratepayers from exploitation of the monopoly power through excessive rates and other forms of overreaching. . . . New York law gives its Public Service Commission plenary supervisory powers over all property, real and personal, 'used or to be used for or in connection with or to facilitate the . . . sale or furnishing of electricity for light, heat or power.' N.Y.Pub.Serv.Law §§ 2(12) and 66(1) (McKinney 1955)."

68

Thus, although *First National Bank of Boston v. Bellotti, supra*, holds that speech of a corporation is entitled to some First Amendment protection, it by no means follows that a utility with monopoly power conferred by a State is also entitled to such protection.

6/13/25, 9:45 PM          CENTRAL HUDSON GAS & ELECTRIC CORPORATION, Appellant, v. PUBLIC SERVICE COMMISSION OF NEW YORK. | Supre…

69   Case 2:25-cv-00888-TLN-AC    Document 26-1    Filed 06/14/25    Page 103 of 146

The state-created monopoly status of a utility arises from the unique characteristics of the services that a utility provides. As recognized in *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 595-596, 96 S.Ct. 3110, 3120, 49 L.Ed.2d 1141 (1976), "public utility regulation typically assumes that the private firm is a natural monopoly and that public controls are necessary to protect the consumer from exploitation." The consequences of this natural monopoly in my view justify much more wide-ranging supervision and control of a utility under the First Amendment than this Court held in *Bellotti* to be permissible with regard to ordinary corporations. Corporate status is generally conferred as a result of a State's determination that the corporate characteristics "enhance its efficiency as an economic entity." *First National Bank of Boston v. Bellotti, supra*, at 825-826, 98 S.Ct., at 1441 (REHNQUIST, J., dissenting). A utility, by contrast fulfills a function that serves special public interests as a result of the natural monopoly of the service provided. Indeed, the extensive regulations governing decisionmaking by public utilities suggest that for purposes of First Amendment analysis, a utility is far closer to a state-controlled enterprise than is an ordinary corporation.[3] Accordingly, I think a State has broad discretion in determining the statements that a utility may make in that such statements emanate from the entity created by the State to provide important and unique public services. And a state regulatory body charged with the oversight of these types of services may reasonably decide to impose on the utility a special duty to conform its conduct to the agency's conception of the public interest. Thus I think it is constitutionally permissible for it to decide that promotional advertising is inconsistent with the public interest in energy conservation. I also think New York's ban on such advertising falls within the scope of permissible state regulation of an economic activity by an entity that could not exist in corporate form, say nothing of enjoy monopoly status, were it not for the laws of New York.[4]

II

70

This Court has previously recognized that although commercial speech may be entitled to First Amendment protection, that protection is not as extensive as that accorded to the advocacy of ideas. Thus, we stated in *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 455-456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978):

71

"Expression concerning purely commercial transactions has come within the ambit of the Amendment's protection only recently. In rejecting the notion that such speech 'is wholly outside the protection of the First Amendment,' *Virginia*

*Pharmacy, supra*, [425 U.S.], at 761, [96 S.Ct., at 1825], we were careful not to hold 'that it is wholly undifferentiable from other forms' of speech. 425 U.S., at 771, n. 24, [96 S.Ct., at 1831, n. 24]. We have not discarded the 'common-sense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech. *Ibid*. To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression." (Footnote omitted.)

72

The Court's decision today fails to give due deference to this subordinate position of commercial speech. The Court in so doing returns to the bygone era of *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), in which it was common practice for this Court to strike down economic regulations adopted by a State based on the Court's own notions of the most appropriate means for the State to implement its considered policies.

73

I had thought by now it had become well established that a State has broad discretion in imposing economic regulations. As this Court stated in *Nebbia v. New York*, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934):

74

"[T]here can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects. . . .

75

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio*. . . . [I]t does not lie with the courts to determine that the rule is unwise."

76

Case 2:25-cv-00888-TLN-AC    Document 26-1    Filed 06/14/25    Page 105 of 146

And Mr. Justice Black, writing for the Court, observed more recently in *Ferguson v. Skrupa*, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963):

77

"The doctrine . . . that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws."

78

The State of New York has determined here that economic realities require the grant of monopoly status to public utilities in order to distribute efficiently the services they provide, and in granting utilities such status it has made them subject to an extensive regulatory scheme. When the State adopted this scheme and when its Public Service Commission issued its initial ban on promotional advertising in 1973, commercial speech had not been held to fall within the scope of the First Amendment at all. *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), however, subsequently accorded commercial speech a limited measure of First Amendment protection.

79

The Court today holds not only that commercial speech is entitled to First Amendment protection, but also that when it is protected a State may not regulate it unless its reason for doing so amounts to a "substantial" governmental interest, its regulation "directly advances" that interest, and its manner of regulation is "not more extensive than necessary" to serve the interest. *Ante,* at 566. The test adopted by the Court thus elevates the protection accorded commercial speech that falls within the scope of the First Amendment to a level that is virtually indistinguishable from that of noncommercial speech. I think the Court in so doing has effectively accomplished the "devitalization" of the First Amendment that it counseled against in *Ohralik*. I think it has also, by labeling economic regulation of business conduct as a restraint on "free speech," gone far to resurrect the discredited doctrine of cases such as *Lochner* and *Tyson & Brother v. Banton*, 273 U.S. 418, 47 S.Ct. 426, 71 L.Ed. 718 (1927). New York's order here is in my view more akin to an economic regulation to which virtually complete deference should be accorded by this Court.

80

I doubt there would be any question as to the constitutionality of New York's conservation effort if the Public Service Commission had chosen to raise the price of electricity, see, *e. g., Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381,

60 S.Ct. 907, 84 L.Ed. 1263 (1940), *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.*, 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109 (1936), to condition its sale on specified terms, see, *e. g., Nebbia v. New York, supra*, at 527-528, 54 S.Ct., at 511-512, or to restrict its production, see, *e. g., Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). In terms of constitutional values, I think that such controls are virtually indistinguishable from the State's ban on promotional advertising.

81

An ostensible justification for striking down New York's ban on promotional advertising is that this Court has previously "rejected the 'highly paternalistic' view that government has complete power to suppress or regulate commercial speech. '[P]eople will perceive their own best interests if only they are well enough informed and . . . the best means to that end is to open the channels of communication, rather than to close them. . . .' " *Ante*, at 562. Whatever the merits of this view, I think the Court has carried its logic too far here.

82

The view apparently derives from the Court's frequent reference to the "marketplace of ideas," which was deemed analogous to the commercial market in which a *laissez-faire* policy would lead to optimum economic decisionmaking under the guidance of the "invisible hand." See, *e. g.*, Adam Smith, Wealth of Nations (1776). This notion was expressed by Mr. Justice Holmes in his dissenting opinion in *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919), wherein he stated that "the best test of truth is the power of the thought to get itself accepted in the competition of the market . . . ." See also, *e. g., Consolidated Edison v. Public Service Comm'n*, 447 U.S., at 534, 100 S.Ct., at 2331; J. Mill, On Liberty (1858); J. Milton, Areopagitica, A Speech for the Liberty of Unlicensed Printing (1644).

83

While it is true that an important objective of the First Amendment is to foster the free flow of information, identification of speech that falls within its protection is not aided by the metaphorical reference to a "marketplace of ideas." There is no reason for believing that the marketplace of ideas is free from market imperfections any more than there is to believe that the invisible hand will always lead to optimum economic decisions in the commercial market. See, *e. g.,* Baker, Scope of the First Amendment, Freedom of Speech, 25 UCLA L.Rev. 964, 967-981 (1978). Indeed, many types of speech have been held to fall outside the scope of the First Amendment, thereby subject to governmental regulation, despite this Court's references to a marketplace of ideas. See, *e. g., Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (fighting words); *Beauharnais v. Illinois*, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed.

Case 3:25-cv-00888-TLN-AC   Document 36-1   Filed 06/14/25   Page 106 of 146

Case 25-cv-00888-TLN-AC    Document 26-1    Filed 06/14/25    Page 107 of 146

919 (1952) (group libel); *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (obscenity). It also has been held that the government has a greater interest in regulating some types of protected speech than others. See, *e. g., FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (indecent speech); *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, supra* (commercial speech). And as this Court stated in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344, n. 9, 94 S.Ct. 2997, 3009, n. 9, 41 L.Ed.2d 789 (1974): "Of course, an opportunity for rebuttal seldom suffices to undo [the] harm of a defamatory falsehood. Indeed the law of defamation is rooted in our experience that the truth rarely catches up with a lie." The Court similarly has recognized that false and misleading commercial speech is not entitled to any First Amendment protection. See, *e. g., ante*, at 566.

84

The above examples illustrate that in a number of instances government may constitutionally decide that societal interests justify the imposition of restrictions on the free flow of information. When the question is whether a given commercial message is protected, I do not think this Court's determination that the information will "assist" consumers justifies judicial invalidation of a reasonably drafted state restriction on such speech when the restriction is designed to promote a concededly substantial state interest. I consequently disagree with the Court's conclusion that the societal interest in the dissemination of commercial information is sufficient to justify a restriction on the State's authority to regulate promotional advertising by utilities; indeed, in the case of a regulated monopoly, it is difficult for me to distinguish "society" from the state legislature and the Public Service Commission. Nor do I think there is any basis for concluding that individual citizens of the State will recognize the need for and act to promote energy conservation to the extent the government deems appropriate, if only the channels of communication are left open.[5] Thus, even if I were to agree that commercial speech is entitled to some First Amendment protection, I would hold here that the State's decision to ban promotional advertising, in light of the substantial state interest at stake, is a constitutionally permissible exercise of its power to adopt regulations designed to promote the interests of its citizens.

85

The plethora of opinions filed in this case highlights the doctrinal difficulties that emerge from this Court's decisions granting First Amendment protection to commercial speech. My Brother STEVENS, quoting Mr. Justice Brandeis in *Whitney v. California*, 274 U.S. 357, 376-377, 47 S.Ct. 641, 648-649, 71 L.Ed. 1095 (1927), includes Mr. Justice Brandeis' statement that "[t]hose who won our independence by revolution were not cowards. They did not fear political change.

They did not exalt order at the cost of liberty." *Ante*, at 582. Mr. Justice
BLACKMUN, in his separate opinion, joins only in the Court's judgment because
he believes that the Court's opinion "does not provide adequate protection for
truthful, nonmisleading, noncoercive commercial speech." *Ante*, at 573. Both Mr.
Justice STEVENS, *ante*, at 582, and Mr. Justice BLACKMUN, *ante*, at 577, would
apply the following formulation by Mr. Justice Brandeis of the clear-and-present-
danger test to the regulation of speech at issue in this case:

86

"If there be time to expose through discussion the falsehood and fallacies, to
avert the evil by the processes of education, the remedy to be applied is more
speech, not enforced silence. Only an emergency can justify repression."
*Whitney v. California, supra*, at 377, 47 S.Ct., at 649 (concurring opinion).

87

Although the Court today does not go so far as to adopt this position, its reasons
for invalidating New York's ban on promotional advertising make it quite difficult
for a legislature to draft a statute regulating promotional advertising that will
satisfy the First Amendment requirements established by the Court in this
context. See Part III, *infra*.

88

Two ideas are here at war with one another, and their resolution, although it be
on a judicial battlefield, will be a very difficult one. The sort of "advocacy" of
which Mr. Justice Brandeis spoke was not the advocacy on the part of a utility to
use more of its product. Nor do I think those who won our independence, while
declining to "exalt order at the cost of liberty," would have viewed a merchant's
unfettered freedom to advertise in hawking his wares as a "liberty" not subject to
extensive regulation in light of the government's substantial interest in attaining
"order" in the economic sphere.

89

While I agree that when the government attempts to regulate speech of those
expressing views on public issues, the speech is protected by the First
Amendment unless it presents "a clear and present danger" of a substantive evil
that the government has a right to prohibit, see, *e. g., Schenck v. United States*,
249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919), I think it is important
to recognize that this test is appropriate in the political context in light of the
central importance of such speech to our system of self-government. As
observed in *Buckley v. Valeo*, 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659
(1976):

90

"Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' "

91

And in *Garrison v. Louisiana*, 379 U.S. 64, 74-75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964), this Court stated that "speech concerning public affairs is more than self-expression; it is the essence of self-government."

92

The First Amendment, however, does not always require a clear and present danger to be present before the government may regulate speech. Although First Amendment protection is not limited to the "exposition of ideas" on public issues, see, *e. g., Winters v. New York*, 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948)—both because the line between the informing and the entertaining is elusive and because art, literature, and the like may contribute to important First Amendment interests of the individual in freedom of speech—it is well established that the government may regulate obscenity even though it does not present a clear and present danger. Compare, *e. g., Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 57-58, 93 S.Ct. 2628, 2635, 37 L.Ed.2d 446 (1973), with *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). Indecent speech, at least when broadcast over the airwaves, also may be regulated absent a clear and present danger of the type described by Mr. Justice Brandeis and required by this Court in *Brandenburg. FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). And in a slightly different context this Court declined to apply the clear-and-present-danger test to a conspiracy among members of the press in violation of the Sherman Act because to do so would "degrade" that doctrine. *Associated Press v. United States*, 326 U.S. 1, 7, 65 S.Ct. 1416, 1418, 89 L.Ed. 2013 (1945). Nor does the Court today apply the clear-and-present-danger test in invalidating New York's ban on promotional advertising. As noted above, in these and other contexts the Court has clearly rejected the notion that there must be a free "marketplace of ideas."

93

If the complaint of those who feel the Court's opinion does not go far enough is that the "only test of truth is its ability to get itself accepted in the marketplace of ideas"—the test advocated by Thomas Jefferson in his first inaugural address, and by Mr. Justice Holmes in *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (dissenting opinion) there is no reason whatsoever to limit the protection accorded commercial speech to "truthful,

Case 2:25-cv-00888-TLN-AC    Document 26-1    Filed 06/14/25    Page 110 of 146

nonmisleading, noncoercive speech. See *ante*, at 573 (BLACKMUN, J., concurring in judgment). If the "commercial speech" is in fact misleading, the "marketplace of ideas" will in time reveal that fact. It may not reveal it sufficiently soon to avoid harm to numerous people, but if the reasoning of Brandeis and Holmes is applied in this context, that was one of the risks we took in protecting free speech in a democratic society.

94

Unfortunately, although the "marketplace of ideas" has a historically and sensibly defined context in the world of political speech, it has virtually none in the realm of business transactions. Even so staunch a defender of the First Amendment as Mr. Justice Black, in his dissent in *Breard v. Alexandria*, 341 U.S., at 650, n., 71 S.Ct., at 936, n., stated:

95

"Of course I believe that the present ordinance could constitutionally be applied to a 'merchant' who goes from door to door 'selling pots.' "

96

And yet, with the change in solicitation and advertising techniques, the line between what Central Hudson did here and the peddler selling pots in Alexandria a generation ago is difficult, if not impossible to fix. Doubtless that was why Mr. Justice Black joined the unanimous opinion of the Court in *Valentine v. Chrestensen*, 316 U.S., at 54, 62 S.Ct., at 921, in which the Court stated:

97

"This court has unequivocally held that the streets are proper places for the exercise of the freedom of communicating information and disseminating opinion and that, though the states and municipalities may appropriately regulate the privilege in the public interest, they may not unduly burden or proscribe its employment in these public thoroughfares. *We are equally clear that the Constitution imposes no such restraint on government as respects purely commercial advertising*. Whether, and to what extent, one may promote or pursue a gainful occupation in the streets, to what extent such activity shall be adjudged a derogation of the public right of user, are matters for legislative judgment." (Emphasis added.)

98

I remain of the view that the Court unlocked a Pandora's Box when it "elevated" commercial speech to the level of traditional political speech by according it First Amendment protection in *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The line between "commercial speech," and the kind of speech that those who drafted the First Amendment had in mind, may not be a technically or intellectually easy one to

draw, but it surely produced far fewer problems than has the development of judicial doctrine in this area since *Virginia Board*. For in the world of political advocacy and *its* marketplace of ideas, there is no such thing as a "fraudulent" idea: there may be useless proposals, totally unworkable schemes, as well as very sound proposals that will receive the imprimatur of the "marketplace of ideas" through our majoritarian system of election and representative government. The free flow of information is important in this context not because it will lead to the discovery of any objective "truth," but because it is essential to our system of self-government.

99

The notion that more speech is the remedy to expose falsehood and fallacies is wholly out of place in the commercial bazaar, where if applied logically the remedy of one who was defrauded would be merely a statement, available upon request, reciting the Latin maxim "*caveat emptor*." But since "fraudulent speech" in this area is to be remediable under *Virginia Pharmacy Board, supra*, the remedy of one defrauded is a lawsuit or an agency proceeding based on common-law notions of fraud that are separated by a world of difference from the realm of politics and government. What time, legal decisions, and common sense have so widely severed, I declined to join in *Virginia Pharmacy Board*, and regret now to see the Court reaping the seeds that it there sowed. For in a democracy, the economic is subordinate to the political, a lesson that our ancestors learned long ago, and that our descendants will undoubtedly have to relearn many years hence.

III

100

The Court concedes that the state interest in energy conservation is plainly substantial, *ante*, at 568, as is the State's concern that its rates be fair and efficient. *Ante*, at 569. It also concedes that there is a direct link between the Commission's ban on promotional advertising and the State's interest in conservation. *Ibid*. The Court nonetheless strikes down the ban on promotional advertising because the Commission has failed to demonstrate, under the final part of the Court's four-part test, that its regulation is no more extensive than necessary to serve the State's interest. *Ante*, at 569-571. In reaching this conclusion, the Court conjures up potential advertisements that a utility might make that conceivably would result in net energy savings. The Court does not indicate that the New York Public Service Commission has in fact construed its ban on "promotional" advertising to preclude the dissemination of information that clearly would result in a net energy savings, nor does it even suggest that the Commission has been confronted with and rejected such an advertising proposal.[6] The final part of the Court's test thus leaves room for so many

hypothetical "better" ways that any ingenious lawyer will surely seize on one of them to secure the invalidation of what the state agency actually did. As Mr. Justice BLACKMUN observed in *Illinois Elections Bd. v. Socialist Workers Party*, 440 U.S. 173, 188-189, 99 S.Ct. 983, 993, 59 L.Ed.2d 230 (1979) (concurring opinion):

101

"A judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less 'restrictive' in almost any situation, and thereby enable himself to vote to strike legislation down."

102

Here the Court concludes that the State's interest in energy conservation cannot justify a blanket ban on promotional advertising. In its statement of the facts, the Court observes that the Commission's ban on promotional advertising is not "a perfect vehicle for conserving energy." It states:

103

"[T]he Commission's order prohibits promotional advertising to develop consumption during periods when demand for electricity is low. By limiting growth in 'off-peak' consumption, the ban limits the 'beneficial side effects' of such growth in terms of more efficient use of existing powerplants. [App. to Juris. Statement] 37a." *Ante*, at 559.

104

The Court's analysis in this regard is in my view fundamentally misguided because it fails to recognize that the beneficial side effects of "more efficient use" may be inconsistent with the goal of energy conservation. Indeed, the Commission explicitly found that the promotion of off-peak consumption would impair conservation efforts.[7] The Commission stated:

105

"Increased off-peak generation, . . . while conferring some beneficial side effects, also consumes valuable energy resources and, if it is the result of increased sales, necessarily creates incremental air pollution and thermal discharges to waterways. More important, any increase in off-peak generation from most of the major companies producing electricity in this State would not, at this time, be produced from coal or nuclear resources, but would require the use of oil-fired generating facilities. The increased requirement for fuel oil to serve the incremental off-peak load created by promotional advertising would aggravate the nations' already unacceptably high level of dependence on foreign sources of supply and would, in addition, frustrate rather than encourage conservation efforts." App. to Juris. Statement 37a.[8]

106

The Court also observes, as the Commission acknowledged, that the ban on promotional advertising can achieve only "piecemeal conservationism" because oil dealers are not under the Commission's jurisdiction, and they remain free to advertise. Until I have mastered electrical engineering and marketing, I am not prepared to contradict by virtue of my judicial office those who assume that the ban will be successful in making a substantial contribution to conservation efforts. And I doubt that any of this Court's First Amendment decisions justify striking down the Commission's order because more steps toward conservation could have been made. This is especially true when, as here, the Commission lacks authority over oil dealers.

107

The Court concludes that the Commission's ban on promotional advertising must be struck down because it is more extensive than necessary: it may result in the suppression of advertising by utilities that promotes the use of electrical devices or services that cause no net increase in total energy use. The Court's reasoning in this regard, however, is highly speculative. The Court provides two examples that it claims support its conclusion. It first states that both parties acknowledge that the "heat pump" will be "a major improvement in electric heating," and that but for the ban the utilities would advertise this type of "energy efficien[t]" product.[9] The New York Public Service Commission, however, considered the merits of the heat pump and concluded that it would most likely result in an overall increase in electric energy consumption. The Commission stated:

108

"[I]nstallation of a heat pump means also installation of central air-conditioning. To this extent, promotion of off-peak electric space heating involves promotion of on-peak summer air-conditioning as well as on-peak usage of electricity for water heating. And the price of electricity to most consumers in the State does not now fully reflect the much higher marginal costs of on-peak consumption in summer peaking markets. In these circumstances, there would be a subsidization of consumption on-peak, and consequently, higher rates for all consumers." App. to Juris. Statement 58a.

109

Subsidization of peak consumption not only may encourage the use of scarce energy resources during peak periods, but also may lead to larger reserve generating capacity requirements for the State.

110

The Court next asserts that electric heating as a backup to solar and other heat may be an efficient alternative energy source. *Ante*, at 570. The Court fails to establish, however, that an advertising proposal of this sort was properly presented to the Commission. Indeed, the Court's concession that the Commission did not make findings on this issue suggests that the Commission did not even consider it. Nor does the Court rely on any support for its assertion other than the assertion of appellant. Rather, it speculates that "[i]n the absence of authoritative findings to the contrary, we must credit as within the realm of possibility the claim that electric heat can be an efficient alternative in some circumstances." *Ibid*.[10]

111

Ordinarily it is the role of the State Public Service Commission to make factual determinations concerning whether a device or service will result in a net energy savings and, if so, whether and to what extent state law permits dissemination of information about the device or service. Otherwise, as here, this Court will have no factual basis for its assertions. And the State will never have an opportunity to consider the issue and thus to construe its law in a manner consistent with the Federal Constitution. As stated in *Barrows v. Jackson*, 346 U.S. 249, 256-257, 73 S.Ct. 1031, 1035, 97 L.Ed. 1586 (1953):

112

It would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation. Nor are we so ready to frustrate the expressed will of Congress or that of the state legislatures. Cf. *Southern Pacific Co. v. Gallagher*, 306 U.S. 167, 172 [, 59 S.Ct. 389, 391, 83 L.Ed. 586]."

113

I think the Court would do well to heed the admonition in *Barrows* here. The terms of the order of the New York Public Service Commission in my view indicate that advertising designed to promote net savings in energy use does not fall within the scope of the ban. The order prohibits electric corporations "from *promoting the use of electricity* through the use of advertising subsidy payments . . ., or employee incentives." App. to Juris. Statement 31a (emphasis added). It is not clear to me that advertising that is likely to result in net savings of energy is advertising that "promot[es] the use of electricity," nor does the Court point to any language in the Commission order that suggests it has adopted this construction. Rather, it would seem more accurate to characterize such advertising as designed to "discourage" the use of electricity.[11] Indeed, I think it is quite likely that the Commission would view advertising that would clearly result in a net savings in energy as consistent with the objectives of its order and therefore permissible.[12] The Commission, for example, has authorized the

dissemination of information that would result in *shifts* in electrical energy demand, thereby reducing the demand for electricity during peak periods. *Id.*, at 37a.**13** It has also indicated a willingness to consider at least some other types of "specific proposals" submitted by utilities. *Id.*, at 37a-38a. And it clearly permits informational as opposed to promotional dissemination of information. *Id.*, at 43a-46a. Even if the Commission were ultimately to reject the view that its ban on promotional advertising does not include advertising that results in net energy savings, I think the Commission should at least be given an opportunity to consider it.

114

It is in my view inappropriate for the Court to invalidate the State's ban on commercial advertising here, based on its speculation that in some cases the advertising may result in a net savings in electrical energy use, and in the cases in which it is clear a net energy savings would result from utility advertising, the Public Service Commission would apply its ban so as to proscribe such advertising. Even assuming that the Court's speculation is correct, I do not think it follows that facial invalidation of the ban is the appropriate course. As stated in *Parker v. Levy*, 417 U.S. 733, 760, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974), "even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the 'remainder of the statute . . . covers a whole range of easily identifiable and constitutionally proscribable . . . conduct. . . .' *CSC v. Letter Carriers*, 413 U.S. 548, 580-581, 93 S.Ct. 2880, 2898, 37 L.Ed.2d 796 (1973)." This is clearly the case here.

115

For the foregoing reasons, I would affirm the judgment of the New York Court of Appeals.

**1**

The dissenting opinion attempts to construe the Policy Statement to authorize advertising that would result "in a net energy savings" even if the advertising encouraged consumption of additional electricity. *Post*, at 604-605. The attempted construction fails, however, since the Policy Statement is phrased only in terms of advertising that promotes "the purchase of utility services" and "sales" of electricity. Plainly, the Commission did not intend to permit advertising that would enhance net energy efficiency by increasing consumption of electrical services.

**2**

"Marginal cost" has been defined as the "*extra* or incremental cost of producing an *extra* unit of output." P. Samuelson, Economics 463 (10th ed. 1976) (emphasis in original).

Central Hudson also alleged that the Commission's order reaches beyond the agency's statutory powers. This argument was rejected by the New York Court of Appeals, *Consolidated Edison Co. v. Public Service Comm'n*, 47 N.Y.2d 94, 102-104, 417 N.Y.S.2d 30, 33-35, 390 N.E.2d 749, 752-754 (1979), and was not argued to this Court.

**4**

*Consolidated Edison Co. v. Public Service Comm'n*, 63 A.D.2d 364, 407 N.Y.S.2d 735, (1978); App. to Juris. Statement 22a (N.Y.Sup.Ct., Feb. 17, 1978).

**5**

In an opinion concurring in the judgment, Mr. Justice STEVENS suggests that the Commission's order reaches beyond commercial speech to suppress expression that is entitled to the full protection of the First Amendment. See *post*, at 580-581. We find no support for this claim in the record of this case. The Commission's Policy Statement excluded "institutional and informational" messages from the advertising ban, which was restricted to all advertising "clearly intended to promote sales." App. to Juris. Statement 35a. The complaint alleged only that the "prohibition of promotional advertising by Petitioner is not reasonable regulation of Petitioner's commercial speech. . . ." *Id.*, at 70a. Moreover, the state-court opinions and the arguments of the parties before this Court also viewed this litigation as involving only commercial speech. Nevertheless, the concurring opinion of Mr. Justice STEVENS views the Commission's order as suppressing more than commercial speech because it would outlaw, for example, advertising that promoted electricity consumption by touting the environmental benefits of such uses. See *post*, at 581. Apparently the concurring opinion would accord full First Amendment protection to all promotional advertising that includes claims "relating to . . . questions frequently discussed and debated by our political leaders." *Ibid*.

Although this approach responds to the serious issues surrounding our national energy policy as raised in this case, we think it would blur further the line the Court has sought to draw in commercial speech cases. It would grant broad constitutional protection to any advertising that links a product to a current public debate. But many, if not most, products may be tied to public concerns with the environment, energy, economic policy, or individual health and safety. We rule today in *Consolidated Edison Co. v. Public Service Comm'n of New York*, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319, that utilities enjoy the full panoply of First Amendment protections for their

direct comments on public issues. There is no reason for providing similar constitutional protection when such statements are made only in the context of commercial transactions. In that context, for example, the State retains the power to "insur[e] that the stream of commercial information flow[s] cleanly as well as freely." *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 772, 96 S.Ct. 1817, 1831, 48 L.Ed.2d 346 (1976). This Court's decisions on commercial expression have rested on the premise that such speech, although meriting some protection, is of less constitutional moment than other forms of speech. As we stated in *Ohralik*, the failure to distinguish between commercial and noncommercial speech "could invite dilution, simply by a leveling process, of the force of the [First] Amendment's guarantee with respect to the latter kind of speech." 436 U.S., at 456, 98 S.Ct., at 1918.

**6**

In most other contexts, the First Amendment prohibits regulation based on the content of the message. *Consolidated Edison Co. v. Public Service Comm'n of New York*, 447 U.S., at 537-540, 100 S.Ct., at 2333-2334. Two features of commercial speech permit regulation of its content. First, commercial speakers have extensive knowledge of both the market and their products. Thus, they are well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity. *Bates v. State Bar of Arizona*, 433 U.S. 350, 381, 97 S.Ct. 2691, 2708, 53 L.Ed.2d 810 (1977). In addition, commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not "particularly susceptible to being crushed by overbroad regulation." *Ibid.*

**7**

In *Linmark Associates, Inc. v. Willingboro*, 431 U.S. 85, 95-96, 97 S.Ct. 1614, 1619-1620, 52 L.Ed.2d 155 (1977), we observed that there was no definite connection between the township's goal of integrated housing and its ban on the use of "For Sale" signs in front of houses.

**8**

This analysis is not an application of the "overbreadth" doctrine. The latter theory permits the invalidation of regulations on First Amendment grounds even when the litigant challenging the regulation has engaged in no constitutionally protected activity. *E. g., Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951). The overbreadth doctrine derives from the recognition that unconstitutional restriction of expression may deter protected speech by parties not before the court and thereby escape judicial review. *Broadrick v. Oklahoma*, 413 U.S. 601, 612-613, 93 S.Ct. 2908, 2915-2916, 37 L.Ed.2d 830 (1973); see Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844, 853-858

Case 2:25-cv-00888-TLN-AC    Document 26-1    Filed 06/14/25    Page 118 of 146

(1970). This restraint is less likely where the expression is linked to "commercial well-being" and therefore is not easily deterred by "overbroad regulation." *Bates v. State Bar of Arizona, supra*, at 381, 97 S.Ct., at 2707.

In this case, the Commission's prohibition acts directly against the promotional activities of Central Hudson, and to the extent the limitations are unnecessary to serve the State's interest, they are invalid.

**9**

We review with special care regulations that entirely suppress commercial speech in order to pursue a nonspeech-related policy. In those circumstances, a ban on speech could screen from public view the underlying governmental policy. See *Virginia Pharmacy Board*, 425 U.S., at 780, n. 8, 96 S.Ct., at 1835, n. 8 (STEWART, J., concurring). Indeed, in recent years this Court has not approved a blanket ban on commercial speech unless the expression itself was flawed in some way, either because it was deceptive or related to unlawful activity.

**10**

Several commercial speech decisions have involved enterprises subject to extensive state regulation. *E. g., Friedman v. Rogers*, 440 U.S. 1, 4-5, 99 S.Ct. 887, 891, 59 L.Ed.2d 100 (1979) (optometrists); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (lawyers); *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, supra*, at 750-752, 96 S.Ct., at 1819-1820 (pharmacists).

**11**

There may be a greater incentive for a utility to advertise if it can use promotional expenses in determining its rate of return, rather than pass those costs on solely to shareholders. That practice, however, hardly distorts the economic decision whether to advertise. Unregulated businesses pass on promotional costs to consumers, and this Court expressly approved the practice for utilities in *West Ohio Gas Co. v. Public Utilities Comm'n*, 294 U.S. 63, 72, 55 S.Ct. 316, 321, 79 L.Ed. 761 (1935).

**12**

See W. Jones, Regulated Industries 191-287 (2d ed. 1976).

**13**

The Commission also might consider a system of previewing advertising campaigns to insure that they will not defeat conservation policy. It has instituted such a program for approving "informational" advertising under the Policy Statement challenged in this case. See *supra*, at 560. We have observed that commercial speech is such a sturdy brand of expression that traditional prior restraint doctrine may not apply to it. *Virginia Pharmacy Board v. Virginia*

*Citizens Consumer Council*, 425 U.S., at 771-772, n. 24, 96 S.Ct., at 1830, n. 24. And in other areas of speech regulation, such as obscenity, we have recognized that a prescreening arrangement can pass constitutional muster if it includes adequate procedural safeguards. *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

**14**

In view of our conclusion that the Commission's advertising policy violates the First and Fourteenth Amendments, we do not reach appellant's claims that the agency's order also violated the Equal Protection Clause of the Fourteenth Amendment, and that it is both overbroad and vague.

**15**

The Commission order at issue here was not promulgated in response to an emergency situation. Although the advertising ban initially was prompted by critical fuel shortage in 1973, the Commission makes no claim that an emergency now exists. We do not consider the powers that the State might have over utility advertising in emergency circumstances. See *State v. Oklahoma Gas & Electric Co.*, 536 P.2d 887, 895-896 (Okl.1975).

**1**

See *Friedman v. Rogers*, 440 U.S. 1, 10, 99 S.Ct. 887, 894, 59 L.Ed.2d 100 (1979) (Court upheld a ban on practice of optometry under a trade name as a permissible requirement that commercial information " 'appear in such a form . . . as [is] necessary to prevent its being deceptive,' " quoting from *Virginia Pharmacy Board v. Virginia COnsumer Council*, 425 U.S. 748, 772, n. 24, 96 S.Ct. 1817, 1830, n. 24, 48 L.Ed.2d 346 (1976)); *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978).

**2**

See *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Carey v. Population Services International*, 431 U.S. 678, 700-702, 97 S.Ct. 2010, 2024-2025, 52 L.Ed.2d 675 (1977); *Linmark Associates, Inc. v. Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 50 L.Ed.2d 155 (1977); *Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).

**3**

In my view, the Court today misconstrues the holdings of both *Virginia Pharmacy Board* and *Linmark Associates* by implying that those decisions were based on the fact that the restraints were not closely enough related to the governmental interests asserted. See *ante*, at 564-565, and n. 7. Although the Court noted the

6/13/25, 9:45 PM          CENTRAL HUDSON GAS & ELECTRIC CORPORATION, Appellant, v. PUBLIC SERVICE COMMISSION OF NEW YORK. | Supre…

Case 2:25-cv-00888-TLN-AC          Document 26-1          Filed 06/14/25          Page 120 of 146

lack of substantial relationship between the restraint and the governmental interest in each of those cases, the holding of each clearly rested on a much broader principle.

**1**

See *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444, quoted *ante*, at 563, n. 5. Cf. *Smith v. United States*, 431 U.S. 291, 318, 97 S.Ct. 1756, 1772, 52 L.Ed.2d 324 (STEVENS, J., dissenting).

**2**

See Farber, Commercial Speech and First Amendment Theory, 74 Nw.U.L.Rev. 372, 382-383 (1979):

"Economic motivation could not be made a disqualifying factor [from maximum protection] without enormous damage to the first amendment. Little purpose would be served by a first amendment which failed to protect newspapers, paid public speakers, political candidates with partially economic motives and professional authors." (Footnotes omitted.)

**3**

See *id.*, at 386-387.

**4**

The utility's characterization of the Commission's ban in its complaint as involving commercial speech clearly does not bind this Court's consideration of the First Amendment issues in this new and evolving area of constitutional law.

Nor does the Commission's intention not to suppress "institutional and informational" speech insure that only "commercial speech" will be suppressed. The blurry line between the two categories of speech has the practical effect of requiring that the utilities either refrain from speech that is close to the line, or seek advice from the Public Service Commission. But the Commission does not possess the necessary expertise in dealing with these sensitive free speech questions; and, in any event, ordinarily speech entitled to maximum First Amendment protection may not be subjected to a prior clearance procedure with a government agency.

**5**

Mr. Justice Brandeis quoted Lord Justice Scrutton's comment in *King v. Secretary of State for Home Affairs ex parte O'Brien*, [1923] 2 K.B. 361, 382:

" 'You really believe in freedom of speech, if you are willing to allow it to men whose opinions seem to you wrong and even dangerous. . . .' " 274 U.S., at 377, n. 4, 47 S.Ct., at 648, n. 4.

See also *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 63, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (opinion of STEVENS, J.).

**1**

The New York Court of Appeals stated:

"In light of current exigencies, one of the policies of any public service legislation must be the conservation of our vital and irreplaceable resources. The Legislature has but recently imposed upon the commission a duty 'to encourage all persons and corporations . . . to formulate and carry out long-range programs . . . [for] the preservation of environmental values and the conservation of natural resources' (Public Service Law, § 5, subd. 2). Implicit in this amendment is a legislative recognition of the serious situation which confronts our State and Nation. More important, conservation of resources has become an avowed legislative policy embodied in the commission's enabling act (see also, *Matter of New York State Council of Retail Merchants v. Public Serv. Comm. of State of N. Y.*, 45 N.Y.2d 661, 673-674 [412 N.Y.S.2d 358, 384 N.E.2d 1282])." *Consolidated Edison Co. v. Public Service Comm'n*, 47 N.Y.2d 94, 102-103, 417 N.Y.S.2d 30, 34, 390 N.E.2d 749, 753 (1979).

**2**

In *Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980), for example, we recently upheld Air Force regulations that imposed restrictions on the free speech and petition rights of Air Force personnel. See also, *e. g., Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (commissioned officer may be prohibited from publicly urging enlisted personnel to disobey orders that might send them into combat); *Snepp v. United States*, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (employees of intelligence agency may be required to submit publications relating to agency activity for prepublication review by the agency).

**3**

In this regard the New York Court of Appeals stated:

"Public utilities, from the earliest days in this State, have been regulated and franchised to serve the commonweal. Our policy is 'to withdraw the unrestricted right of competition between corporations occupying . . . the public streets . . . and supplying the public with their products or utilities which are well nigh necessities' (*People ex rel. New York Edison Co. v. Willcox*, 207 N.Y. 86, 99, [100 N.E. 705], *Matter of New York Elec. Lines Co.*, 201 N.Y. 321, [94 N.E. 1056]). The realities of the situation all but dictate that a utility be granted monopoly status (see *People ex rel. New York Elec. Lines Co. v. Squire*, 107 N.Y. 593, 603-605, [14 N.E. 820]). To protect against abuse of this superior economic position extensive governmental regulation has been deemed a necessary coordinate

(see *People ex rel. New York Edison Co. v. Willcox, supra,* [207 N.Y.] at pp. 93-94 [100 N.E. 705]." 47 N.Y.2d, at 109-110, 417 N.Y.S.2d, at 38-39, 390 N.E.2d, at 757.

**4**

The Commission's restrictions on promotional advertising are grounded in its concern that electric utilities fulfill their obligation under the New York Public Service Law to provide "adequate" service at "just and reasonable" rates. N.Y.Pub.Serv.Law § 65(1) (McKinney 1955). The Commission, under state law, is required to set reasonable rates. N.Y.Pub.Serv.Law §§ 66(2) and 72 (McKinney 1955); § 66(12) (McKinney Supp.1979). The Commission has also been authorized by the legislature to prescribe "such reasonable improvements [in electric utilities' practices] as will best promote the public interest . . .." § 66(2). And in the performance of its duties the Commission is required to "encourage all persons and corporations subject to its jurisdiction to formulate and carry out long-range programs, individually or cooperatively, for the performance of their public service responsibilities with economy, efficiency, and care for the public safety, the preservation of environmental values, and the conservation of natural resources." N.Y.Pub.Serv.Law § 5(2) (McKinney Supp.1979). Here I think it was quite reasonable for the State Public Service Commission to conclude that the ban on promotional advertising was necessary to prevent utilities from using their broad state-conferred monopoly power to promote their own economic well-being at the expense of the state interest in energy conservation—an interest that could reasonably be found to be inconsistent with the promotion of greater profits for utilities.

**5**

Although the Constitution attaches great importance to freedom of speech under the First Amendment so that individuals will be better informed and their thoughts and ideas will be uninhibited, it does not follow that "people will perceive their own best interests," or that if they do they will act to promote them. With respect to governmental policies that do not offer immediate tangible benefits and the success of which depends on incremental contributions by all members of society, such as would seem to be the case with energy conservation, a strong argument can be made that while a policy may be in the longrun interest of all members of society, some rational individuals will perceive it to their own shortrun advantage to not act in accordance with that policy. When the regulation of commercial speech is at issue, I think this is a consideration that the government may properly take into account. As was observed in *Townsend v. Yeomans*, 301 U.S. 441, 451, 57 S.Ct. 842, 847, 81

L.Ed. 1210 (1937), "the Legislature, acting within its sphere, is presumed to know the needs of the people of the state." This observation in my view is applicable to the determination of the State Public Service Commission here.

**6**

Indeed appellee in its brief states:

"[N]either Central Hudson nor any other party made an attempt before the Commission to demonstrate or argue for a specific advertising strategy that would avoid the difficulties that the Commission found inherent in electric utility promotional advertising. The Commission, therefore continued to enforce its ban on promotion which it had instituted in 1973." Brief for Appellee 15.

The Court makes no attempt to address this statement, or to explain why, when no state body has addressed the issue, the Court should nonetheless resolve it by invalidating the state regulation.

**7**

In making this finding, the Commission distinguished "between promotional advertising designed to shift existing consumption from peak to off-peak hours and advertising designed to promote additional consumption during off-peak hours." App. to Juris. Statement 58a, n. 2. It proscribed only the latter. *Ibid.*

**8**

And in denying appellant's petition for rehearing, the Commission again stated:

"While promotion of off-peak usage, particularly electric space heating, is touted by some as desirable because it might increase off-peak usage and thereby improve a summer-peaking company's load factor, we are convinced that off-peak promotion, especially in the context of imperfectly structured electric rates, is inconsistent with the public interest, even if it could be divorced in the public mind from promoting electric usage generally. As we pointed out in our Policy Statement, increases in generation, even off-peak generation, at this time, requires the burning of scarce oil resources. This increased requirement for fuel oil aggravates the nation's already high level of dependence on foreign sources of supply." *Id.*, at 58a (footnotes omitted).

**9**

As previously discussed, however, it does not follow that because a product is "energy efficient" it is also consistent with the goal of energy conservation. Thus, with regard to the heat pump, counsel for appellees stated at oral argument that "Central Hudson says there are some [heat pumps] without air conditioning, but . . . they have never advised us of that." Tr. of Oral Arg. 32-33. The electric heat pump, he continued, "normally carr[ies] with it air conditioning in the summer, and the commission found that this would result in air conditioning that would

Case 2:25-cv-00888-TLN-AC    Document 26-1    Filed 06/14/25    Page 124 of 146

not otherwise happen." *Id.*, at 33. This is but one example of the veritable Sargasso Sea of difficult nonlegal issues that we wade into by adopting a rule that requires judges to evaluate highly complex and often controversial questions arising in disciplines quite foreign to ours.

**10**

Even assuming the Court's speculation is correct, it has shown too little. For the regulation to truly be "no more extensive than necessary," it must be established that a more efficient energy source will serve only as a means for saving energy, rather than as an inducement to consume more energy because the cost has decreased or because other energy using products will be used in conjunction with the more efficient one.

**11**

This characterization is supported by the reasoning of the New York Court of Appeals, which stated:

"[P]romotional advertising . . . seeks . . . to encourage the increased consumption of electricity, whether during peak hours or off-peak hours. Thus, not only does such communication lack any beneficial informative content, but it may be affirmatively detrimental to the society. . . . Conserving diminishing resources is a matter of vital State concern and increased use of electrical energy is inimical to our interests. Promotional advertising, if permitted, would only serve to exacerbate the crisis." 47 N.Y.2d, at 110, 417 N.Y.S.2d, at 39, 390 N.E.2d, at 757-758.

**12**

At oral argument counsel for appellant conceded that the ban would not apply to utility advertising promoting the nonuse of electricity. Tr. of Oral Arg. 6. Indeed, counsel stated: "If the use reduces the amount of electricity used, it is not within the ban. The promotional ban is defined as anything which might be expected to increase the use of electricity." *Ibid*. And counsel for appellee stated that "the only thing that is involved here is the promotion by advertising of electric usage." *Id.*, at 30. "And if a showing can be made that promotion in fact is going to conserve energy," counsel for appellee continued, "which . . . has never been made to us, the commission's order says we are ready to relax our ban, we're not interested in banning for the sake of banning it. We think that is basically a bad idea, if we can avoid it. In gas, we have been relaxing it as more gas has become available." *Id.*, at 40.

**13**

By contrast, as previously discussed, the Public Service Commission does not permit the promotion of off-peak consumption alone. *Supra*, at 600-601, and n. 8.

Case 2:25-cv-00888-TLN-AC     Document 26-1     Filed 06/14/25     Page 125 of 146

CC0 | Transformed by Public.Resource.Org

## 💼 Supreme Court Toolbox

- about
- Supreme Court collection
- liibulletin previews
- subscribe

---

**ACCESSIBILITY**

**ABOUT LII**

**CONTACT US**

**ADVERTISE HERE**

**HELP**

**TERMS OF USE**

**PRIVACY**



## EXHIBIT J –
## Bell Atlantic v. Twombly

**Case Title:** *Bell Atlantic Corp. v. Twombly*
**Citation:** 550 U.S. 544 (2007)
**Court:** Supreme Court of the United States
**Docket No.:** 05-1126
**Date Decided:** May 21, 2007
**Opinion by:** Justice Souter
**Source:** SupremeCourt.gov
**Authority Cited Under:** Binding U.S. Supreme Court precedent

---

## Relevant Summary:

The Court held that a complaint must contain **enough factual matter to state a claim that is plausible on its face**, not merely speculative. This replaced the old "no set of facts" standard and became the governing interpretation of Rule 8 pleading standards.

The case reinforced that courts can and should **dismiss claims early** when plaintiffs fail to allege concrete facts — especially in complex or high-cost litigation like TCPA class actions.

---

## Key Quotes (Pages 7–8):

*"A plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions…"*

*"Factual allegations must be enough to raise a right to relief above the speculative level… on the assumption that all the allegations in the complaint are true."*

*"Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."*

---

## Use in Motion:

Cited in the **Legal Standard** section to justify **dismissal at the pleading stage** for failure to state a plausible claim under Rule 12(b)(6).

---

***Full official Supreme Court opinion follows this page.***

(Bench Opinion)          OCTOBER TERM, 2006                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BELL ATLANTIC CORP. ET AL. *v.* TWOMBLY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 05–1126.  Argued November 27, 2006—Decided May 21, 2007

The 1984 divestiture of the American Telephone & Telegraph Company's (AT&T) local telephone business left a system of regional service monopolies, sometimes called Incumbent Local Exchange Carriers (ILECs), and a separate long-distance market from which the ILECs were excluded.  The Telecommunications Act of 1996 withdrew approval of the ILECs' monopolies, "fundamentally restructur[ing] local telephone markets" and "subject[ing] [ILECs] to a host of duties intended to facilitate market entry."  *AT&T Corp.* v. *Iowa Utilities Bd.*, 525 U. S. 366, 371.  It also authorized them to enter the long-distance market.  "Central to the [new] scheme [was each ILEC's] obligation . . . to share its network with" competitive local exchange carriers (CLECs)."  *Verizon Communications Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U. S. 398, 402.

Respondents (hereinafter plaintiffs) represent a class of subscribers of local telephone and/or high speed Internet services in this action against petitioner ILECs for claimed violations of §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  The complaint alleges that the ILECs conspired to restrain trade (1) by engaging in parallel conduct in their respective service areas to inhibit the growth of upstart CLECs; and (2) by agreeing to refrain from competing against one another, as indicated by their common failure to pursue attractive business opportunities in contiguous markets and by a statement by one ILEC's chief executive officer that competing in another ILEC's territory did not seem right.  The District Court dismissed the complaint, concluding that parallel business conduct allegations, taken alone, do not state a claim under §1; plaintiffs must

2          BELL ATLANTIC CORP. *v.* TWOMBLY

allege additional facts tending to exclude independent self-interested conduct as an explanation for the parallel actions. Reversing, the Second Circuit held that plaintiffs' parallel conduct allegations were sufficient to withstand a motion to dismiss because the ILECs failed to show that there is no set of facts that would permit plaintiffs to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence.

*Held:*

1. Stating a §1 claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. An allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Pp. 6–17.

(a) Because §1 prohibits "only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp.* v. *Independence Tube Corp.*, 467 U. S. 752, 775, "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement," *Theatre Enterprises, Inc.* v. *Paramount Film Distributing Corp.*, 346 U. S. 537, 540. While a showing of parallel "business behavior is admissible circumstantial evidence from which" agreement may be inferred, it falls short of "conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense." *Id.*, at 540–541. The inadequacy of showing parallel conduct or interdependence, without more, mirrors the behavior's ambiguity: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. Thus, this Court has hedged against false inferences from identical behavior at a number of points in the trial sequence, *e.g.,* at the summary judgment stage, see *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574. Pp. 6–7.

(b) This case presents the antecedent question of what a plaintiff must plead in order to state a §1 claim. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley* v. *Gibson*, 355 U. S. 41, 47. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.,* a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. Applying these general standards to a §1 claim, stating a claim requires a complaint with enough

Syllabus

factual matter to suggest an agreement.  Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.  The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects Rule 8(a)(2)'s threshold requirement that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief."  A parallel conduct allegation gets the §1 complaint close to stating a claim, but without further factual enhancement it stops short of the line between possibility and plausibility.  The requirement of allegations suggesting an agreement serves the practical purpose of preventing a plaintiff with " 'a largely groundless claim' " from " 'tak[ing] up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.' "  *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U. S. 336, 347.  It is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive.  That potential expense is obvious here, where plaintiffs represent a putative class of at least 90 percent of subscribers to local telephone or high-speed Internet service in an action against America's largest telecommunications firms for unspecified instances of antitrust violations that allegedly occurred over a 7-year period.  It is no answer to say that a claim just shy of plausible entitlement can be weeded out early in the discovery process, given the common lament that the success of judicial supervision in checking discovery abuse has been modest.  Plaintiffs' main argument against the plausibility standard at the pleading stage is its ostensible conflict with a literal reading of *Conley*'s statement construing Rule 8: "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  355 U. S., at 45–46.  The "no set of facts" language has been questioned, criticized, and explained away long enough by courts and commentators, and is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.  *Conley* described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.  Pp. 7–17.

2. Under the plausibility standard, plaintiffs' claim of conspiracy in restraint of trade comes up short.  First, the complaint leaves no doubt that plaintiffs rest their §1 claim on descriptions of parallel conduct, not on any independent allegation of actual agreement

Syllabus

among the ILECs. The nub of the complaint is the ILECs' parallel behavior, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience. Nothing in the complaint invests either the action or inaction alleged with a plausible conspiracy suggestion. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, the District Court correctly found that nothing in the complaint intimates that resisting the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on preserving its regional dominance. The complaint's general collusion premise fails to answer the point that there was no need for joint encouragement to resist the 1996 Act, since each ILEC had reason to try and avoid dealing with CLECs and would have tried to keep them out, regardless of the other ILECs' actions. Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act to enter into their competitors' territories, leaving the relevant market highly compartmentalized geographically, with minimal competition. This parallel conduct did not suggest conspiracy, not if history teaches anything. Monopoly was the norm in telecommunications, not the exception. Because the ILECs were born in that world, doubtless liked it, and surely knew the adage about him who lives by the sword, a natural explanation for the noncompetition is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same. Antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid §1 claim. This analysis does not run counter to *Swierkiewicz* v. *Sorema N. A.*, 534 U. S. 506, 508, which held that "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination." Here, the Court is not requiring heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed. Pp. 18–24.

425 F. 3d 99, reversed and remanded.

SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, BREYER, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, except as to Part IV.

# EXHIBIT K –
# Wal-Mart v. Dukes

**Case Title:** *Wal-Mart Stores, Inc. v. Dukes*
**Citation:** 564 U.S. 338 (2011)
**Court:** Supreme Court of the United States
**Docket No.:** 10-277
**Date Decided:** June 20, 2011
**Opinion by:** Justice Antonin Scalia
**Source:** SupremeCourt.gov / Bench Opinion
**Authority Cited Under:** Binding U.S. Supreme Court precedent

---

## Relevant Summary:

The Supreme Court reversed the Ninth Circuit's decision to certify a nationwide class of 1.5 million female Wal-Mart employees. The Court clarified that Rule 23(a)(2)'s **commonality requirement** demands more than shared legal issues — it requires that a **common answer** will resolve key questions for the class. It also held that **claims for individualized monetary relief** cannot be certified under Rule 23(b)(2).

---

## Key Quotes (Pages 8–12):

> *"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. ... Their claims must depend upon a common contention ... capable of classwide resolution."*

> *"Without some glue holding together the reasons for all those decisions, it will be impossible to say that examination of all the class members' claims will produce a common answer..."*

---

## Use in Motion:

Cited in **Section III.C** of Defendant's Motion to Dismiss to support the position that Plaintiff's class allegations fail under Rule 23 because they lack **typicality, commonality, and classwide cohesion**.

---

*Full U.S. Supreme Court opinion follows this page.*

---

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WAL-MART STORES, INC. *v.* DUKES ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 10–277.  Argued March 29, 2011—Decided June 20, 2011

Respondents, current or former employees of petitioner Wal-Mart, sought judgment against the company for injunctive and declaratory relief, punitive damages, and backpay, on behalf of themselves and a nationwide class of some 1.5 million female employees, because of Wal-Mart's alleged discrimination against women in violation of Title VII of the Civil Rights Act of 1964.  They claim that local managers exercise their discretion over pay and promotions disproportionately in favor of men, which has an unlawful disparate impact on female employees; and that Wal-Mart's refusal to cabin its managers' authority amounts to disparate treatment.  The District Court certified the class, finding that respondents satisfied Federal Rule of Civil Procedure 23(a), and Rule 23(b)(2)'s requirement of showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  The Ninth Circuit substantially affirmed, concluding, *inter alia,* that respondents met Rule 23(a)(2)'s commonality requirement and that their backpay claims could be certified as part of a (b)(2) class because those claims did not predominate over the declaratory and injunctive relief requests.  It also ruled that the class action could be manageably tried without depriving Wal-Mart of its right to present its statutory defenses if the District Court selected a random set of claims for valuation and then extrapolated the validity and value of the untested claims from the sample set.

*Held*:

1. The certification of the plaintiff class was not consistent with Rule 23(a).  Pp. 8–20.

   (a) Rule 23(a)(2) requires a party seeking class certification to

2                    WAL-MART STORES, INC. *v.* DUKES

Syllabus

prove that the class has common "questions of law or fact." Their
claims must depend upon a common contention of such a nature that
it is capable of classwide resolution—which means that determina-
tion of its truth or falsity will resolve an issue that is central to the
validity of each one of the claims in one stroke. Here, proof of com-
monality necessarily overlaps with respondents' merits contention
that Wal-Mart engages in a pattern or practice of discrimination.
The crux of a Title VII inquiry is "the reason for a particular em-
ployment decision," *Cooper* v. *Federal Reserve Bank of Richmond*, 467
U. S. 867, 876, and respondents wish to sue for millions of employ-
ment decisions at once. Without some glue holding together the al-
leged reasons for those decisions, it will be impossible to say that ex-
amination of all the class members' claims will produce a common
answer to the crucial discrimination question. Pp. 8–12.

(b) *General Telephone Co. of Southwest* v. *Falcon*, 457 U. S. 147,
describes the proper approach to commonality. On the facts of this
case, the conceptual gap between an individual's discrimination claim
and "the existence of a class of persons who have suffered the same
injury," *id.*, at 157–158, must be bridged by "[s]ignificant proof that
an employer operated under a general policy of discrimination," *id.,*
at 159, n. 15. Such proof is absent here. Wal-Mart's announced pol-
icy forbids sex discrimination, and the company has penalties for de-
nials of equal opportunity. Respondents' only evidence of a general
discrimination policy was a sociologist's analysis asserting that Wal-
Mart's corporate culture made it vulnerable to gender bias. But be-
cause he could not estimate what percent of Wal-Mart employment
decisions might be determined by stereotypical thinking, his testi-
mony was worlds away from "significant proof" that Wal-Mart "oper-
ated under a general policy of discrimination." Pp. 12–14.

(c) The only corporate policy that the plaintiffs' evidence convinc-
ingly establishes is Wal-Mart's "policy" of giving local supervisors
discretion over employment matters. While such a policy could be
the basis of a Title VII disparate-impact claim, recognizing that a
claim "can" exist does not mean that every employee in a company
with that policy has a common claim. In a company of Wal-Mart's
size and geographical scope, it is unlikely that all managers would
exercise their discretion in a common way without some common di-
rection. Respondents' attempt to show such direction by means of
statistical and anecdotal evidence falls well short. Pp. 14–20.

2. Respondents' backpay claims were improperly certified under
Rule 23(b)(2). Pp. 20–27.

(a) Claims for monetary relief may not be certified under Rule
23(b)(2), at least where the monetary relief is not incidental to the
requested injunctive or declaratory relief. It is unnecessary to decide

Syllabus

whether monetary claims can ever be certified under the Rule because, at a minimum, claims for individualized relief, like backpay, are excluded. Rule 23(b)(2) applies only when a single, indivisible remedy would provide relief to each class member. The Rule's history and structure indicate that individualized monetary claims belong instead in Rule 23(b)(3), with its procedural protections of predominance, superiority, mandatory notice, and the right to opt out. Pp. 20–23.

(b) Respondents nonetheless argue that their backpay claims were appropriately certified under Rule 23(b)(2) because those claims do not "predominate" over their injunctive and declaratory relief requests. That interpretation has no basis in the Rule's text and does obvious violence to the Rule's structural features. The mere "predominance" of a proper (b)(2) injunctive claim does nothing to justify eliminating Rule 23(b)(3)'s procedural protections, and creates incentives for class representatives to place at risk potentially valid monetary relief claims. Moreover, a district court would have to reevaluate the roster of class members continuously to excise those who leave their employment and become ineligible for classwide injunctive or declaratory relief. By contrast, in a properly certified (b)(3) class action for backpay, it would be irrelevant whether the plaintiffs are still employed at Wal-Mart. It follows that backpay claims should not be certified under Rule 23(b)(2). Pp. 23–26.

(c) It is unnecessary to decide whether there are any forms of "incidental" monetary relief that are consistent with the above interpretation of Rule 23(b)(2) and the Due Process Clause because respondents' backpay claims are not incidental to their requested injunction. Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay. Once a plaintiff establishes a pattern or practice of discrimination, a district court must usually conduct "additional proceedings . . . to determine the scope of individual relief." *Teamsters* v. *United States*, 431 U. S. 324, 361. The company can then raise individual affirmative defenses and demonstrate that its action was lawful. *Id.*, at 362. The Ninth Circuit erred in trying to replace such proceedings with Trial by Formula. Because Rule 23 cannot be interpreted to "abridge, enlarge or modify any substantive right," 28 U. S. C. §2072(b), a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims. Pp. 26–27.

603 F. 3d 571, reversed.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, and ALITO, JJ., joined, and in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined as to Parts I and III.

4                  WAL-MART STORES, INC. *v.* DUKES

Syllabus

GINSBURG, J., filed an opinion concurring in part and dissenting in part, in which BREYER, SOTOMAYOR, and KAGAN, JJ., joined.

# EXHIBIT L –
# Little v. City of Seattle

**Case Title:** *Little v. City of Seattle*
**Citation:** 863 F.2d 681 (9th Cir. 1988)
**Court:** U.S. Court of Appeals, Ninth Circuit
**Date Decided:** December 19, 1988
**Judges:** Sneed, Alarcon, and Beezer
**Source:** CourtListener.com (full public-access opinion)
**Authority Cited Under:** Binding Ninth Circuit precedent

---

## Relevant Summary:

The Ninth Circuit upheld the district court's decision to limit discovery pending resolution of dispositive motions. The opinion reaffirmed that trial courts have **broad discretion** to control the scope and timing of discovery and may **stay discovery entirely** when it is not needed to resolve legal issues in a pending motion.

---

## Key Quote (Page 685):

> *"A district court has wide discretion in controlling discovery. … A district court's decision to limit discovery will not be disturbed unless it is clearly unreasonable, arbitrary, or fanciful."*

---

## Use in Motion:

Cited in your **Motion to Stay Discovery and All Rule 26 Obligations** to support the Court's authority to pause discovery until a pending Motion to Dismiss is resolved, especially when discovery is burdensome and may be unnecessary.

---

## Page Range in PDF: Pages 1–7 (attached)

***Full Ninth Circuit opinion follows this page.***

---

6/13/25, 10:02 PM          24 soc.sec.rep.ser. 227, Medicare&medicaid Gu 37,606 South Hills Health System, a Pennsylvania... – CourtListener.com

Dec. 30, 1988 Case 2:25-cv-00888-TLN-AC    Document 26-1    Filed 06/14/25    Page 137 of 146

# 24 soc.sec.rep.ser. 227, Medicare&medicaid Gu 37,606 South Hills Health System, a Pennsylvania Hospital Corp. And the Robert Packer Hospital (Guthrie Medical Center), Loch Haven Hospital, Evangelical Community Hospital, Centre Community Hospital, Wilkes Barre General Hospital, and Dubois Regional Medical Center, Intervening v. Otis Bowen, Secretary of Health and Human Services, and Blue Cross of Western Pa

Court of Appeals for the Third Circuit

**Citations:** 864 F.2d 1084
**Docket Number:** 87-3551

## Combined Opinion

864 F.2d 1084

24 Soc.Sec.Rep.Ser. 227, Medicare&Medicaid Gu 37,606
SOUTH HILLS HEALTH SYSTEM, A Pennsylvania Hospital Corp. and
the Robert Packer Hospital (Guthrie Medical Center), Loch
Haven Hospital, Evangelical Community Hospital, Centre
Community Hospital, Wilkes Barre General Hospital, and
Dubois Regional Medical Center, Intervening Plaintiffs, Appellants
v.
Otis BOWEN, Secretary of Health and Human Services, and Blue
Cross of Western PA.

No. 87-3551.

United States Court of Appeals,
Third Circuit.

Argued Jan. 20, 1988.
Decided Dec. 30, 1988.

Roland Morris (argued), Jane Dalton Elliott, Duane, Morris & Heckscher, Philadelphia, Pa., for appellants.

Timothy M. White (argued), Office of the General Counsel, Dept. of Health and Human Services, Washington, D.C., for appellees.

Before HIGGINBOTHAM and BECKER, Circuit Judges, and HUYETT, District Judge.*

OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

1

This case presents the question whether the district court properly refused to enjoin the Secretary of the Department of Health and Human Services ("HHS") from releasing certain Medicare related hospital cost reports to persons requesting them under the Freedom of Information Act, 5 U.S.C. Sec. 552 (1983) ("FOIA"). Appellants are eight hospitals located in Pennsylvania, required by law to submit these annual cost reports to HHS's Health Care Financing Administration ("HCFA") as a condition to reimbursement for the health care services they provide to Medicare beneficiaries. The district court granted summary judgment for the Secretary. The court concluded that the disclosure rule was neither inconsistent with applicable regulations, arbitrary and capricious, nor a violation of either the Trade Secrets Act, 18 U.S.C. Sec. 1905 (1983), or the fifth amendment's guarantee of due process, since a valid HCFA regulation, 42 C.F.R. Sec. 401.135(c) (1987), requires the Secretary to release the cost reports. We agree with the district court that the disclosure regulation is not inconsistent with other agency regulations, and we find that it is authorized by law as required by the Administrative Procedure Act ("APA"). However, we find that a challenge to the regulation as arbitrary and capricious is premature at this time, as the agency has not yet had an opportunity to make a record in response to the appellants' argument that a significant change in market conditions has rendered the regulation arbitrary. Accordingly, the district court did not have jurisdiction over the arbitrariness and capriciousness challenge brought by the appellants. We will therefore affirm the decision of the district court in part, vacate it in part, and remand with instructions that the district court dismiss in accordance with this opinion.

2

I. The Procedural History.

3

Title XVIII of the Social Security Act, 42 U.S.C.A. Secs. 1395-1395xx (1983) ("the Act"), established the program of Health Insurance for the Aged and Disabled popularly known as Medicare. The Secretary of Health and Human Services ("the Secretary") administers the program through the HCFA. Hospitals that participate in the Medicare program are required, by statute and regulation, to submit annual cost reports to the HCFA. See 42 U.S.C.A. Sec. 1395g(a) (1983); 42 C.F.R. Sec. 413.20(b) (1987).1 These reports set forth in detail the costs incurred by hospitals in providing medical services, and enable HCFA to calculate appropriate reimbursement levels for participating health care providers. Since 1975, an HCFA regulation, 42 C.F.R. Sec. 401.135(c) (1987), has made the reports available to any member of the public who requests them in writing.2

4

In July 1984, South Hills Health System ("South Hills"), which operates a hospital, a home health care agency, and a nursing home, was notified by Blue Cross of Western Pennsylvania that several hospitals had made Freedom of Information Act requests for copies of its facilities' cost reports. Blue Cross also notified South Hills that it planned to provide the information upon receipt of the reports' copying costs from the requesters. South Hills immediately wrote to Blue Cross, objecting to disclosure. It contended that the information was confidential and, as such, exempt from mandatory disclosure under the FOIA, 5 U.S.C. Sec. 552(b)(4) (1983) ("Exemption 4").3 Moreover, it claimed that disclosing this information to its competitors would seriously jeopardize its marketplace position.

5

In support of the latter argument, South Hills asserted that competition in the health care marketplace had increased since the promulgation of the regulations, due in part to a change in the method of calculating Medicare reimbursement to health care providers. In 1983, as part of its general program of reducing the federal budget deficit, Congress passed the Social Security Amendments of 1983. These amendments changed the system of calculating payments to hospitals and other providers participating in the Medicare program from a system based on the providers' "reasonable costs," a payment regime based on a hospital's actual costs, to a "prospective payment system," a flat rate system. Pursuant to the change, the HCFA reimburses participating hospitals for the costs of inpatient care in accordance with a payment schedule for standard types of patient cases, called Diagnosis Related Groups. 42 U.S.C. Sec. 1395ww(d) (Supp.1985). Congress's intent in mandating this change was its desire to increase hospital cost efficiency. See Staff of the House Committee on Ways and Means, 98th Cong., 1st Sess., Social Security Act Amendments of 1983 (Comm.Print 1983), reprinted in 382 Medicare and Medicaid Guide 131, 132 (C.C.H.1983). South Hills argues that this change has caused such increased competition in the health care market as to render the disclosure regulation, 42 C.F.R. Sec. 401.135(c), "no longer viable or realistic." Appellants' Appendix ("App'ts.App.") at 26A. South Hills has continued to rely principally on this argument throughout its dealings with the HCFA and in this litigation. Since we hold only that the district court had no jurisdiction to consider an arbitrariness and capriciousness challenge to the regulation until a proper party made a 553(e) petition for reconsideration of the rule, we specifically make no finding as to the accuracy of these assertions.

6

Blue Cross initially replied that it was required to release the reports absent a court order to the contrary. Upon further discussion with regional HCFA officials, however, Blue Cross agreed to forward the documents to HCFA's Office of Public Affairs in Baltimore and to allow that office to review the FOIA requests and notify South Hills whether HHS would release the reports. In November 1984, HCFA's Baltimore public affairs office informed South Hills by telephone that the Medicare cost reports would be released. Shortly thereafter, South Hills representatives met with HCFA Baltimore officials, who agreed to further delay disclosure until they had re-examined the applicable regulation to determine whether release of the reports was authorized. In January 1986, HCFA's FOIA officer

informed South Hills, either through the agency or the courts, to examine the public record regarding the release of the cost reports, South Hills's cost reports would be released in accordance with 42 C.F.R. Sec. 401.135(c) (1987). HCFA then granted South Hills's request that it further delay the release of the cost reports so that South Hills could file an appeal from HCFA's decision.

7

In January 1986, South Hills filed a complaint in the United States District Court for the Western District of Pennsylvania, seeking reversal of HCFA's decision on the grounds that: (1) release under authority of 42 C.F.R. Sec. 401.135(c) would violate certain other HCFA disclosure regulations; (2) 42 C.F.R. Sec. 401.135(c) does not authorize release because it is arbitrary, capricious, and an abuse of the Secretary's discretion under the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A) (1982);4 (3) disclosure of the cost reports would violate the Trade Secrets Act, 18 U.S.C. Sec. 1905 (1983); and (4) disclosure of its Medicare cost reports--without HCFA's individualized consideration of each requested report to determine whether release is precluded by Exemption 4--would violate South Hills's constitutional right to due process guaranteed by the fifth amendment. In addition, South Hills sought preliminary and permanent injunctions restraining the Secretary and Blue Cross of Western Pennsylvania from releasing its Medicare cost reports to any person or entity not connected with the Medicare program in an official government capacity.

8

The district court subsequently granted motions permitting fourteen additional hospitals to intervene as plaintiffs, and granted leave for the Hospital Association of Pennsylvania to file a brief amicus curiae in support of South Hills. With the approval of the district court, all parties stipulated that the Secretary and Blue Cross would not release the Medicare cost reports of the plaintiffs pending final judgment of the district court.

9

In August 1987, the district court entered an order denying the motions for summary judgment filed by South Hills and the intervening plaintiffs and granting the motions for summary judgment of the Secretary and Blue Cross. The district court found that the cost data contained in the Medicare reports was confidential commercial or financial information of the kind covered by both Exemption 4, 5 U.S.C. Sec. 552(b)(4), and the Trade Secrets Act, 18 U.S.C. Sec. 1905. South Hills v. Bowen, No. 86-178, slip op. at 7 (W.D.Pa. Aug. 6, 1987). It held, however, that 42 C.F.R. Sec. 401.135(c) did not violate any other HHS or HCFA regulation, that it properly authorized disclosure notwithstanding the cost reports' confidential nature, and that, under the altered reimbursement regime, it is neither arbitrary and capricious, nor a violation of the Trade Secrets Act. Id. at 8-9. The district court reasoned that "the advent of increased competition in the health care market pursuant to the prospective payment system, does not diminish the public's right to assure that Medicare funds are properly spent." Id. at 9. With respect to South Hills's fifth amendment claim, the district court found that disclosure of the Medicare cost reports would not constitute a deprivation of property without due process of law.

10

South Hills and seven of the intervening hospitals--the Robert Packer Hospital (Guthrie Medical Center), Lock Haven Hospital, Evangelical Community Hospital, Centre Community Hospital, Wilkes-Barre General Hospital, Lewistown Hospital, and DuBois Regional Medical Center--now appeal from the district court's decision.5 In response to a motion filed by the hospitals, the district court issued an order staying any action on its order pending this appeal.

11

II. Legislative, Regulatory, and Judicial Background of the

12

Disclosure Regulation.

13

After the passage of the FOIA, the Secretary of Health, Education and Welfare, HHS's predecessor agency, initially denied FOIA requests for Medicare related reports. Relying on 42 U.S.C. Sec. 1306(a) of the Social Security statute,6 which prohibits disclosure of Medicare related reports except as specifically authorized by regulation, the Secretary took the position that since he declined to publish a regulation providing for disclosure of the reports, subsection (b)(3) of the Freedom of Information Act, 5 U.S.C. Sec. 552(b)(3) (hereinafter "Exemption 3"), prohibiting disclosure of matters specifically exempted by statute, was controlling. Stretch v. Weinberger, 495 F.2d 639, 640 (3d Cir.1974).

14

This Court rejected the Secretary's argument and held that 42 U.S.C. Sec. 1306(a) was not a withholding statute within the meaning of Exemption 3. Id. at 639.7 We found that Congress's intent in enacting the Social Security Act's disclosure provision was twofold: " 'to insure efficient administration and to protect recipients from humiliation and exploitation,' " id. at 640 (quoting S.Rep. No. 734, 76th Cong., 1st Sess. 29 (1939)), by shielding "highly personal data about [them]" from the public. Id. We also found that Congress did not have similar concerns about surveys or reports on extended care facilities, since at the time of the passage of legislation, the Department was itself not concerned with them. Id.8

15

Following Steen v. United States Dept. of the Army, 26 Schechter v. Weinberger, 506 F.2d 1275 (D.C.Cir.1974) (medical laboratory and hospital); Serchuk v. Weinberger, 493 F.2d 663 (5th Cir.1974); but see People of the State of California v. Weinberger, 505 F.2d 767 (9th Cir.1974), the Secretary engaged in formal rulemaking under the Administrative Procedures Act, 5 U.S.C. Sec. 553 (1982), and promulgated the regulation at issue here. In the period following its promulgation, a number of hospitals unsuccessfully challenged the rule. See Parkridge Hospital, Inc. v. Califano, 625 F.2d 719 (6th Cir.1980); Humana of Virginia v. Blue Cross of Virginia, 622 F.2d 76 (4th Cir.1980); St. Mary's Hospital, Inc. v. Harris, 604 F.2d 407 (5th Cir.1979); St. Joseph's Hospital Health Center v. Blue Cross of Central N.Y., Inc., 489 F.Supp. 1052 (N.D.N.Y.1979), aff'd, 614 F.2d 1290 (2d Cir.1979), cert. denied, 445 U.S. 962, 100 S.Ct. 1650, 64 L.Ed.2d 238 (1980); Cedars Nursing and Convalescent Center, Inc. v. Aetna Life and Casualty Co., 472 F.Supp. 296 (E.D.Pa.1979); Brookwood Medical Center, Inc. v. Califano, 470 F.Supp. 1247 (N.D.Ga.1979); Doctor's Hospital of Sarasota, Inc. v. Califano, 455 F.Supp. 476, 479 (M.D.Fla.1978).

16

Since these court rulings, HHS has transferred the regulation, without subsequent change, from one section of its regulations to another in accordance with its internal reorganization. 46 Fed.Reg. 55,695-55,696 (1981). Section 401.135 was initially published as part of the Social Security regulations at 20 C.F.R. Sec. 422.435 (1975). In 1981, following the Secretary of HHS's designation of the HCFA as the agency responsible for administering the Medicare program, the HCFA issued regulations separately implementing the Freedom of Information Act with respect to documents collected or produced in the administration of the Social Security Act, 42 C.F.R. Secs. 401.101-401.152 (1981), under authority of Sec. 1106 of the Social Security Act, 42 U.S.C. Sec. 1306 (1982). HCFA included among these rules, without change, the Medicare cost report release rule.

17

III. The Appellants' Arguments.

18

On this appeal, the health care providers seek a permanent injunction against disclosure of Medicare cost reports by the Secretary and Blue Cross, or in the alternative, that the Secretary be required to promulgate additional regulations that provide for case-by-case evaluation of such FOIA requests for cost reports as arise and that the Secretary be enjoined from releasing any reports until such rulemaking is completed. Our review of the district court's grant of summary judgment is plenary.

19

A. The Disclosure Rule is not Inconsistent with other HHS regulations.

20

The Hospitals argue that, in applying 42 C.F.R. Sec. 401.135(c), the Secretary is violating two other HHS regulations: 42 C.F.R. Secs. 401.105(a) and 401.126(c). The first of these requires HHS to apply the FOIA exemptions, including Exemption 4, to every proposed disclosure of information. See 42 C.F.R. Sec. 401.105(a) (1988). The second provides that requested information that falls under one of the FOIA exemptions may nevertheless be released, subject to a case-by-case determination, based on consideration of the obligation of confidentiality and the administrative necessity of disclosure. See 42 C.F.R. Sec. 401.126(c) (1988). The Hospitals argue that their Medicare cost reports are covered by Exemption 4. Consequently, they argue, the Secretary's decision to release the reports under the authority of 42 C.F.R. Sec. 401.135(c), without conducting case-by-case determinations, is inconsistent with the two HHS FOIA rules described above. This "inconsistency" or derogation of HHS's own rules, the Hospitals argue, results in the Secretary's action being arbitrary and capricious under 5 U.S.C. Sec. 706(2)(A).

21

The Hospitals also contend that, because the agency is "inconsistent," its determination regarding the release of their cost reports should be accorded lessened deference on this review because the agency has failed to interpret its blanket disclosure rule--which read alone is susceptible of only one meaning--in light of the two other regulations. We find, however, that there is no inconsistency between HCFA's Medicare cost report disclosure rule and its other FOIA regulations. Accordingly, we will not intrude on the Secretary's determination.

1.

22

Section 401.105(a), the first rule that the Hospitals contend that the Secretary is violating, provides that:

23

The Freedom of Information Act rules shall be applied to every proposed disclosure of information. If, considering the circumstances of the disclosure, the information would be made available in accordance with the Freedom of Information Act rules, then the information may be disclosed regardless of whether the requester or recipient of the information has a statutory right to request the information under the Freedom of Information Act, 5 U.S.C. 552, or whether a request has been made.

24

42 C.F.R. Sec. 401.105(a) (1988). The Hospitals argue that this regulation was intended to protect their interest in the confidentiality of their reports and that the regulation must therefore be applied to them. In arguing for this conclusion, the Hospitals rely on the Supreme Court's statement in Chrysler Corporation v. Brown, 441 U.S. 281 (/opinion/110062/chrysler-corp-v-brown/), 99 S.Ct. 1705 (/opinion/110062/chrysler-corp-v-brown/), 60 L.Ed.2d 208 (/opinion/110062/chrysler-corp-v-brown/) (1979), that Congress's principal concern in the FOIA was for the agency's need for confidentiality and that "the FOIA by itself protects the submitters' interest in confidentiality only to the extent that this interest is endorsed by the agency collecting the information." Chrysler, 441 U.S. at 292-93 (/opinion/110062/chrysler-corp-v-brown/), 99 S.Ct. at 1712-13 (/opinion/110062/chrysler-corp-v-brown/). In our view, 42 C.F.R. Sec. 401.105(a) is a general regulation that does not provide the type of specific endorsement of a submitter's--here the hospitals'--interest in confidentiality envisioned by Chrysler.

25

In light of this conclusion, we also reject the Hospitals' contention that there is an inconsistency between 42 C.F.R. Sec. 401.105(a) and the agency's decision to release the hospital cost reports. This rule merely states that anyone seeking information from the agency, whether or not that person is entitled to make a FOIA request, and whether or not he or she calls it a FOIA request, will be treated as a person making the request under FOIA and entitled to do so under FOIA for purposes of these regulations: it grants to everyone requesting information the same minimum rights as an FOIA requester. The regulation does not bar the HCFA from deciding that some requesters--such as those seeking the disclosure of Medicare cost reports--should be granted greater rights than a FOIA requester. The regulation therefore does not preclude or supercede HCFA's mandatory disclosure rule for Medicare cost reports. Accordingly, HCFA's disclosure order, based on this regulation, does not violate the minimum, general requirement of 42 C.F.R. Sec. 401.105(a).

2.

26

The Hospitals also contend that Sec. 401.126 conflicts with the disclosure regulation. That section states that:

27

Neither 5 U.S.C. 552 nor this regulation directs the withholding of any record or information, except to the extent of the prohibitions in paragraph (b) of this section. Except for material required to be withheld under the statutory provisions incorporated in paragraph (b) of this section or under another statute which meets the standards in 5 U.S.C. 552(b)(3), materials exempt from mandatory disclosure will nevertheless be made available when this can be done consistently with obligations of confidentiality and administrative necessity. The disclosure of materials or records under these circumstances in response to a specific request, however, is of no precedent force with respect to any other request.

28

42 C.F.R. Sec. 401.126(c) (1988). Again, we see no inconsistency between this regulation and the Secretary's order to release the hospitals' Medicare cost reports. This regulation provides only that materials sought will be released, even if they are exempt from mandatory disclosure, as long as a statute does not specifically prohibit their release and as long as such release is consistent with the obligations of confidentiality and administrative necessity. Paragraph (b), to which the regulation refers, lists statutorily exempted materials. The Medicare cost reports are not included.9 We therefore read Section 401.126(c) as a requirement that certain information be released, and find that it is perfectly consistent with the existence of other subsections--such as Sec. 401.135(c)-- requiring the release of additional, specified information. We conclude that this regulation, like 42 C.F.R. Sec. 401.105(a), describes minimum, general requirements for disclosure of information and that it does not preclude the Secretary from deciding to release the Medicare cost reports under a more stringent, specific regulation mandating their disclosure.

29

We further note that HCFA's Medicare cost report disclosure regulation is consistent with HHS's regulations, which the HCFA regulations supplement, rather than replace or restrict. See 42 C.F.R. Sec. 401.101(3) (1988). The HHS regulation implementing the FOIA is published at 45 C.F.R. Part 5. Section 5.71(c) of that regulation provides: "Except to the extent specifically otherwise provided by regulations of operating agencies, information having a commercial or financial value and in which the person providing the information has a proprietary interest will not be disclosed if it is in fact confidential." 42 C.F.R. Sec. 5.71(c)(1987) (emphasis added).

30

Because no regulation pointed to by the health care providers is inconsistent with 42 C.F.R. Sec. 401.135(c), we find that the Secretary did not act inconsistently with HCFA's regulations by ordering the release of the Hospitals' cost report.

31

B. South Hills' Argument that the Disclosure Regulation has Become Arbitrary and Capricious due to Increased Health Care Market Competition Is Not Yet Ripe for Consideration.

32

South Hills asserts that its cost reports are covered by exemption 4's exemption of confidential financial information. It further asserts that the Secretary's decision to release the reports is arbitrary and capricious, because the regulation that he relied on for authority to disclose that information is arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. Sec. 706(2) (A) (1982). South Hills contends that competition among hospitals, and in particular between hospitals and Health Maintenance Organizations, which do not have to file the cost reports, has intensified since the 1983 change in the Medicare reimbursement system. South Hills further maintains that in the current health care market, the revelation of a health care provider's cost data threatens its market position. South Hills further argues that the 1983 shift to the prospective payment system has diminished the public interest in disclosure of hospital cost information, because reimbursement is no longer tied to a hospital's actual costs, but instead is made pursuant to the fixed payment schedule established by HCFA's Diagnosis Related Groups. South Hills argues that, consequently, cost information is no longer a useful vehicle for public monitoring of Medicare expenditures. For that reason, it asserts, the determination that HHS made in promulgating its disclosure regulation--that the public interest served in disclosure outweighs any harm caused to health care providers by virtue of disclosure of its confidential information--is no longer reasonable and enforcement of the regulation is arbitrary, capricious, and in violation of the APA.

33

Relying on its argument that Sec. 401.135(c) is now arbitrary and capricious, South Hills also argues that, because Sec. 401.135(c) violates the APA, it cannot provide the authorization for release that the Trade Secrets Act, 18 U.S.C. Sec. 1905 (1982), requires. The Trade Secrets Act requires that government officials only release confidential information when "authorized by law," a requirement that South Hills argues has not been met here. South Hills acknowledges that under Sec. 1905, information otherwise shielded from disclosure by the statute may be disclosed pursuant to an agency disclosure regulation, if that regulation provides the "authoriz[ation] by law" required by the Trade Secrets Act. Chrysler, 441 U.S. at 295 (/opinion/110062/chrysler-corp-v-brown/), 99 S.Ct. at 1714 (/opinion/110062/chrysler-corp-v-brown/). It also concedes that several courts have held that 42 C.F.R. Sec. 401.135(c) does fulfill Chrysler's criteria for providing the requisite authorization. See, e.g. Parkridge Hospital, Inc. v. Califano, 625 F.2d 719 (6th Cir.1980). South Hills argues, however, that because "extraordinary changes ... in the health care industry since those cases were decided have rendered [Sec.] 401.135(c) invalid," South Hills Brief at 24, the regulation does not currently provide the legal sanction required by Sec. 1905 for disclosure.

34

The district court rejected South Hills's argument that the current conditions of the health care market have rendered 42 C.F.R. Sec. 401.135(c) arbitrary and capricious. While we find that South Hills may legitimately bring an arbitrariness and capriciousness challenge to the legislation, we hold that under the circumstances of this case, the district court lacked jurisdiction to determine whether the regulation is arbitrary and capricious.

35

1. South Hills' Assertion That the Regulation is Arbitrary and Capricious is not Ripe at This Time.

36

South Hills may legitimately attack 42 C.F.R. Sec. 401.135(c) for being arbitrary and capricious under the APA. We see no rationale in the APA that would preclude a challenge to disclosure regulations on the grounds that they were arbitrary and capricious. See Chrysler, 441 U.S. at 308 (/opinion/110062/chrysler-corp-v-brown/), 99 S.Ct. at 1720 (/opinion/110062/chrysler-corp-v-brown/) (so indicating). Indeed, several appellate courts adjudicating the earlier series of challenges to HHS's cost report disclosure rule assumed that even a disclosure regulation that meets the Chrysler criteria of being "authorized by law" within the meaning of the Trade Secrets Act, and that is therefore "in accordance with law" within the meaning of 5 U.S.C. Sec. 706(2)(A), may nevertheless run afoul of the APA because it is "arbitrary, capricious, [and] an abuse of discretion," 5 U.S.C. Sec. 706(2)(A) (1982). Parkridge Hospital, Inc. v. Califano, 625 F.2d 719, 725 (6th Cir.1980); Humana of Virginia v. Blue Cross of Virginia, 622 F.2d 76, 79-80 (4th Cir.1980); St. Mary's Hospital, Inc. v. Harris, 604 F.2d 407, 410 (5th Cir.1979); St. Joseph's Hospital Health Center v. Blue Cross of Central New York, Inc., 489 F.Supp. 1052, 1062 (N.D.N.Y.1979), aff'd mem, 614 F.2d 1290 (1st Cir.1979), cert. denied, 445 U.S. 962, 100 S.Ct. 1650, 64 L.Ed.2d 238 (1980).

37

However, the district court was without jurisdiction to consider such a challenge at this time. The reason is simple: There is no agency record for the court to review. Under Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (/opinion/108283/citizens-to-preserve-overton-park-inc-v-volpe/), 91 S.Ct. 814 (/opinion/108283/citizens-to-preserve-overton-park-inc-v-volpe/), 28 L.Ed.2d 136 (/opinion/108283/citizens-to-preserve-overton-park-inc-v-volpe/) (1971), courts review agency decisions by evaluating whether the agency's record provides substantial support for the decision that has been reached. In the present case, the only existing agency record concerning the rule is that created by HHS when the regulation was promulgated. But South Hills does not argue that the rule was invalid when promulgated, which was prior to the change from a cost-based reimbursement system to a diagnosis-based reimbursement system. It does not challenge the Secretary's reasoning at the time of promulgation that the regulation would result in no deleterious impact on hospital competition or the country's health care.

Since South Hills concedes that the disclosure regulation had the force of law when promulgated, and does not argue that there was an improper adjudication in its case, all that remains of its contention is that this validly promulgated agency regulation should be repealed on the grounds that supervening changes have rendered it arbitrary and capricious. South Hills is in effect arguing that at some point after the Congress legislated, and HCFA adopted regulations concerning, the new system of Medicare reimbursement, the blanket disclosure rule ceased to be a rational method of handling FOIA requests for Medicare cost reports, because the harm caused to the providers by their release was greater than the public interest in disclosure. South Hills is implicitly contending that at that point, HCFA should have rescinded the regulation and either adopted a new regulation exempting all Medicare cost reports from disclosure, or at a minimum, established a case-by-case determination of whether to withhold, according to the same procedures established by the agency for handling other materials covered by Exemption 4. The Secretary having failed to exercise his discretion in this manner, South Hills is asking this Court to require him to do so.

39

The principal case relied on in support of this argument is Geller v. FCC, 610 F.2d 973 (D.C.Cir.1979), which, the providers assert, stands for the proposition that where the predicate for a regulation is removed, the agency's failure to repeal the rule is arbitrary and capricious.

40

South Hills has standing to assert this claim under Sec. 4(e) of the Administrative Procedure Act, which states that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. Sec. 553(e) (1982). Courts have held that persons believing themselves aggrieved by a longstanding regulation are under certain circumstances not limited to the time period prescribed by the authorizing statute for challenging the regulation. See Geller v. FCC, 610 F.2d 973 (/opinion/372466/henry-geller-v-federal-communications-commission-and-united-states-of/), 977 (1979); Investment Co. Inst. v. Board of Governors of the Federal Reserve System, 551 F.2d 1270, 1280-81 (D.C.Cir.1977).

41

Geller provides a clear example of the nature of such challenges. Although direct judicial review of Federal Communications Commission orders could only validly be sought within sixty days of the orders' promulgation, Geller successfully challenged such an order collaterally five years later. See Geller, 610 F.2d at 977 (/opinion/372466/henry-geller-v-federal-communications-commission-and-united-states-of/). The order had adopted an industry compromise, parts of which were concededly not in the public interest, in order to facilitate the passage of new copyright legislation that was to define better the respective rights of the broadcasting and cable television industries. Once this legislation had been passed, the agency's order had served its stated purpose and so the agency could not validly deny Geller's petition to the agency to reexamine its order and repeal those portions that were not in the public interest.

42

Like Geller, South Hills challenges an agency decision, based not on the circumstances that the agency considered in promulgating its rule, but rather on subsequent events, here increased market competition that is allegedly a product of Congress's change in the Medicare reimbursement scheme. Like Geller, South Hills could not make a direct challenge to the agency regulation, as the agency record is no longer open for consideration of new facts, and South Hills does not contest this fact. The record in the informal agency action during which this disclosure regulation was promulgated was closed at the time the Secretary ended the notice and comment period. Since the record is closed, South Hills' attack on the regulation is untimely, unless it can demonstrate that circumstances have so changed since the rule-making that the original reasons for promulgating the regulation no longer exist or some equally compelling reason.

43

Such second generation challenges to agency regulations are permitted out of necessity. "[U]nlike ordinary adjudicative orders, administrative rules and regulations are capable of continuing application; limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity." Functional Music, Inc. v. FCC, 274 F.2d 543, 546 (D.C.Cir.1958), cert. denied, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959). Even where the challenging party participated in the original rulemaking proceeding, as in Geller, the events and circumstances that made the rule necessary may have disappeared, and with them the rationale for the regulation.

44

Normally, however, an agency may exercise "a generous measure of discretion respecting the launching of rulemaking proceedings," Geller, 610 F.2d at 979 (/opinion/372466/henry-geller-v-federal-communications-commission-and-united-states-of/). If this were not so, the statutory limits on judicial review of administrative rules would be undermined by the second generation exception, in violation of the structure of our government, which requires that agencies administer statutes, so long as they do it within the bounds of the

Administrative Procedure Act (APA) in the Act, Congress itself may intervene at any time to take Congressional action to repeal the statutory authorization for the HCFA regulation, or to seek amendment of the regulation to make it more compatible with present circumstances.

45

In this case, however, the question of whether the agency properly exercised its discretion is not properly before us. As this Court stated in Consolidation Coal Co. v. Donovan, 656 F.2d 910 (3d Cir.1981), "the rule of Geller has been applied only when the agency has finally acted to deny the petition for reconsideration or further rulemaking ...". Id. at 915 (emphasis added). The threshold obstacle to our consideration of South Hills' argument in this case is that it has not filed a Sec. 553(e) petition for rulemaking with the Secretary. We have examined South Hills' complaint to the district court and find that it is not a petition for review of an order by HHS refusing to reexamine the continuing validity of HCFA's Medicare cost report disclosure rule, see Geller, 610 F.2d at 978 (/opinion/372466/henry-geller-v-federal-communications-commission-and-united-states-of/), nor is it an appeal from a denial of a petition to eliminate specific regulations on demonstrable grounds of invalidity, see Geller, 610 F.2d at (/opinion/372466/henry-geller-v-federal-communications-commission-and-united-states-of/)978 (citing Functional Music ). Instead, South Hills's complaint states that it is appealing from a final agency decision by the Secretary to release its cost reports under the regulation. Nothing in the record indicates that the intervening providers have made any request related to rulemaking to the Secretary.10

46

Because a threshold requirement of seeking judicial review of an agency's refusal to undertake rulemaking is the filing of a rulemaking petition with the relevant agency, and because none of the appellants in this case have filed such a petition, we hold that the district court lacked jurisdiction to review the Secretary's enforcement of Sec. 401.135(c).

47

C. Appellants' Constitutional Arguments.

48

Finally, the appellants make constitutional arguments, which we find to be without merit. First, South Hills argues that as a consequence of the inconsistency between the disclosure regulation and FOIA's Exemption 4, the blanket disclosure rule for Medicare cost reports violates the due process clause of the fifth amendment to the constitution. The Hospitals argue that their property interest in commercial and financial information about their own institution and business affairs has been recognized and protected by Congress in FOIA's exemption 4, which HCFA has adopted in its regulations. These regulations, according to appellants, provide for disclosure of FOIA-exempted information only after consideration of certain enumerated factors. See 42 C.F.R. Sec. 401.126 (1988). The Hospitals further argue that, having recognized a property interest in the Medicare cost reports and having established procedures for its protections, the Secretary is in derogation of his constitutional obligation to provide equal process when he does not follow these established procedures in each instance of a request for a Medicare cost report. Appellants therefore assert that the Secretary's decision ordering release of their reports deprived them of property without due process of law. Relying on Board of Regents v. Roth, 408 U.S. 564 (/opinion/108608/board-of-regents-of-state-colleges-v-roth/), 92 S.Ct. 2701 (/opinion/108608/board-of-regents-of-state-colleges-v-roth/), 33 L.Ed.2d 548 (/opinion/108608/board-of-regents-of-state-colleges-v-roth/) (1972), appellants seek reversal of the agency's disclosure order and a remand of the case to the Secretary with instructions that he grant the hospitals the process they argue is due to them--an individualized hearing and a reconsideration of the regulation in light of changed circumstances.

49

Appellants have cited no authority to support their claim that they have a property interest in the information in their cost reports, and, as the property interest has not been demonstrated, we decline to reach the subsequent question of whether they have been granted sufficient process in the taking of this asserted property right.

50

Next, appellants argue that 42 C.F.R. Sec. 401.126(c) requires the agency to consider its obligation of confidentiality before releasing a Medicare cost report to a requestor, and that the Secretary, by failing to conduct the required inquiry, deprived the hospitals of due process of law. This argument fails because, as we have stated, nothing in the regulation cited by the hospitals prohibits the disclosure of Medicare cost reports pursuant to Sec. 401.135(c).

51

IV. Conclusion.

52

For the foregoing reasons, we will affirm the judgment of the district court that 42 C.F.R. Sec. 401.135(c) is not inconsistent with other applicable regulations and that its application does not violate the due process clause of the constitution. We find that the question of whether the regulation is arbitrary and capricious was not properly before the district court. Accordingly, to the extent that the district

court's order holding that a valid ~~the regulation met the standard~~ vacated and this order demands for dismissal.

*

Honorable Daniel H. Huyett, 3rd, United States District Judge, sitting by designation

↵ 1

The HCFA actually obtains the information indirectly, through fiscal intermediaries. 42 C.F.R. Sec. 413.20 (1987). The providers in this case submit annual reports to Blue Cross of Western Pennsylvania, which has custody of the reports at issue, and was named as a defendant in this case. As the Secretary of Health and Human Services is the only real defendant in interest, however, it is the only defendant to have filed briefs. See 42 C.F.R. Sec. 421.5(b) (1983)

↵ 2

The regulation states:

Sec. 401.135 Release of Medicare information to the public.

The following shall be made available to the public under the conditions specified:

* * *

(c) Upon request in writing, cost reports submitted by the providers of services pursuant to section 1815 of the [Social Security] Act to enable the Secretary to determine amounts due to providers.

↵ 42

C.F.R. Sec. 401.135 (1975)

↵ 3

Under this provision, "trade secrets and commercial or financial information obtained from a person and privileged or confidential" are exempt from mandatory disclosure to FOIA requesters. 5 U.S.C. Sec. 552(b)(4) (1983)

↵ 4

This statute provides for judicial review of administrative actions, and in relevant part states:

Sec. 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

* * *

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,

5 U.S.C. Sec. 706 (1983).

↵ 5

Five other intervening hospitals, Nesbitt Memorial Hospital, Pocono Hospital, St. Joseph's Hospital, and Divine Providence Hospital, and Lewistown Hospital, initially joined the appeal but have withdrawn

↵ 6

This provision states, in pertinent part:

Sec. 1306. Disclosure of information in possession of Department of Health and Human Services ...

(a) Disclosure prohibited; exceptions

No disclosure of any ... report ... obtained at any time by the Secretary ... or by any officer or employee of the Department ... in the course of discharging their respective duties under this chapter ... shall be made except as the Secretary ... may by regulations prescribe.

42 U.S.C. Sec. 1306(a) (1983).

↵ 7

Stretch concerned extended care facility survey reports that informed the Secretary about the performance of nursing and old age homes. Our reasoning in that case, however, is also applicable to hospital reports

Moreover, we reasoned that Sec. 1306(a) could not be an Exemption 3 withholding statute since it provides no "standards or guides through which legislative judgment would be reflected in the making of administrative exemptions." Stretch, 495 F.2d at 640. After our ruling in Stretch, the Congress amended 5 U.S.C. Sec. 553(b)(3) to explicitly exclude as exempting statutes those statutes that permit wholly discretionary withholding of requested information. The final Conference Committee Report expressed agreement with our view that 42 U.S.C. Sec. 1306(a) does not fall within Exemption 3. See H.R.Rep. No. 1441 (Conf.), 94th Cong., 2d Sess. 25-26, reprinted in 1976 U.S.Code Cong. & Admin.News 2183, 2244, 2260-2261

↵ 9

This regulation provides that the following materials are exempt from disclosure by statute and should not be disclosed:

... (b)(1) Reports described in sections 1106(d) and (e) of the Social Security Act shall not be disclosed, except in accordance with the provisions of sections 1106(d) and (e). Sections 1106(d) and (e) provide for public inspection of certain official reports dealing with the operation of the health programs established by titles XVIII and XIX of the Social Security Act (Medicare and Medicaid), but require that program validation survey reports and other formal evaluations of providers of services shall not identify individual patients, individual health care practitioners, or other individuals. Section 1106(e) further requires that none of the reports shall be made public until the contractor or provider whose performance is being evaluated has had a reasonable opportunity to review that report and to offer comments. See Sec. 401.133(b) and (c);

(2) Disclosure of materials described in section 1865(a)(2) of the Social Security Act as amended, is prohibited. Section 1865(a)(2) provides for release by the Joint Commission on the Accreditation of Hospitals (JCAH) to the Secretary (or a State agency designated by him) on a confidential basis accreditation surveys made by JCAH, if the hospitals authorize such release. Materials which are confidential under this provision include accreditation letters and accompanying Recommendations and Comments prepared by the JCAH concerning hospitals surveyed by it; and

(3) Tax returns and return information defined in section 6103 of the Internal Revenue Code, as amended by the Tax Reform Act of 1976, shall not be disclosed except as authorized by the Internal Revenue Code.

(c) Effect of exemption. Neither 5 U.S.C. 552 nor this regulation directs the withholding of any record or information, except to the extent of the prohibitions in paragraph (b) of this section. Except for material required to be withheld under the statutory provisions incorporated in paragraph (b) of this section or under another statute which meets the standards in 5 U.S.C. 552(b)(3), materials exempt from mandatory disclosure will nevertheless be made available when this can be done consistently with obligations of confidentiality and administrative necessity. The disclosure of materials or records under these circumstances in response to a specific request, however, is of no precedent force with respect to any other request.

↵ 42

C.F.R. Sec. 401.126(b) (1988)

↵ 10

We have also considered whether we should treat, sua sponte, South Hills' request to the HCFA to reevaluate the FOIA regulations in the context of making a decision about whether to release South Hills's cost reports, discussed at Appellant's Appendix at 59A, as a 553(e) request for a reconsideration of a rule. We find that South Hills' request was too situation specific and too informal to constitute a 553(e) request. There is no record in this case of any communication between the intervening hospitals and the HCFA, much less any record of a rulemaking petition filed by any one of the interveners with the Secretary

↵