Dana J. Oliver, Esq. (SBN: 291082)
dana@danaoliverlaw.com
OLIVER LAW CENTER, INC.
8780 19th Street #559
Rancho Cucamonga, CA 91701
Telephone: (855)384-3262
Facsimile: (888)570-2021

*Local Counsel for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARK AUSSIEKER**, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>**OMID AGHAZADEH d/b/a "GOLDEN CAPITAL HOLDINGS"**<br><br>*Defendant.* | Case No. 2:25-cv-00888-TLN-AC<br><br>**PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATIONS** |

**INTRODUCTION**

Plaintiff respectfully files his objections to Magistrate Judge Claire's Findings and Recommendations, which recommend dismissing the entire case, with prejudice, under Rule 12(b)(6) of the FEDERAL RULES OF CIVIL PROCEDURE. For the reasons that follow, the Plaintiff respectfully submits that Defendant has not met its burden in demonstrating that dismissal is warranted on the basis that the subject communications were not telephone solicitations, even viewed in the light most favorable to the Plaintiff and with all factual inferences in the Plaintiff's favor. The Plaintiff further respectfully submits that the Magistrate erred in holding that the Plaintiff's claims here did not constitute telephone solicitations as a matter of law.

The subject Findings and Recommendations recommend dismissing this TCPA case at the pleadings stage on the premise that Defendant's messages were mere "offers to buy" Plaintiff's home and therefore not "telephone solicitations" as required under the TCPA. Respectfully, that conclusion rests on drawing inferences against the well-pled allegations in the Complaint and resolving factual disputes about the messages' purpose at the 12(b)(6) stage, in addition to creating a carve-out that cannot be squared with Ninth Circuit authority holding that the "purpose" inquiry looks to what the challenged communication sought to get the called party to do, not how the caller labels itself or even what was said on the call. That mode of analysis reverses Rule 12(b)(6). It draws inferences against the Complaint and resolves the dispositive "purpose" question in Defendant's favor. It also rests on a flawed and incomplete legal analysis, as well.

The pleaded facts are straightforward: a telemarketer using fictitious business names, including "Yuna Homes" and "Golden Capital," blasted out automated texts to numbers on the National DNC Registry touting "options to sell" property through connections to a "group of

investors." In reality, the messages were inviting homeowners to engage Defendant to "give a proposal," at which point Defendant would draft a putative purchase contract for the sale of the message recipient's property, attempt to resell that contract to potential buyers for a cost, and then pocket that cost. In addition to constituting classic solicitations of services, those services, colloquially known as "wholesaler" services, are also regulated and restricted to licensed real estate brokers under California law. Implicit in this legal holding is the recognition that such services are the same type offered by real estate brokers, which courts have uniformly held that calls advertising such services constitute telephone solicitations. At the very least, whether the subject messages are brokerage or assignment solicitations, as opposed to simply a pure offer to purchase, is a disputed factual question not resolvable on a motion to dismiss. The F&Rs concede as much elsewhere by emphasizing that the "purpose" inquiry is dispositive under Ninth Circuit authority, but then resolves that very question against Plaintiff by adopting Defendant's characterization of the messages while discounting Plaintiff's contrary facts.

*De novo* review is warranted. The Court should reject the F&Rs' dispositive legal conclusion that real estate "wholesaler" texts of the kind alleged here are categorically outside § 227(c); hold that Plaintiff plausibly pleaded a DNC claim because the messages encouraged the recipient to procure Defendant's (illegal) brokerage/assignment services; and deny the motion to dismiss or, at minimum, grant leave to amend to add further factual detail.

## BACKGROUND AND FACTUAL ALLEGATIONS

Mr. Aussieker has brought this action to enforce the consumer-privacy provisions of the TCPA alleging that Mr. Aghazadeh violated the TCPA by making telemarketing calls to Plaintiff and other putative class members listed on the National Do Not Call Registry without their written consent. *See* ECF No. 1 ("Complaint"). The Plaintiff is, and at all times mentioned herein

was, a "person" as defined by 47 U.S.C. § 153(39) and at no point did the Plaintiff consent to receiving telemarketing calls from the Defendant prior to receiving them. *Id.* at ¶¶ 14-15.

The Plaintiff's telephone number, 906-XXX-XXXX, is a residential, non-commercial telephone number used for personal and household reasons on the Do Not Call Registry. *Id.* at ¶¶ 16-17, 20. Plaintiff has never been a customer of Aghazadeh and never consented to receive calls or text messages from him or any of his fictitiously named entities. *Id.* at ¶ 21. Despite that fact, on November 4, 2024, the Plaintiff received a text message from 209-260-1663:

> Hello KIMBERLY, Came across your property in SACRAMENTO. Are you open to options to sell it?

*Id.* at ¶ 23. The Plaintiff then received another text message from that number after responding that he was not open to selling because there were people living in it.:

> Do you own the property at [NN ]A[XXXXX XXXX]?

*Id.* at ¶ 24. The Plaintiff continued to receive various text messages from the Defendant and from this telephone number asking to give a proposal on the Plaintiff's home and touted the services offered by the Defendant, using the fictitious names "Yuna Homes" and "Golden Capital." *Id.* at ¶ 25. Defendant openly brags on Instagram about engaging in a business called "real estate wholesaling," which consists of cold-calling people that are potentially interested in selling their house, cold-calling people that are potentially interested in buying the house, and brokering a deal for the property and pocketing the difference; the post has been deleted but counsel for Plaintiff has a saved copy. *Id.* at ¶ 27. This activity requires a real estate broker license. CAL BUS. & PROF. CODE § 10131. *Id.* at ¶ 28. Defendant does not possess a real estate broker license. *Id.* at ¶ 29. Defendant has stated on Instagram that he made over $750,000 last year by engaging in such illegal real estate transactions without a license and boasts of using an automated system to send as many as 25,000 text messages per day. *Id.* at ¶ 30. Defendant also brags about using automated "SMS drips" to "maximize marketing" and invites Instagram viewers to watch a six-hour "sales call marathon." *Id.* at ¶ 31.

The aforementioned calls and text messages were all made seeking to solicit the Plaintiff to use the Defendant's services in the sale of a home, as well as ancillary services like connecting the Plaintiff to "investors in the SACRAMENTO area that are actively seeking to buy homes" as-is. *Id.* at ¶ 33. By Defendant's very own admission in the messages, Defendant advertises that he will connect the Plaintiff to investors interested in purchasing the property, and pocket the difference in price, that is, collect an illegal real estate commission. *Id.* at ¶ 34. *Based on Defendant's own admissions*, in exchange for providing these brokerage services, Defendant pockets the difference in the sales and purchase prices. *Id.* at ¶ 35. As a result, Defendant acts as and performs much the same services as a real estate agent for a commission. *Id.* at ¶ 36.

## LEGAL STANDARD

Under the Federal Magistrates Act, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party objects to a magistrate judge's findings and recommendations, "the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; FED. R. CIV. P. 72(b)(3). For those portions of a magistrate judge's findings and recommendations to which no objections are filed, there is no requirement that the district judge review the Magistrate's report. *Thomas v. Arn*, 474 U.S. 140, 152 (1985). However, as with all matters, the district judge may *sua sponte* review the Magistrate Judge's report under a *de novo* or any other standard. *Id.* at 154.

"The Ninth Circuit is particularly hostile to motions to dismiss under Rule 12(b)(6)." *Matthews v. Mid City Cannabis Club, Inc.*, No. CV 20-07841 PA (JPRx), 2021 WL 1567496, at *2 (C.D. Cal. Mar. 2, 2021). Indeed, as the Ninth Circuit has noted, "[t]he Rule 8 standard contains a powerful presumption against rejecting pleadings for failure to state a claim." *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). The requirement that a plaintiff "show"

that he or she is entitled to relief means that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). A complaint may be dismissed only where it appears that there are not "enough facts to state a claim that is plausible on its face," not merely because the defendant proffers some contrary facts. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Of course, all factual inferences and evidence must be drawn in the Plaintiff's favor and all the Plaintiff's factual allegations treated as true.

## ARGUMENT

1. <u>The Magistrate erred in holding that the messages Plaintiff received were not telephone solicitations based on a disputed analysis of the messages' purpose.</u>

When evaluating a Motion to Dismiss under Rule 12(b)(6), the Supreme Court's familiar *TwIqbal* standard requires a court to accept factual allegations as true and to draw all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555–56. The Ninth Circuit, in explaining Rule 8's requirements, has long emphasized a "powerful presumption against rejecting pleadings for failure to state a claim." *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). The question is *plausibility*, whether the facts alleged allow the court to draw a reasonable inference that the calls may be telephone solicitations to permit a "purpose" analysis, *not* whether the defendant proffers an alternative account.

Whether a message was sent "for the purpose of encouraging" the purchase of goods or services is quintessentially fact-intensive. *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2013). Here, Plaintiff's facts as pled describe messaging that touted "*options*," plural, to sell a home. Thus, on face, it was erroneous for the magistrate judge to conclude that the only "option" offered in the messages was a pure offer to purchase. To be sure, just as in *Chesbro*, one such "option" may involve nothing solicitous at all: a "pure" offer to buy a home, as

admitted by the text of the messages in *Coffey*, or simply redeeming rewards points for an item whose value is less than that of the points, as in *Chesbro*. But such "options" also include, and the Plaintiff pled in his Complaint that they did in fact include, options to engage in what is, in essence, an (illegal) contract writing, arbitrage, and consignment service, just as spending the points on an item that required an outlay of both points and money, as in *Chesbro*. And another such option might involve simply listing the property with a realtor.

The industry calls this practice "wholesaling." As will be explained below, the State of California considers it illegal. Given that the messages also reference a "group of investors," it is at least plausible that Defendant is offering the service of introducing call recipients to that "group" of investors he has curated, negotiate and draft a contract, and then negotiate the sale of the contract and other purchase particulars with any potentially interested investors: those are services that profit from intermediation. And the allegations in the Complaint thus plausibly support the inference that the messages sought to encourage the Plaintiff to purchase and invest in the Defendant's services. The F&Rs' approach, analyzing the purpose of the messages purely on their explicit content and concluding that they were a "pure purchase" context, while at the same time appearing to misapprehend the nature of real estate wholesaling, attempted to resolve that very dispute at the pleadings stage. That was error because it ran contrary to the Ninth Circuit's counsel in *Chesbro*, which recognized that the analysis is fact-intensive, and that the purpose of the call need not be stated on the call itself.

The Court may determine at the Rule 12(b)(6) stage as a matter of law whether an offer to buy property constitutes a solicitation under the TCPA. However, whether the communication was actually an offer to buy (as Defendant claims) or was instead a disguised attempt to solicit real estate-related services (as Plaintiff alleges), is a disputed factual issue. Such factual disputes

must be resolved by a jury or through later procedural stages after discovery, not at the motion to dismiss stage. Even on its own terms, *Coffey* involved a pure purchase inquiry. The caller identified himself as a "home buyer," asked if the recipient had "given up on selling," and did not pitch services. Here, the pleadings are different. The messages touted "options to sell," promise a "proposal," and invoke a network of "investors," all consistent with a contract wholesaling, as opposed to homebuying, business model. On a motion to dismiss, those well-pleaded facts must be credited. At minimum, whether these messages were a service solicitation rather than a pure offer to buy is a fact question under the Ninth Circuit's purpose test.

Indeed, the F&Rs run contrary to good principles of contractual interpretation, as well. The messages lack the hallmarks of a legal "offer" to purchase or even an invitation to deal. Instead, they read as solicitations to engage in a wholesaling process for services managed by Defendant. A true contractual or quasi-contractual offer manifests a present intent to be bound on definite terms, for example, "I am interested in buying your house. I will pay $300,000 for it." By contrast, statements like "Are you open to options to sell it?," "we can give you a proposal," and offering to "connect" the plaintiff to "investors in the SACRAMENTO area" are classic solicitations for a service. By contrast, in *Coffey*, the plaintiff explicitly *conceded* that the purpose of the call was to buy a house and that it was merely a pretextual solicitation for services. Plaintiff here alleges no such pretext.

The absence of a concrete price, buyer identity, timeline, or contingencies confirms the interlocutor's role a provider of services though which real estate transactions are facilitated, not a party to a potential real estate buying transaction. In fact, it shows that the Defendant is not the actual buyer of the property and is working with other people on the buyer's behalf to sell it, and thus providing a service. Brokers and realtors also ask people if they want to sell their homes. It

is a logical fallacy to conclude that asking if someone is interested in selling equates to that person being the buyer. *Chesbro* counsels that courts will look past labels to the actual function of the messages themselves, and here the function was plainly to solicit the provision of services. By contrast, cases finding no solicitations, such as the survey calls in *Orea* or the blood plasma calls in *Murphy*, involved communications that sought to extract something from the recipient for the caller's own use and did not ask the recipient to procure services. Defendant's messages asked Plaintiff to procure Defendant's services and were not an offer.

The F&Rs correctly noted that the Court could not consider Defendant's attachments on a Rule 12(b)(6) motion and therefore looked only to the pleadings. Having done so, it should not have then adopted Defendant's unsworn view of what the messages *really* meant, while at the same discounting Plaintiff's allegations that the Defendant was operating a contract drafting, consignment, and arbitrage service. Rule 12(b)(6) demands the opposite approach. Taken as true, the pleadings allege a real-estate wholesaling service pitch, that is, an inducement to engage Defendant's contract brokerage services. The Ninth Circuit's *Chesbro* purpose test and the FCC's regulations easily encompass that conduct. At minimum, whether these were "pure" purchase inquiries or service solicitations is a factual dispute not suitable for Rule 12(b)(6). The Court should reject the F&Rs and deny dismissal, or allow amendment.

2. <u>The Magistrate also erred in holding that real estate wholesaling is not a solicitation as a matter of law.</u>

In arriving at the conclusions in the F&Rs, Magistrate Judge Claire also held that, as a matter of law, that the practice alleged here, that of real estate *wholesaling*, unlike the pure *offer* to purchase in *Coffey v. Fast Easy Offer*, did not constitute a telephone solicitation as a matter of law. In this respect, the Court appears to have misapprehended the Plaintiff's argument. The Plaintiff did not argue, as did *Coffey*, that because someone makes money from offering to buy a

- 8 -
OBJECTIONS TO FINDINGS AND RECOMMENDATIONS
*Aussieker v. Aghazadeh*

home, and then "flips" it for a profit, that the call was a telephone solicitation. Rather, the Plaintiff's complaint alleges a different scheme entirely: the Defendant does not purchase the recipient's house at all. Rather, the Defendant offers to represent the call recipient in the drafting of a real estate contract and then offers their services and connections to "shop around" that contract to people who are interested in purchasing the *contract* providing for the sale of a home, and then pocketing the difference. In any event, as will be explained below, the *Coffey* court, and the Magistrate Judge here, erred by focusing on the fact that the plaintiff "would still be making money" and "not spending a cent on purchasing any goods or services." This profitability analysis is legally irrelevant. A person can "purchase" services and still receive money in return, for example, by compensating a realtor through a commission deducted from sale proceeds or a lawyer through a contingent fee on any recovery. The legally significant act is offering a service.

The FCC's definition sweeps in the definition of a "telephone solicitation" any call made "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(15). This definition empowers consumers to stop unwanted telemarketing across the board, and does not simply cabin the statute to pure sales advertisements. As the Ninth Circuit observed in *Chesbro*, a caller's purpose may not always be ascertainable on the text of the call, and a measure of common sense and factual inquiry is necessary to determine if a call is a solicitation. 705 F.3d at 918. The call is a "telephone solicitation," whether the caller urges the recipient to buy a vacuum, to sign a listing agreement with a realtor, or to hire a home-selling concierge. In essence, the Plaintiff alleged that the Defendant was operating as an unlawful real estate broker under California law, and thus encouraging call recipients to purchase his services, rendering the messages telephone solicitations as a matter of law.

In this respect, the F&Rs pay insufficient heed to California law, which codifies what common sense already supplies. A "real estate broker" includes a person who "solicits prospective sellers," "solicits or obtains listings," "negotiates the sale [or] purchase," or "sells or offers to sell, buys or offers to buy, or exchanges or offers to exchange a real property sales contract." CAL. BUS. & PROF. CODE § 10131(a), (e). The Plaintiff's complaint, as well as subsequent briefing on the matter, made clear that the Defendant's entire business model revolves around the drafting, exchange, and shopping around of real property sales contracts. California courts distinguish a mere "finder," who can introduce parties, or a pure buyer, from someone who negotiates, advises, or otherwise helps conclude a sale; the latter is a broker requiring licensure. *Tyrone v. Kelley*, 507 P.2d 65, 70 (Cal. 1973); *Venturi & Co. LLC v. Pac. Malibu Dev. Corp.*, 172 Cal. App. 4th 1417, 1421, 92 Cal. Rptr. 3d 123, 127 (Cal. C.A. 2nd Dist. Div. 8, 2009). Plaintiff's allegations describe exactly those activities: Defendant's texts prime the homeowner to receive a "proposal," connect to "investors," and then sign paperwork that Defendant drafts, shops around, and then assigns for a spread. That is solicitation of services, because it is no different than the work of a real estate broker, as California law recognizes.

It was thus error for the Magistrate to dismiss the Plaintiff's allegations in this regard as "unrelated to the TCPA claim." To be sure, the Plaintiff does not seek to assert a right of action for violations of the Business and Professions Code. However, the Plaintiff brought in these code provisions and case law to show what the Defendant is alleged to have done is no different than a real estate broker, given that such activities are brokerage activities requiring a license under the law. But those facts bear directly on *purpose* and plausibility of the same: they explain *what* Defendant was selling (brokerage/assignment services), *how* he makes money (by receiving an option premium from the actual purchasers of the contract), and *why* he blasts out automated

texts under fictitious names to numbers on the DNC Registry (volume marketing of services to get as many contracts as possible without regulatory oversight). The Court need not and was not asked to adjudicate a licensing violation to consider these facts as context for what the telemarketing sought to accomplish.

And there exists a wealth of authority and TCPA-specific case law holding that real estate brokers who call to offer to list and sell property, and are thus subject to brokerage licensing requirements, *do* make telephone solicitations subject to the TCPA. *E.g.*, *In Re Rules and Regs*, 20 F.C.C. Rcd. 3788, 3793 (F.C.C. 2005) ("[W]e clarify that a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner."); *Valdes v. Century 21 Real Est., LLC*, No. CV 2:19-05411, 2019 WL 5388162, at *1 (D.N.J. Oct. 22, 2019); *Pepper v. GVG Cap. LLC*, No. CV H-22-2912, 2023 WL 205297, at *2 (S.D. Tex. Jan. 17, 2023). The licensing facts go to the very heart of what the messages sought to induce, the engagement of unlicensed brokerage services. They also explain why the outreach is conducted via mass automated texts under shifting fictitious names, a hallmark of volume wholesaling services, rather than *ad hoc* offers to purchase. Given that Defendant is no different than a broker simply operating without a license, it was error for the Magistrate to conclude that the scheme described here, in essence, a solicitation for brokerage services, was not a telephone solicitation as a matter of law.

The Magistrate also erred in rejecting the argument, as did the *Coffey* court, that the calls were not solicitations because the homeowner "pays nothing" because the spread in the contract wholesaling comes out of the negotiated contract resale price. That is legally irrelevant. First, that analysis ignores the key distinction between a house flipper and a contract wholesaler. The Plaintiff does not argue, as in that case, that the messages were "a pretextual attempt to

encourage [him] to sell [his] home through [Defendant], to [Defendant's] pecuniary benefit." *Coffey v. Fast Easy Offer LLC*, No. 24-cv-02725-PHX-SPL, 2025 WL 1591302, at *3 (D. Ariz. June 5, 2025). A house flipper, like Fast Easy Offer, provides no services to the home seller, the call recipient. It simply buys the house at a reduced price, fixes it, and then resells it under its own name. Any money it makes is far removed from the purchase act itself. By contrast, a wholesaler is simply a real estate broker of a different color. Instead of listing a property on the MLS, it "lists" a signed contract it drafted for the sale of a house to a "group of investors," who will agree to purchase the favorably-drafted contract for a certain sum (say, $5,000). The wholesaler will then sell the contract, and often provide additional services to ensure the deal goes through. In essence, instead of listing a house, a wholesaler lists a *contract* for a house.

As California law recognizes, that is a distinction without a difference. A wholesaler provides services. A buyer does not. In *Coffey*, unlike here, the caller identified himself as a "home buyer." That distinction matters. The Plaintiff here does not argue or rely that an offer to buy a house was simply and "in reality a solicitation for a service." In other words, Plaintiff did not argue that the solicitations were pretextual. To the contrary, the Defendant's entire pled business model makes clear that the Defendant was offering services all along. Nor is it relevant that the wholesaler pockets the brokerage fee instead of charging it to the call recipient, as explained above. A buyer's making money off a property it flips and resells is not necessarily intertwined with the act of actually making money by an offer to purchase itself. By contrast, a wholesaler selling a home purchase contract, just like a realtor selling a house, is intertwined with the "purchase" act, and makes money off the purchase itself, and is thus providing its services in that context. Defendant here only makes money, a commission, if an interested buyer comes forward and wishes to purchase the contract, just as a realtor only makes money, a

commission, if an interested buyer comes forward and wishes to purchase a property. Those acts are enmeshed with the purchase and sales acts themselves, unlike in the case of a "buy and flip."

Courts routinely treat such structures as payment for services even when not directly charged to the call recipient. *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 209-210 (S.D.N.Y. 2024) ("Defendant's offer to represent Plaintiff clearly qualifies as an offer of services. . . . Courts have straightforwardly held that a person who is solicited to pay a portion of his ultimate sales price to an agent in exchange for listing services has purchased a service."). Indeed, the statutory definition's inclusion of "investment in" "services" captures precisely this scenario: the homeowner is induced to invest in the wholesaler's contract arbitrage services and is precluded from attempting to sell the house elsewhere as it has already incurred a contractual obligation, with the wholesaler compensated through the eventual price paid for the contract it has negotiated. The Magistrate erred in determining that the messages here were offers to buy as a matter of law, as opposed to an offer for specific contract and wholesale services.

This Court is bound by *Chesbro*'s purpose framework, not by another district court's narrower lens. The analysis here is fundamentally flawed if Defendant's true intent was to solicit an assignment-based transaction rather than purchase the property outright. Such intent transforms the call from a mere offer to buy into a commercial solicitation for services, precisely the conduct regulated by the TCPA. To the extent *Coffey* is read to adopt a categorical "offers to buy property are never solicitations" rule, it conflicts with *Chesbro*'s instruction to evaluate purpose, what the message seeks to get the recipient to do. And here, the purpose was to engage the Defendant to provide contract wholesaling and arbitrage services. Even on its own terms, *Coffey* concerned a "pure" purchase inquiry involving messages such as "Have you given up on selling your property?" Indeed, the defendant in *Coffey* identified himself as "Yannick the home

buyer" and did not offer any services *at all*. *Coffey*, 2025 WL 1591302, at *1. And the website at issue in that case offered to "buy houses for cash." *Id.* There, dismissal turned on the absence of any allegation that the messages asked the recipient to purchase anything or engage in any services whatsoever, unlike here. Here, by contrast, Plaintiff alleges that messages touted "option*s* to sell," promised a "proposal," and described a network of "investors," all in service of Defendant's contractual drafting and assignment wholesale model. Those facts plausibly allege a solicitation for services no different than an agent offering to ghostwrite a novel.

What's more, the phrasing used here, "options," "proposal," and "investors," is consistent with a services pipeline providing option*s* (plural) and connecting the party to investor*s* (plural). Thus, the F&Rs' conclusion that there is "no appreciable difference" between the messages here and the generic "have you given up on selling?" messages in *Coffey* ignore both context and word choice and appears to fail to appreciate the legally significant distinction between an offer of services and a pure offer to purchase property. The F&Rs' "Nonetheless" analysis of Judge Logan's opinion misses the point. Words like "options" and "proposal" are *service* verbs. They speak to what the Defendant will *do* for the caller recipient, not what the Defendant will pay the homeowner for their property, nor do they intimate as much.

3. Leave to amend is warranted.

If the Court concludes that more detail would be helpful, amendment would cure any perceived deficiencies. With amendment, the Plaintiff would more fully and completely allege the nature of the Defendant's services, including by reference to the Defendant's own marketing materials and Instagram page, where the Defendant *himself* advertises a sales call marathon. The Plaintiff would allege public records showing that Defendant never actually purchased a property, unlike Fast Easy Offer, who had closed on at least 100 houses in Maricopa County and

had a physical presence in the area. The Plaintiff would also include additional allegations showing how the Defendant holds himself out as and how Defendant describes his own business practices, as a high-volume contractual drafter and wholesaler, not as an actual buyer of property or even a flipper. Moreover, the Defendant also has marketing and other materials that describe high-volume automated outreach, including the provision of SMS drips and tens of thousands of daily texts, that are inconsistent with the homebuying process, as Defendant simply would not have the actual requisite capital necessary to make or follow through on so many offers to purchase actual homes. Rule 15 is liberal, and it compels allowing leave to amend.

Moreover, to the extent the F&Rs reach the class allegations, striking them now would be improper, as well. The Ninth Circuit disfavors Rule 12(b)(6) and Rule 12(f) attempts to pre-adjudicate class issues without a record. *See, e.g.*, *Mattson v. New Penn Fin., LLC*, 2018 WL 6735088, at 2 (D. Or. Nov. 6, 2018). This is especially true in TCPA cases, where common issues permit classwide adjudication. In the event the Court rejects the Magistrate Judge's Findings and Recommendations, it should likewise deny Defendant's incorporated motion to strike.

## CONCLUSION

For the foregoing reasons, the Court should overrule Magistrate Judge Claire's Findings and Recommendations and deny the Motion to Dismiss.

Dated: August 15, 2025

*s/Andrew Roman Perrong*
Andrew Roman Perrong (*Pro Hac Vice*)
a@perronglaw.com
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, PA 19038
215-225-5529
Lead Attorney for Plaintiff and the Proposed Class

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all parties of record on the case.

Dated: August 15, 2025

                                      <u>*s/Andrew Roman Perrong*</u>
                                      Andrew Roman Perrong
                                      (*Pro Hac Vice*)
                                      a@perronglaw.com
                                      Perrong Law LLC
                                      2657 Mount Carmel Avenue
                                      Glenside, PA 19038
                                      215-225-5529
                                      Lead Attorney for Plaintiff and the Proposed Class